3

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 0 2003

Michael N. Milby
Clerk of Court

| | § | |
|---|---|---|
| SALVADOR ACOSTA and | § | |
| RIGO DE LA ROSA | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. B-03-041 |
| SANTA MARIA INDEPENDENT | § | |
| SCHOOL DISTRICT, and employees, | § | |
| agents, and all those acting in concert | § | |
| or at their discretion | § | |
| | § | |

## DEFENDANT SANTA MARIA INDEPENDENT SCHOOL DISTRICT'S
## RULE 12(f) MOTION TO STRIKE
## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION
## AND MOTION FOR SANCTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW, SANTA MARIA INDEPENDENT SCHOOL DISTRICT,** Defendant

in the above-styled and numbered cause and files and serves this its Motion to Strike Plaintiffs'

First Amended Original Petition pursuant to Rule 12(f) of the Federal Rules of Civil Procedure

and Motion for Sanctions, and would show unto the court the following:

### I.

### STATEMENT OF THE CASE

1.      Plaintiffs filed their Original Petition on July 3, 2002 in the 357th Judicial District

Court of Cameron County, Texas alleging that they were terminated for political reasons and due

to reporting of illegal activities as alleged in in Section IV of their Original Complaint,

*"Constitutional Cause of Action -- Free Speech & Freedom of Association."*    See ***Plaintiffs'***

***Original Petition, Exhibit "1"*** attached hereto.    Plaintiffs further state in Paragraph V of

Plaintiffs' Original Petition:

> ***Plaintiffs hereby give notice to all that they only allege state claims in this suit***
> ***and specifically exclude, and do not intend to litigate herein, any federal cause***
> ***of action.*** *The only causes of action that they intend to litigate in this Court are*
> *those concerning rights arising under the laws of the sovereign State of Texas.*
> ***Plaintiffs' Original Petition***, Paragraph V. — Exclusion of Federal Claims, [emphasis
> added] **(Exhibit "1")**

2.    On the claims of the Plaintiffs in their Original Petition, the parties have conducted

discovery and Defendant has taken the plaintiffs' depositions.  Trial was scheduled in the 357th

Judicial District Court on April 7, 2003.  Defendants have prepared their defense of Plaintiffs'

claims, and in a good faith effort attempted to resolve the Plaintiffs' claims through a settlement

offer which was declined.

3.    On or about February 7, 2003, Defendants filed their Motion for Summary

Judgment seeking dismissal of all of Plaintiffs' claims.

4.    On or about February 11, 2003, approximately two months prior to trial, Plaintiffs

filed their First Amended Original Petition which included claims arising under federal law,

including claims premised loosely under the U.S. Constitution and other new theories of liability

arising under Texas law.  See ***Plaintiffs' First Amended Original Petition*** **(Exhibit "2")**

5.    Defendants would show that Plaintiffs' First Amended Original Petition constitutes

unfair and unwarranted surprise in this matter, and has been filed at the "eleventh hour" as a means

of avoiding the merits of Defendants' Motion for Summary Judgment.

6.    Plaintiffs' depositions have been taken in this matter on December 4, 2003, based on the pleadings asserting no federal claims, and therefore Defendants had no reason to seek deposition testimony with which to challenge such claims. It defies credibility that the timing of Plaintiffs' "change of heart" regarding federal causes of action and other new theories of liability is coincidental.

7.    Plaintiffs' First Amended Original Petition, paragraph IV, asserts for the first time causes of action under both the United States and State Constitution. By correspondence to Plaintiff by defense counsel dated December 10, 2002, and orally on several occasions, Defendant raised the fact that under Plaintiffs' present petition, the only remedy was equitable relief.

> *Your lawsuit raises a sole cause of action under the Texas Constitution of discrimination based on political association.*
>
> *I am aware of no authority in the State of Texas for back wages under the Texas Constitution. Even back wages that have been alleged in the form of injunctive relief are not recoverable under the constitution. As you know, the Texas Supreme Court in the City of Beaumont v. Bullion, 896 S.W.2d 143 (Tex. 1995) provided that there was no right of action for damages arising under the free speech and free assembly provisions of the Texas Constitution. Numerous cases since then have likewise held the same. In Jackson v. Houston I.S.D., 994 S.W.2d 396, 400 (Houston 14th Dist. 1999), the court specifically held that back wages pled as injunctive relief were not allowed under the Constitution.*
>
> *Should you have other authority to the contrary, please advise me immediately so that we can schedule a mediation. However, based on your position that Mr. Acosta would only return to his job if back wages were awarded, I see no point in mediating this case at this time.*
>
> **Correspondence of December 10, 2002 to Plaintiffs from Defendant, ¶¶2, 3, and 4** [emphasis added], (attached hereto as **Exhibit "3"**).

See also correspondence to Plaintiff dated  January 23, 2003 (**Exhibit "4"**) and correspondence dated January 28, 2003, to Plaintiff (**Exhibit "5"**) relating to an offer of settlement.  The attached Exhibits "4" and "5" were both attached to Defendant's Motion for Summary Judgment.

8.    Additionally, in paragraph V and VI of Plaintiffs' First Amended Original Petition (**Exhibit "2"**), Plaintiffs raised for the first time a breach of contract claim and primary estoppel claims.  During the depositions of Salvador Acosta taken on December 3, 2002, questions were asked of Plaintiff and his counsel whether Plaintiff was asserting any claims for breach of contract, given that Plaintiff had not appealed to the Texas Education Agency in that  the  hearing examiner's decision that Plaintiff was an at-will employee.

Page 80, 25    *Q.  I understand that, and in fact you had a whole*
Page 81  1  *hearing regarding whether or not you were a contract employee;*
     2  *is that right?*
     3    *A.  That's correct.*
     4    *Q.  And it was TEA's decision in the termination and*
     5  *determination that you did not have a contract, right?*
     6    *A.  From what I understand, yes, ma'am.*
     7    *Q.  In fact, I'll show you what we're going to mark as*
     8  *Exhibit No. 14, where the Hearing Officer concluded that.  And*
     9  *it is not an issue in your lawsuit whether or not you have a*
     10  *contract; is that correct?*
     11    *A.  My attorney --*
     12    *Q.  Well, you know, I need to know because otherwise I'm*
     13  *going to have to go into -- we're going to have to be here for*
     14  *several more hours to discuss whether or not that's an issue.*
     15       *And it was not, you did not appeal the decision*
     16  *of the TEA.  In fact, if you will look at the end of this, the*
     17  *hearing officer's recommendation was:  I hereby recommend that*
     18  *a written contract did not exist between the parties and this*
     19  *case be dismissed for lack of jurisdiction.*
     20       *Is that what the last sentence says on Exhibit*
     21  *14?*
     22    *A.  Yes, ma'am.*
     23    *Q.  Now, when you were terminated you appealed the*
     24  *termination to the board; is that right?*
     25    *A.  Right.*
**Deposition of Salvador Acosta, p.80, L.25 - p.84, L.25 (*Exhibit "6"*)**

> 19    *Q.    And you did not appeal the TEA's decision regarding*
> 20   *whether or not you had a contract, correct?*
> 21    *A.    Correct.*
> 22    *Q.    And you have not pled in your present lawsuit any*
> 23   *allegations regarding any breach of contract?*
> 24    *A.    Right.*
> 25    *Q.    **And is it your understanding you don't intend to?***
> *Page 85*
> 1    *A.    No.*
> 2    *Q.    **Is that correct?***
> 3    *A.    **That's correct.***
>
> *Deposition of Salvador Acosta, p.80, L.25 - p.84, L.25, emphasis added (**Exhibit** "6")*

9.    While a party does not need to seek leave to file an amended pleading seven days before trial, the right to do so is by no means unlimited where the amendment constitutes surprise and/or prejudice.  See Tex. R.Civ.P. 70 (permitting courts to assess costs associated with surprise pleadings and to *"make such other order with respect thereto as my be just"*; Tex.R.Civ.P. 63; Tex.R.Civ.P. 66.  See also ***Stevenson v. Koutzarov***, 795 S.W.2d 313, 321 (Tex. App. — Houston [14th Dist.] 1990, writ denied) (pretrial amendment adding causes of action should have been struck because it was not based on newly discovered matters).

10.    Defendant would further show that Plaintiffs' counsel has shown a pattern of first excluding federal claims of action in his petition and then waiting until a motion for summary judgment is on file before amending his cause of action to state federal claims of action.  See, Cause No. 2002-01-153-E, styled Norma Ortiz, et al vs. Brownsville Independent School District, et al, in the 357th Judicial District Court of Cameron County, Texas, removed to Cause No. B-02-184, U.S. District Court, Southern District at Brownsville, Texas.    See *Motion to Strike Plaintiffs' Third Amended Petition* filed in that case, a copy of which is  attached hereto as **Exhibit "7"** which was filed in that cause.

11.    For the foregoing reasons, Defendant requests that the Court strike the Plaintiffs' First Amended Original Petition as it constitutes surprise and the amendment asserts new causes of action, and, therefore, is prejudicial on its face. *Hardin v. Hardin*, 597 S.W.2d 347 (Tex. 1980) (if the amended pleading was a substantive change, on appeal, the burden is on the party who received the adverse ruling to show that the court abused its discretion); *State Bar v. Kirkpatrick*, 874 S.W.2d 656, 658 (Tex. 1994). Defendant further requests sanctions for the costs associated with the preparation of Defendant's Motion for Summary Judgment, the removal to federal court, and its Motion to Strike.

**WHEREFORE, PREMISES CONSIDERED,** Defendants pray that Plaintiffs' First Amended Original Petition be struck in its entirety and that such pleadings not be considered in conjunction with Defendant's Motion for Summary Judgment. Defendants further request such other and further relief to which they may be justly entitled, including costs associated with the preparation of Defendant's Motion for Summary Judgment, the removal to federal court,  and its Motion to Strike.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorneys for Petitioner

By _____
ELIZABETH G. NEALLY
Texas Bar No. 14840400
Federal Bar No. 8044

JEFFREY D. ROERIG
Texas Bar No. 17161700
Federal Bar No. 1503

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing **DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S RULE 12(f) MOTION TO STRIKE** has been mailed, Certified, Return Receipt Requested vis U.S. Postal Service to counsel of record, to wit:

Michael Pruneda
The Pruneda Law Firm
P. O. Box T
Pharr, Texas 78577

on this 2ᵒ day of February, 2003.

Elizabeth G. Neally

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | § § § § | |
| vs. | § § | CIVIL ACTION NO. _____ |
| SANTA MARIA INDEPENDENT SCHOOL DISTRICT, and employees, agents, and all those acting in concert or at their discretion | § § § § § | |

## ORDER SETTING HEARING ON
## DEFENDANT SANTA MARIA INDEPENDENT SCHOOL DISTRICT'S
## RULE 12(f) MOTION TO STRIKE
## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

Defendant Santa Maria Independent School District's Rule 12(f) Motion to Strike having been presented before this court, and the court is of the opinion that said motion should be heard.

**IT IS THEREFORE ORDERED**, Defendant Santa Maria  Independent School District's Rule 12(f) Motion to Strike is hereby set for hearing on the _____ day of _____, 2003 at _____ o'clock.

**SIGNED** this _____ day of _____, 2003.

_____
Presiding Judge

cc:    Michael Pruneda
       Elizabeth G. Neally
       Jeffrey D. Roerig

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SALVADOR ACOSTA and | § | |
| RIGO DE LA ROSA | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. _____ |
| SANTA MARIA INDEPENDENT | § | |
| SCHOOL DISTRICT, and employees, | § | |
| agents, and all those acting in concert | § | |
| or at their discretion | § | |

## ORDER GRANTING
## DEFENDANT SANTA MARIA INDEPENDENT SCHOOL DISTRICT'S
## RULE 12(f) MOTION TO STRIKE
## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

On this day came on to be considered Defendant Santa Maria  Independent School District's Rule 12(f) Motion to Strike, and the Court, after reviewing the file and hearing the argument of counsel, is of the opinion that said Defendant's Motion to Strike Plaintiff's First Amended Original Petition should be GRANTED.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Defendant Santa Maria  Independent School District's Rule 12(f) Motion to Strike is hereby GRANTED;

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiff's First Amended Original Petition against the Defendant SANTA MARIA  INDEPENDENT SCHOOL DISTRICT  be struck in its entirety.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that sanctions against the Plaintiffs in the amount of $_____ be paid to Defendant for its costs incurred as a result

of the Defendant's Motion for Summary Judgment, removal of the case to federal court, and this

Motion to Strike to be paid within _____ days from the hearing on this matter.

SIGNED FOR ENTRY this _____ day of _____, 2003.


_____
PRESIDING JUDGE

cc:    Michael Pruneda
       Elizabeth G. Neally

CAUSE NO. 2002-07-2652-E

| | |
|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | IN THE 357 DISTRICT COURT |
| | |
| V. | |
| | OF |
| SANTA MARIA INDEPENDENT SCHOOL | |
| DISTRICT *and employees, agents, and all those* | |
| *acting in concert or at their discretion* | CAMERON COUNTY, TEXAS |

FILED 12:00 O'CLOCK
AURORA DE LA GARZA DIST. CLER
JUL 0 3 2002
DISTRICT COURT OF CAMERON CITY, TEX
DEPUT

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME, PLAINTIFFS SALVADOR ACOSTA and RIGO DE LA ROSA (hereinafter referred to as "Plaintiffs"), complaining of SANTA MARIA INDEPENDENT SCHOOL DISTRICT and employees, agents, and all those acting in concert or at their discretion, (hereinafter called by name or referred to as "Defendant"), and for such causes of action shows unto the court the following:

### I.
### DISCOVERY LEVEL

The cause of action should be governed in accordance with Discovery Level 2 of the Texas Rules of Civil Procedure.

### II.
### PARTIES

Plaintiff, SALVADOR ACOSTA, is a resident of Cameron County, Texas.

Plaintiff, RIGO DE LA ROSA, is a resident of Cameron County, Texas.

Defendant, SANTA MARIA INDEPENDENT SCHOOL DISTRICT, is a governmental entity in Texas operating under color of law that can be served by delivering citation to its superintendent Al Hernandez at P.O. Box 448, Santa Maria, Texas 78592 or wherever found.

Venue is proper in Cameron County, Texas in that the acts made the basis of this cause of action occurred in Cameron County. Further, both Plaintiffs and Defendants are located within and/ or are residents of Cameron County, Texas.

### III.
### FACTUAL ALLEGATIONS

Plaintiffs were long-time loyal employees of Santa Maria I.S.D. that were dedicated and hard working employees. Despite Plaintiffs' performance, dedication, and efforts, Defendant failed to give Plaintiffs the opportunity to work free of political hostility, harassment, humiliation, and retaliation during their employment and continue in their positions. Ultimately, Plaintiffs were both

EXHIBIT
1

terminated for political reasons. Plaintiff De La Rosa was terminated on or about July 7, 2000 and Plaintiff Acosta was terminated on or about September 15, 2000.

Plaintiffs believe that following political changes on the Defendant's School Board, they were targeted by Defendant. Plaintiffs believe that the reasons given for their terminations were false and that that the true reasons were based on their political speech and associations.

As a result, Plaintiffs sue the Defendant for violation of their civil rights arising under the Constitution and laws of the sovereign state of Texas.

## IV.
## CONSTITUTIONAL CAUSE OF ACTION—
### *FREE SPEECH & FREEDOM OF ASSOCIATION*

Plaintiffs allege that the Defendant's actions were committed with a deliberate indifference and were arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory which resulted in the denial of the Plaintiffs' civil rights under and in violation of, *Article I, section 8* of the Constitution of the State of Texas. These acts that subjected Plaintiffs to the deprivations of rights guaranteed to all individuals the freedom of speech, political expression, political affiliation and association were unlawful in that they were based to an impermissible extent on Plaintiffs speech and association.

## V.
## EXCLUSION OF FEDERAL CLAIMS

Plaintiffs hereby give notice to all that they only allege state claims in this suit and specifically exclude, and do not intend to litigate herein, any federal cause of action. The only causes of action that they intend to litigate in this Court are those concerning rights arising under the laws of the sovereign State of Texas.

## VI.
## JURY TRIAL REQUEST

Plaintiffs request that a jury be convened in order that issues the basis of this lawsuit be tried.

## VII.
## ACTUAL DAMAGES

As a result of the incidents described above that are made the basis of this suit, Plaintiffs have suffered from an infringement of their civil rights. In all reasonable probability, Plaintiffs will continue to suffer such for a long time into the future, if not for the balance of their natural lives. Such injury will likely exist for the remainder of Plaintiffs' lifetime. Plaintiffs seek to recover all damages to which they may be appropriately entitled and the court deems proper.

## VIII.
## INJUNCTIVE RELIEF

The continuing nature of the denial of Plaintiffs' fundamental rights that arbitrarily and irrationally have been denied and will deny to Plaintiffs rights and entitlements under the laws described above, is resulting in immediate and irreparable harm to the Plaintiffs. Plaintiffs are therefore entitled to temporary and permanent injunctive orders restraining the Defendant from

continuing with such actions and future action. Additionally, Plaintiffs request that this court order a permanent injunction, based on the customary nature of the unlawful acts, that Defendant and employees, agents and all those acting in concert with them or at their discretion refrain from denying Plaintiffs the rights infringed upon in this action. Thereafter, Defendant shall comply, follow, govern, and enforce such orders.

## IX.
## DECLARATORY RELIEF

This lawsuit involves an actual controversy within this Court's jurisdiction. Thus, the Court may declare the rights and other legal relations of the Plaintiffs and grant such other necessary and proper relief allowed by a declaratory judgment.

## X.
## DISCOVERY REQUESTS

Attached to the Original Petition, Plaintiffs propounded to the Defendant:

1.   Plaintiffs' Request for Disclosure to Defendant;

2.   Plaintiffs' First Set of Interrogatories to Defendant; and

3.   Plaintiffs' Request for Production to Defendant.

These discovery requests should be answered accordingly and in compliance with the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Honorable Court grant the following:

a).   Entering a permanent injunction, declaratory judgment, restraining and enjoining the Defendant, its officers, agents, employees, attorneys, and successors in office, and all other persons in active concert and participation with them, from retaliating against the Plaintiffs or otherwise violate their rights; and

b).   such other appropriate relief as Plaintiffs may be justly entitled and the Court deems proper.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____

MICHAEL PRUNEDA
State Bar No. 24025601

ATTORNEY FOR PLAINTIFFS

CAUSE NO. 2002-07-2682-Z

| | | |
|---|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | ♦ | IN THE 357 DISTRICT COURT |
| | ♦ | |
| V. | ♦ | |
| | ♦ | OF |
| | ♦ | |
| SANTA MARIA INDEPENDENT SCHOOL | ♦ | |
| DISTRICT and employees, agents, and all those | ♦ | |
| acting in concert or at their discretion | ♦ | CAMERON COUNTY, TEXAS |

FILED ___12:00___ O'CLOCK ___ M
AURORA DE LA GARZA, DIST. CLERK

JUL 0 3 2002

DISTRICT COURT OF CAM...

## PLAINTIFFS' REQUEST FOR JURY TRIAL

COME NOW Plaintiffs, SALVADOR ACOSTA and RIGO DE LA ROSA, requesting that

a jury trial be held on said cause. Pursuant to 216 of the Texas Rule of Civil Procedure a jury fee in

the sum of $30.00 has been paid to the District Clerk's office.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____

*MICHAEL PRUNEDA*
State Bar No. 24025601

ATTORNEY FOR PLAINTIFFS

CAUSE NO. 2002-07-2652-E

| | | |
|---|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | ◆ | IN THE 357th DISTRICT COURT |
| | ◆ | |
| v. | ◆ | |
| | ◆ | OF |
| | ◆ | |
| SANTA MARIA INDEPENDENT SCHOOL | ◆ | |
| DISTRICT *and employees, agents, and all those* | ◆ | |
| *acting in concert or at their discretion* | ◆ | CAMERON COUNTY, TEXAS |

## PLAINTIFFS' FIRST AMENDED—
### *ORIGINAL PETITION*

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME, PLAINTIFFS SALVADOR ACOSTA and RIGO DE LA ROSA (hereinafter referred to as "Plaintiffs"), complaining of SANTA MARIA INDEPENDENT SCHOOL DISTRICT and employees, agents, and all those acting in concert or at their discretion, (hereinafter called by name or referred to as "Defendant"), and for such causes of action shows unto the court the following:

### I.
### DISCOVERY LEVEL

The cause of action should be governed in accordance with Discovery Level 2 of the Texas Rules of Civil Procedure.

### II.
### PARTIES

Plaintiff, SALVADOR ACOSTA, is a resident of Cameron County, Texas.

Plaintiff, RIGO DE LA ROSA, is a resident of Cameron County, Texas.

Defendant, SANTA MARIA INDEPENDENT SCHOOL DISTRICT, has been served thereafter appeared.

Venue is proper in Cameron County, Texas in that the acts made the basis of this cause of action occurred in Cameron County. Further, both Plaintiffs and Defendants are located within and/ or are residents of Cameron County, Texas.

### III.
### FACTUAL ALLEGATIONS

Plaintiffs were long-time loyal employees of Santa Maria I.S.D. that were dedicated and hard working employees. Despite Plaintiffs' performance, dedication, and efforts, Defendant failed to give Plaintiffs the opportunity to work free of political hostility, harassment, humiliation, and retaliation during their employment and continue in their positions. Ultimately, Plaintiffs were both



EXHIBIT
2

terminated for political reasons and due to reporting of illegal activities. Plaintiff De La Rosa was terminated on or about July 7, 2000 and Plaintiff Acosta was terminated on or about September 15, 2000 despite an oral and written contract of which was breached and representations which were relied on.

Plaintiffs believe that following political changes on the Defendant's School Board, they were targeted by Defendant. Plaintiffs believe that the reasons given for their terminations were false and that that the true reasons were based on their political speech and associations.

As a result, Plaintiffs sue the Defendant for violation of their civil rights arising under the Constitution and laws of the United States and sovereign state of Texas.

## IV.
## CONSTITUTIONAL CAUSES OF ACTION

(a)     The Defendant and employees, agents and all those acting in concert with them or at their discretion deprived Plaintiffs of their right of free speech under the laws and Constitutions of the Constitutions of the United States and State of Texas by basing their employment decisions to an impermissible extent on Plaintiffs' exercise of free speech on matters of public concern, political support of candidates, and political associations. Such actions by Defendants were a customary practice and further enforced by policy makers in an arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory manner.

(b)     The Defendant and employees, agents and all those acting in concert with them or at their discretion deprived Plaintiffs of their right of freedom of association under the laws and Constitutions of the United States and State of Texas by basing their employment decisions to an impermissible extent on Plaintiffs' exercise of their right to freely associate and/or disassociate with groups, public figures, political candidates, and others. Such actions by Defendants were a customary practice and further enforced by policy makers in an arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory manner.

As a result of these unlawful deprivations, Plaintiffs according to the factual allegations, have effectively been subjected to discrimination, retaliation, harassment, demotion, reassignment, denial of employment, breach of contract and reliance and other adverse actions, and as a result have a loss of earnings and earning capacity, consequential and compensatory damages, suffered anxiety, mental anguish, humiliation, embarrassment, and other emotional harm and distress since being subjected to these unlawful actions undertaken under color of state law and will continue to suffer lost wages in the past and future and other compensatory damages to which they are appropriately entitled and the court deems proper to be proved at trial.

## V.
## BREACH OF CONTRACT

Plaintiff Salvador Acosta would show that he had a oral and written contract that was intentionally, knowingly, and maliciously breached by Defendant. Defendant breached its obligations to Plaintiff that caused pecuniary damages as well as foreseeable compensatory and consequential damages. Plaintiff Salvador Acosta seeks to recover under breach of contract.

## VI.
## PROMISSORY ESTOPPEL

The Defendant and employees and agents represented to Plaintiff Salvador Acosta through its policies, procedures and custom, and express statements that Plaintiff had a oral and written contract. As such, Plaintiff relied on these representations to his detriment following Defendant's failure to provide the benefits and positions Plaintiff relied. As such, Plaintiff sues under this theory.

## VII.
## JURY TRIAL REQUEST

Plaintiffs request that a jury be convened in order that issues the basis of this lawsuit be tried.

## VIII.
## ACTUAL DAMAGES

As a result of the incidents described above that are made the basis of this suit, Plaintiffs have suffered mental pain and anguish. In all reasonable probability, Plaintiffs will continue to suffer such mental pain and anguish for a long time into the future, if not for the balance of their natural lives. Plaintiffs have further been caused a loss of earnings and a loss of earning capacity and in all reasonable probability this incapacity and loss of earnings will continue long into the future. Plaintiffs therefore sues for lost wages in the past and future. As a result, Plaintiffs sues to regain all compensatory damages and any other relief to which they may be appropriately entitled and the court deems proper.

## IX.
## ATTORNEY'S FEES

By reason of the allegations of this Petition, Plaintiffs are entitled to recover attorney fees in a sum that are reasonable and necessary. In this connection, Plaintiffs further seek an upward adjustment or enhancement to the lodestar amount of attorney's fees to be determined in the prosecution of this lawsuit. Reasonable attorneys' fees are further requested for the work expended in the preparation and trial of this cause along with a reasonable fee for any and all appeals to other courts. If ultimately successful in this case, Plaintiffs fully expects that the Defendant will appeal this case. Plaintiffs seek attorneys' fees to compensate the Plaintiffs for the attorneys' fees they have and will incur in the prosecution of this lawsuit, both at trial and on appeal in accordance with the laws and Constitutions of the United States and Texas. As permitted, Plaintiffs also seek to recoup all litigation expenses expended in the prosecution of this lawsuit.

## X.
## INJUNCTIVE RELIEF

The continuing nature of the denial of Plaintiffs' fundamental rights that arbitrarily and irrationally have been denied and will deny to Plaintiffs rights and entitlements under the laws described above, is resulting in immediate and irreparable harm to the Plaintiffs. Plaintiffs are therefore entitled to temporary and permanent injunctive orders restraining the Defendant from continuing with such actions and future action. Additionally, Plaintiffs request that this court order a permanent injunction, based on the customary nature of the unlawful acts, that Defendant and employees, agents and all those acting in concert with them or at their discretion refrain from denying Plaintiffs the rights infringed upon in this action. Thereafter, Defendant shall comply, follow, govern, and enforce such orders.

## XI.
## DECLARATORY RELIEF

This lawsuit involves an actual controversy within this Court's jurisdiction. Thus, the Court may declare the rights and other legal relations of the Plaintiffs and grant such other necessary and proper relief allowed by a declaratory judgment.

## XII.
## DISCOVERY REQUESTS

Attached to the Original Petition, Plaintiffs propounded to the Defendant:

1.      Plaintiffs' Request for Disclosure to Defendant;

2.      Plaintiffs' First Set of Interrogatories to Defendant; and

3.      Plaintiffs' Request for Production to Defendant.

These discovery requests should be answered accordingly and in compliance with the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Honorable Court grant the following:

a).     Judgment against Defendant for an amount compensating Plaintiffs for their damages and injuries in an amount in excess of the minimum jurisdictional limits of this Court with a maximum of three million dollars ($3,000,000.00), such to be awarded by the jury;

b).     Entering a permanent injunction, restraining and enjoining the Defendant, its officers, agents, employees, attorneys, and successors in office, and all other persons in active concert and participation with them, from retaliating against the Plaintiff or otherwise violating his rights in a manner that is, may be, or can be construed as being negative or adverse;

c).     Prejudgment interest as allowed by law;

d).     Attorney, expert and litigation fees and expenses for trial and appeal;

e).     Interest on said judgment at the legal rate from date of judgment;

f).     Costs of suit herein;

g).     Nominal damages and such other appropriate relief as Plaintiff is justly entitled and the Court deems proper.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____
MICHAEL PRUNEDA
State Bar No. 24025601

ATTORNEY FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to opposing counsel of record as noted below:

Signed on this the 7 day of February, 2003:

Elizabeth Neally
ROERIG, OLIVEIRA & FISHER
855 West Price Road, Suite 9
Brownsville, Texas 78520-8786

_____
Michael Pruneda

CAUSE NO. <u>2002-07-2652-E</u>

| | | |
|---|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | ◆ | IN THE <u>357th</u> DISTRICT COURT |
| | ◆ | |
| v. | ◆ | |
| | ◆ | OF |
| | ◆ | |
| SANTA MARIA INDEPENDENT SCHOOL | ◆ | |
| DISTRICT *and employees, agents, and all those* | ◆ | |
| *acting in concert or at their discretion* | ◆ | CAMERON COUNTY, TEXAS |

## PLAINTIFFS' REQUEST FOR JURY TRIAL

COME NOW Plaintiffs, SALVADOR ACOSTA and RIGO DE LA ROSA, requesting that

a jury trial be held on said cause.  Pursuant to 216 of the Texas Rule of Civil Procedure a jury fee in

the sum of $30.00 has been paid to the District Clerk's office.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____

*MICHAEL PRUNEDA*
State Bar No. 24025601

ATTORNEY FOR PLAINTIFFS

# ROERIG, OLIVEIRA & FISHER, L.L.P.
## ATTORNEYS AT LAW

Jeffrey D. Roerig†•
Rene O. Oliveira
W. Michael Fisher
Ricardo Morado
Crisanta Guerra Lozano
Elizabeth G. Neally
Victor V. Vicinaiz*†
David G. Oliveira

Cameron County Office
855 West Price Road - Suite 9
Brownsville, Texas 78520-8786
Tel. 956 542-5666    Fax 956 542-0016

*Hidalgo County Office
506 East Dove
McAllen, Texas 78504
Tel. 956 631-8049    Fax 956 631-8141

Adolph Guerra, Jr.†
D. Alan Erwin, Jr.
Michael A. Zanca*
D. Wilkes Alexander, A.I.A.
Rosemary Conrad-Sandoval*
Lucila Alvarado*
Jesus Quezada, Jr.
Adrian R. Martinez*
Liza M. Vasquez*

†Board Certified -
    Personal Injury Trial Law
    Texas Board of Legal Specialization

•Board Certified -
    Civil Trial Law
    Texas Board of Legal Specialization

December 10, 2002

File No. 23,131

Mr. Michael Pruneda
**Michael Pruneda Law Firm**
P. O. Box T
Pharr, Texas 78577

Re:    **Salvador Acosta and Rigo De La Rosa vs. Santa Maria I.S.D.**
       357ᵗʰ Judicial District Court of Cameron County, Texas
       Cause No. 2002-07-2652-E

Dear Mr. Pruneda:

At the depositions of your clients, Salvador Acosta and Rigo de la Rosa, I suggested that we mediate the case to determine whether or not Mr. Acosta and the School District would consider reinstatement for Mr. Acosta to the position of business manager. You advised me that he would consider only if his back wages were addressed.

Your lawsuit raises a sole cause of action under the Texas Constitution of discrimination based on political association.

I am aware of no authority in the State of Texas for back wages under the Texas Constitution. Even back wages that have been alleged in the form of injunctive relief are not recoverable under the constitution. As you know, the Texas Supreme Court in the City of Beaumont v. Bullion, 896 S.W.2d 143 (Tex. 1995) provided that there was no right of action for damages arising under the free speech and free assembly provisions of the Texas Constitution. Numerous cases since then have likewise held the same. In Jackson v. Houston I.S.D., 994 S.W.2d 396, 400 (Houston 14th Dist. 1999), the court specifically held that back wages pled as injunctive relief were not allowed under the Constitution.

Should you have other authority to the contrary, please advise me immediately so that we can schedule a mediation. However, based on your position that Mr. Acosta would only return to his job if back wages were awarded, I see no point in mediating this case at this time.



EXHIBIT
3

## ROERIG, OLIVIERA & FISHER, L.L.P.

Mr. Michael Pruneda
December 10, 2002
Page 2

     For the School District to award back wages when none are reasonable could be considered a gift of public funds.

     Should you have any questions, please do not hesitate to contact the undersigned.  Thank you for your considerations.

Sincerely,

**ROERIG, OLIVIERA & FISHER, LLP**

Elizabeth G. Neally

EGN:cjb
cc:   Gustavo Acevedo
bcc:  Ms. Wendy Hall
      TASB

# ROERIG, OLIVEIRA & FISHER, L.L.P.
## ATTORNEYS AT LAW

Jeffrey D. Roerig*†
Rene O. Oliveira
W. Michael Fisher
Ricardo Morado
Crisenta Guerra Lozano
Elizabeth G. Neally
Victor V. Vicinaix*†
David G. Oliveira

**Cameron County Office**
855 West Price Road - Suite 9
Brownsville, Texas 78520-8786
Tel. 956 542-5666    Fax 956 542-0016

*Hidalgo County Office
506 East Dove
McAllen, Texas 78504
Tel. 956 631-8049    Fax 956 631-8141

Adolph Guerra, Jr.*
D. Alan Erwin, Jr.
Michael A. Zanca*
D. Wilkes Alexander, A.I.A.
Rosemary Conrad-Sandoval*
Lucila Alvarado*
Jesus Quezada, Jr.
Adrian R. Martinez*
Liza M. Vasquez*

†Board Certified -
  Personal Injury Trial Law
  Texas Board of Legal Specialization

*Board Certified -
  Civil Trial Law
  Texas Board of Legal Specialization

January 23, 2003

File No. 23,131

Mr. Michael Pruneda
**Michael Pruneda Law Firm**
P. O. Box T
Pharr, Texas 78577



Certified Article Number
7160 3901 9844 7054 5425
SENDERS RECORD

Re:   <u>**Salvador Acosta and Rigo De La Rosa vs. Santa Maria I.S.D.**</u>
357th Judicial District Court of Cameron County, Texas
Cause No.2002-07-2652-E

Dear Mr. Pruneda:

Pursuant to the authority bestowed on me by the Board of Trustees for the Santa Maria Independent School District, we are tendering the following offer of settlement without admitting to any liability, in order to resolve any and all issues that your clients Rigoberto de la Rosa and Salvador Acosta have against the Santa Maria I.S.D., its employees, officers and other representatives. The Board of Trustees have authorized Salvador Acosta and de la Rosa to return to the positions that they were assigned to prior to being placed on Administrative Leave and their subsequent termination. Mr. Acosta would return to the position of Business Manager and Mr. de la Rosa would return to the position of Fixed Assets Clerk effective the signing of this letter and their release of all claims against the Santa Maria Independent School District, its employees, heirs, assigns, servants, representatives, or anyone acting on its behalf.

Please convey your clients' acceptance of these settlement terms within ten days, or by February 2, 2003. In the event that your clients do not accept these terms, we will then regard this as a rejection of our offer of settlement.

Please sign below indicating your agreement to the terms set out above, and fax me a copy of same at (956) 542-0016 prior to February 2, 2003 at which time we will forward the Compromise, Release and Settlement Agreement to your offices for signature. Your signature below signifies as a Rule 11 Agreement pursuant to the Texas Rules of Civil Procedure and is binding in a court of law.



EXHIBIT
**4**

## ROERIG, OLIVIERA & FISHER, L.L.P.

Mr. Michael Pruneda
January 23, 2003
Page 2

       Should you have any questions, please do not hesitate to contact the undersigned. Thank you for your considerations.

                                Sincerely,

                                **ROERIG, OLIVEIRA & FISHER, LLP**

                                Elizabeth G. Neally

EGN:cjb
cc:    Gustavo Acevedo
       Wendy Hall

**AGREED TO AND ACCEPTED:**
**ON BEHALF OF PLAINTIFFS**
**SALVADOR ACOSTA and**
**RIGOBERTO DE LA ROSA**

---

Michael Pruneda
Attorney for Plaintiffs

# ROERIG, OLIVEIRA & FISHER, L.L.P.
## ATTORNEYS AT LAW

Jeffrey D. Roerig*†
Rene O. Oliveira
W. Michael Fisher
Ricardo Morado
Crisanta Guerra Lozano
Elizabeth G. Neally
Victor V. Vicinaiz*†
David G. Oliveira

Cameron County Office
855 West Price Road - Suite 9
Brownsville, Texas 78520-8786
Tel. 956 542-5666    Fax 956 542-0016

*Hidalgo County Office
506 East Dove
McAllen, Texas 78504
Tel. 956 631-8049    Fax 956 631-8141

Adolph Guerra, Jr.†
D. Alan Erwin, Jr.
Michael A. Zanca*
D. Wilkes Alexander, A.I.A.
Rosemary Conrad-Sandoval*
Lucila Alvarado*
Jesus Quezada, Jr.
Adrian R. Martinez*
Liza M. Vasquez*

†Board Certified -
    Personal Injury Trial Law
    Texas Board of Legal Specialization

*Board Certified -
    Civil Trial Law
    Texas Board of Legal Specialization

# FACSIMILE

23,131

File No.:

## January 24, 2003

**IMPORTANT:** This message is intended only for the use of the individual which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivery this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you receive the communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the United States Postal Service. Thank you.

**Please deliver the following pages to:    MICHAEL PRUNEDA**
**702-9659**

From:        Elizabeth G. Neally

Subject:    ***Salvador Acosta and Rigo de la Rosa vs. Santa Maria I.S.D.***
357th Judicial District Court, Cameron County, Texas
Cause No. 2002-07-2652-E

Total Number of Pages (Including this one):    3

Time Sent: _____        Sent By: Cindy

---

**ATTACHMENT:    Correspondence of January 23, 2003**

* *  . T C R ( JAN.24.2003  2:04PM )   * *

TTI  ROERIG OLIVEIRA FISH

(MANUAL PRINT)

| < T X > DATE | TIME | ADDRESS | MODE | TIME | PAGE | RESULT | PERS. NAME | FILE |
|---|---|---|---|---|---|---|---|---|
| JAN.23. | 2:45PM | 956 702 7050 | TESM | 0'59" | P. 3 | OK | | 254 |
| | 2:46PM | | TESM | 0'58" | P. 3 | OK | | 254 |
| | 3:15PM | 956 6878131 | TESM | 1'11" | P. 3 | OK | | 255 |
| | 3:30PM | 13618842077 | TESM | 4'01" | P.14 | OK | | 256 |
| | 3:37PM | 3COM LEGAL | TESM | 1'00" | P. 3 | OK | | 257 |
| | 3:39PM | CÖÆŸŸ | TESM | 1'03" | P. 3 | OK | | 257 |
| | 3:47PM | RO&F MCALLEN | TESM | 0'24" | P. 1 | OK | | 258 |
| | 4:22PM | RO&F MCALLEN | TESM | 0'22" | P. 1 | OK | | 259 |
| | 4:26PM | 6318141 | TESM | 0'41" | P. 2 | OK | | 260 |
| | 4:33PM | 18178605010 | TESM | 1'00" | P. 3 | OK | | 262 |
| | 5:19PM | 9566300189 | TESM | 1'10" | P. 3 | OK | | 263 |
| | 5:21PM | 361 8845239 | TESM | 1'11" | P. 3 | OK | | 263 |
| JAN.24. | 8:55AM | AÓAÒÙÖÉÙ CÆÙAAÓ IÙÙ | TESM | 1'01" | P. 3 | OK | | 265 |
| | 8:56AM | 9566100829 | TSM | 1'41" | P. 3 | OK | | 265 |
| | 9:02AM | 9566687328 | TESM | 1'12" | P. 3 | OK | | 266 |
| | 9:05AM | RO&F MCALLEN | TESM | 0'14" | P. 1 | OK | | 267 |
| | 9:31AM | 956 399 7398 | TESM | 1'41" | P. 6 | OK | | 268 |
| | 9:49AM | 9565460251 | TESM | 0'49" | P. 2 | OK | | 269 |
| | 9:59AM | 6028607987 | TESM | 1'15" | P. 4 | OK | | 270 |
| | 10:10AM | DRHR_LAW | TESM | 1'03" | P. 2 | OK | | 273 |
| | 10:12AM | 956 546 4321 | TS | 1'14" | P. 2 | OK | | 274 |
| | 10:14AM | 6028607987 | TESM | 1'09" | P. 3 | OK | | 271 |
| | 11:28AM | LYONS & RHODES INC | TESM | 1'23" | P. 4 | OK | | 275 |
| | 11:30AM | 9566180445 | TESM | 1'22" | P. 4 | OK | | 275 |
| | 11:32AM | 2102271290 | TESM | 1'20" | P. 4 | OK | | 275 |
| | 11:35AM | 6876415 | TESM | 3'01" | P.11 | OK | | 276 |
| | 11:38AM | 12103446016 | TESM | 2'27" | P. 9 | OK | | 277 |
| | 11:41AM | RO&F MCALLEN | TESM | 1'22" | P. 4 | OK | | 278 |
| | 11:43AM | FRONTIER GEN INS | TESM | 0'57" | P. 2 | OK | | 279 |
| | 11:46AM | 9566860050 | TESM | 0'51" | P. 2 | OK | | 281 |
| | 11:47AM | 5412864 | TESM | 0'54" | P. 2 | OK | | 280 |
| | 11:53AM | 956 399 4484 | TESM | 1'10" | P. 2 | OK | | 280 |
| | 1:14PM | 2533834884 | TESM | 0'40" | P. 1 | OK | | 282 |
| | 2:00PM | 9567029659 | TESM | 1'10" | P. 3 | OK | | 283 |
| | 2:02PM | TASB, IÜÖ. | TESM | 1'37" | P. 5 | OK | | 284 |

| < R X > DATE | TIME | ADDRESS | MODE | TIME | PAGE | RESULT | PERS. NAME | FILE |
|---|---|---|---|---|---|---|---|---|

| TX | 245180 | | RX | 001574 |
|---|---|---|---|---|

| # : BATCH | C : CONFIDENTIAL | $ : TRANSFER | P : POLLING |
|---|---|---|---|
| M : MEMORY | L : SEND LATER | @ : FORWARDING | E : ECM |
| S : STANDARD | D : DETAIL | F : FINE | > : REDUCTION |

# ROERIG, OLIVEIRA & FISHER, L.L.P.
## ATTORNEYS AT LAW

Jeffrey D. Roerig†•
Rene O. Oliveira
W. Michael Fisher
Ricardo Morado
Crisanta Guerra Lozano
Elizabeth G. Neally
Victor V. Vicinaiz*†
David G. Oliveira

Cameron County Office
855 West Price Road - Suite 9
Brownsville, Texas 78520-8786
Tel. 956 542-5666    Fax 956 542-0016

*Hidalgo County Office
506 East Dove
McAllen, Texas 78504
Tel. 956 631-8049    Fax 956 631-8141

Adolph Guerra, Jr.†
D. Alan Erwin, Jr.
Michael A. Zanca*
D. Wilkes Alexander, A.I.A.
Rosemary Conrad-Sandoval*
Lucila Alvarado*
Jesus Quezada, Jr.
Adrian R. Martinez*
Liza M. Vasquez*

†Board Certified -
    Personal Injury Trial Law
    Texas Board of Legal Specialization

•Board Certified -
    Civil Trial Law
    Texas Board of Legal Specialization

January 28, 2003

File No.:23,131

Mr. Michael Pruneda
**Michael Pruneda Law Firm**
P. O. Box T
Pharr, Texas 78577

     Re:   <u>**Salvador Acosta and Rigo De La Rosa vs. Santa Maria I.S.D.**</u>
            357th Judicial District Court of Cameron County, Texas
            Cause No.2002-07-2652-E

Dear Mr. Pruneda:

     Per my earlier correspondence to you, there is no authority in Texas law to allow payment of monetary damages for causes of action as pled by your client. I consider your response on January 27, 2003 to be a rejection of our settlement offer. Please advise immediately if it is not. Unless I hear from you today, I will proceed accordingly under the assumption that your clients have rejected the tendered offer.

     Should you have any questions, please do not hesitate to contact the undersigned. Thank you for your considerations.

                    Sincerely,

                    **ROERIG, OLIVEIRA & FISHER, LLP**

                    Elizabeth G. Neally

EGN:cjb
cc:   Al Hernandez
       Gustavo Acevedo
       Wendy Hall



EXHIBIT
5

## ROERIG, OLIVEIRA & FISHER, L.L.P.
### ATTORNEYS AT LAW

Jeffrey D. Roerig◆†
Rene O. Oliveira
W. Michael Fisher
Ricardo Morado
Crisanta Guerra Lozano
Elizabeth G. Neally
Victor V. Vicinaiz◆†
David G. Oliveira

Cameron County Office
855 West Price Road - Suite 9
Brownsville, Texas 78520-8786
Tel. 956 542-5666    Fax 956 542-0016

*Hidalgo County Office
506 East Dove
McAllen, Texas 78504
Tel. 956 631-8049    Fax 956 631-8141

Adolph Guerra, Jr.†
D. Alan Erwin, Jr.
Michael A. Zanca*
D. Wilkes Alexander, A.I.A.
Rosemary Conrad-Sandoval*
Lucila Alvarado*
Jesus Quezada, Jr.
Adrian R. Martinez*
Liza M. Vasquez*

†Board Certified -
   Personal Injury Trial Law
   Texas Board of Legal Specialization
◆Board Certified -
   Civil Trial Law
   Texas Board of Legal Specialization

# FACSIMILE

23,131

File No.:

January 28, 2003

IMPORTANT:  This message is intended only for the use of the individual which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient or the employee or agent responsible for delivery this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you receive the communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the United States Postal Service.  Thank you.

**Please deliver the following pages to:**    **MICHAEL PRUNEDA**
**702-9659**

From:      Elizabeth G. Neally

Subject:   ***Salvador Acosta and Rigo de la Rosa vs. Santa Maria I.S.D.***
357th Judicial District Court, Cameron County, Texas
Cause No. 2002-07-2652-E

Total Number of Pages (Including this one):  _2_

Time Sent: _____                                        Sent By: Cindy

**ATTACHMENT:**    **Correspondence of January 28, 2003**

* * T C R ( JAN.28.2003  4:44PM , . * *

TTI  ROERIG OLIVEIRA FISH

| < T X ><br>DATE | TIME | ADDRESS | MODE | TIME | PAGE | RESULT | PERS. | NAME | (MANUAL PRINT)<br>FILE |
|---|---|---|---|---|---|---|---|---|---|
| JAN.28. | 10:45AM | TöôôEA SEôôÛTû PîEû | TESM | 0'29" | P. 1 | OK | | | 354 |
| | 10:46AM | TöôôEA SEôôÛTû PîEû | TESM | 1'03" | P. 2 | OK | | | 355 |
| | 11:17AM | 512 463 8186 | TESM | 2'01" | P. 6 | OK | | | 356 |
| | 11:30AM | 281 955 2638 | TESM | 3'38" | P. 8 | OK | | | 357 |
| | 11:48AM | 9034541514 | TESM | 0'52" | P. 2 | OK | | | 358 |
| | 1:52PM | 9565423651 | TESM | 1'39" | P. 3 | OK | | | 359 |
| | 1:54PM | 9567029659 | TESM | 0'52" | P. 2 | OK | | | 360 |
| | 1:56PM | 9569823787 | TESM | 0'59" | P. 3 | OK | | | 359 |
| | 1:57PM | 956 5488115 | TESM | 0'59" | P. 3 | OK | | | 359 |
| | 2:00PM | 9565423651 | TESM | 1'31" | P. 2 | OK | | | 361 |
| | 2:02PM | 9569823787 | TESM | 0'52" | P. 2 | OK | | | 361 |
| | 2:03PM | 956 5488115 | TESM | 0'52" | P. 2 | OK | | | 361 |
| | 2:08PM | RENTFRO, FAULK, BLAK | TESM | 2'36" | P. 6 | OK | | | 362 |
| | 2:24PM | 281 955 1414 | TSM | 1'55" | P.-3 | OK | | | 363 |
| | 2:43PM | 9566687328 | TESM | 0'30" | P. 1 | OK | | | 364 |
| | 2:51PM | 361 879 0117 | TESM | 15'10" | P.39 | OK | | | 365 |
| | 3:07PM | RODRIGUEZ&COLVIN | TESM | 1'33" | P. 3 | OK | | | 366 |
| | 3:09PM | TASB, Iôô. | TESM | 0'39" | P. 1 | OK | | | 367 |
| | 3:10PM | TASB, Iôô. | TESM | 1'26" | P. 4 | OK | | | 368 |
| | 3:12PM | 9565650598 | TESM | 1'44" | P. 4 | OK | | | 369 |
| | 3:15PM | 9567837884 | TESM | 1'24" | P. 4 | OK | | | 370 |
| | 3:16PM | 9563655233 | TESM | 2'49" | P. 6 | OK | | | 371 |
| | 3:20PM | RO&F MCALLEN | TESM | 0'42" | P. 2 | OK | | | 372 |
| | 3:21PM | FÊÎÎôôÎôA (HO) | TESM | 15'18" | P.39 | OK | | | 373 |
| | 3:36PM | AôAôôÊô CÊôAAô Iôô | TESM | 0'53" | P. 2 | OK | | | 374 |
| | 3:38PM | 7139525972 | TESM | 1'47" | P. 6 | OK | | | 375 |
| | 3:40PM | 9565460251 | TESM | 2'03" | P. 7 | OK | | | 376 |
| | 3:43PM | 7132232224 | TESM | 0'51" | P. 2 | OK | | | 374 |
| | 3:57PM | 9562838811 | TESM | 1'26" | P. 4 | OK | | | 377 |
| | 3:59PM | 4287139 | TESM | 1'32" | P. 4 | OK | | | 377 |
| | 4:17PM | 6028607987 | TESM | 0'50" | P. 2 | OK | | | 378 |
| | 4:32PM | 956 630 5199 | TESM | 0'48" | P. 2 | OK | | | 379 |
| | 4:37PM | 512 491 2366 | TESM | 0'49" | P. 2 | OK | | | 380 |
| | 4:40PM | 512 491 2366 | TESM | 0'49" | P. 2 | OK | | | 380 |
| | 4:42PM | 956 292 2113 | TSM | 1'16" | P. 2 | OK | | | 380 |

| < R X ><br>DATE | TIME | ADDRESS | MODE | TIME | PAGE | RESULT | PERS. | NAME | FILE |
|---|---|---|---|---|---|---|---|---|---|

TX    245734                          RX        001574

| # : BATCH | C : CONFIDENTIAL | $ : TRANSFER | P : POLLING |
|---|---|---|---|
| M : MEMORY | L : SEND LATER | @ : FORWARDING | E : ECM |
| S : STANDARD | D : DETAIL | F : FINE | > : REDUCTION |

## NO. 2002-07-2652-E

| | | |
|---|---|---|
| SALVADOR ACOSTA AND<br>RIGO DE LA ROSA | * | IN THE DISTRICT COURT |
| VS. | * | 357TH JUDICIAL DISTRICT |
| SANTA MARIA INDEPENDENT<br>SCHOOL DISTRICT, INC. | * | CAMERON COUNTY, TEXAS |

### FILING CERTIFICATE OF THE ORAL DEPOSITION OF
### SALVADOR ACOSTA

I, **THURMAN MOODY**, a Certified Shorthand Reporter in and for the State of Texas, hereby certify pursuant to the Rules and/or agreement of the parties present to the following:

That this deposition transcript is a true record of the testimony given by the witness named herein, after said witness was duly sworn by me.

That $ 474.50 is the charge for the preparation of the completed original deposition transcript and any copies of exhibits attached to the original, charged to **ELIZABETH NEALLY**

That the deposition transcript was submitted on DECEMBER 23, 2002 to S. GARY WERLEY for signature and returned to DORSEY & ASSOCIATES by JANUARY 6,2003

That the deposition transcript was___ was not _X_ returned to the deposition officer by the witness.

That the original deposition transcript, or a copy thereof, together with copies of all exhibits, was delivered to the attorney of party who asked the first question appearing in the transcript on DECEMBER 23 2002.

That pursuant to information made part of the record at the time said testimony was taken; the following includes all parties of record:

| | | |
|---|---|---|
| MICHAEL PRUNEDA | Attorney for | PLAINTIFF |
| ELIZABETH NEALLY | Attorney for | DEFENDANT |


EXHIBIT

CAUSE NO. 2002-07-2652-E

| | |
|---|---|
| SALVADOR ACOSTA and | )( |
| RIGO DE LA ROSA | )( IN THE DISTRICT COURT |
|      Plaintiffs | )( |
|   vs. | )( |
| | )( CAMERON COUNTY, TEXAS |
| SANTA MARIA INDEPENDENT | )( |
| SCHOOL DISTRICT and | )( |
| Employees, Agents and all | )( |
| those Acting in Concert | )( |
| or at their Discretion | )( |
| | )( |
|     Defendants | )( 357TH  JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
SALVADOR ACOSTA
DECEMBER 3, 2002

I, THURMAN J. MOODY, Certified Shorthand
Reporter in and for the State of Texas, hereby certify to the
following:

That the witness, SALVADOR ACOSTA, was duly
sworn by the officer and that the transcript of the ORAL
deposition is a true record of the testimony given by the
witness;

That the deposition transcript was submitted on
December 23, 2002, to counsel for the witness for examination,
signature, and return to Dorsey & Associates, 8318 Jones
Maltsberger, Suite 112, San Antonio, Texas 78216, by January
6, 2003;

That the amount of time used by each party at
the deposition is as follows:
    Michael Pruneda - 0 hours 0 minutes
    Elizabeth G. Neally - 2 hours 11 minutes

That pursuant to information given to the
deposition officer at the time said testimony was taken, the
following includes all parties of record:

  MICHAEL PRUNEDA
  THE PRUNEDA LAW FIRM, P.L.L.C.
  944 West Nolana, Suite B
  Post Office Box T
  Pharr, Texas 78577-1220
  ELIZABETH G. NEALLY

ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78550

     I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the action
in which this proceeding was taken, and further that I am not
financially or otherwise interested in the outcome of the
action.

     Subscribed and sworn to by me on December 23,
2002.

        THURMAN J. MOODY, Texas CSR No. 2861
        Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

CAUSE NO. 2002-07-2652-E

| | |
|---|---|
| SALVADOR ACOSTA and<br>RIGO DE LA ROSA<br><br>    Plaintiffs<br><br>    vs.<br><br>SANTA MARIA INDEPENDENT<br>SCHOOL DISTRICT and<br>Employees, Agents and all<br>those Acting in Concert<br>or at their Discretion<br><br>    Defendants | )( IN THE DISTRICT COURT<br>)(<br>)(<br>)(<br>)(<br>)(<br>)(<br>)( CAMERON COUNTY, TEXAS<br>)(<br>)(<br>)(<br>)(<br>)( 357TH  JUDICIAL DISTRICT |

SUPPLEMENTAL CERTIFICATE UNDER TRCP 203
TO THE ORAL DEPOSITION OF
SALVADOR ACOSTA
DECEMBER 3, 2002

The original deposition of SALVADOR ACOSTA taken on December 3, 2002, was (    ) was not ( ✓ ) returned to the deposition officer on January 6, 2003.

If returned, the attached changes and signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Elizabeth G. Neally, Custodial Attorney.

That $405.50 is the deposition officer's charges to Defendant for preparing the original deposition transcript and any copy of exhibits;

That the deposition was delivered in accordance with Rule 203, TCRP, and that a copy of this certificate was served on all parties shown herein and filed with the clerk.

Subscribed and Sworn to by me on _____,
2003.

_____
THURMAN J. MOODY  Texas CSR No. 2861
Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

DORSEY & ASSOCIATES

San Antonio  -  Corpus Christi  - McAllen  - Austin
(210) 342-3393  - (877) 919-3393 (Toll Free)  Fax (210) 342-6211

Page 1

CAUSE NO. 2002-07-2652-E

SALVADOR ACOSTA and    )(   IN THE DISTRICT COURT
RIGO DE LA ROSA        )(
                       )(
        Plaintiffs     )(
vs.                    )(
                       )(
SANTA MARIA INDEPENDENT )(  OF CAMERON COUNTY, TEXAS
SCHOOL DISTRICT and    )(
Employees, Agents and all)(
 those Acting in Concert )(
or at their Discretion )(
                       )(
        Defendants     )(  357TH JUDICIAL DISTRICT

---

ORAL DEPOSITION OF
SALVADOR ACOSTA
DECEMBER 3, 2002

---

ORAL DEPOSITION OF SALVADOR ACOSTA, produced as
a witness at the instance of the Defendants, and duly sworn,
was taken in the above-styled and numbered cause on December
3, 2002, before THURMAN J. MOODY, Certified Shorthand Reporter
No. 2861 in and for the State of Texas, at the offices of
Roerig, Oliveira & Fisher, 855 West Price Road, Brownsville,
Texas, pursuant to the Texas Rules of Civil Procedure and the
provisions attached hereto.

---

Page 2

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFFS:

    MICHAEL PRUNEDA
    THE PRUNEDA LAW FIRM, P.L.L.C.
    944 West Nolana, Suite B
    Post Office Box T
    Pharr, Texas 78577-1220

FOR THE DEFENDANTS:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78550

I-N-D-E-X

Appearances ................................................... 2

SALVADOR ACOSTA
    Examination By Ms. Neally ..............................^

Errata Sheet .......................................... ^

Reporter's Certificate .................................... ^

Attached to End of Transcript ................... Stipulations

EXHIBITS

NO.   DESCRIPTION                                         PAGE
1     Typed and Handwritten Memo, Food Service Sales ........58
2     Handwritten Notes, 5/4/00 ............................63
3     Handwritten Notes, 98-99 ............................64
4     Memo, Time Punctuality ..............................64
5     Memo, High School Student Incident ..................65
6     Memo, Present Status of Business Office .............66
7     Memo, Letter of Reprimand ...........................67
8     Memo, Letter of Reprimand ...........................69
9     Memo, Failure to Perform Duties .....................71
10    Memo, Reassignment ..................................78
11    Memo, Reprimand .....................................78
12    Memo, Reprimand .....................................78
13    Memo, Contract Status ...............................79
14    TEA Docket 009-LH-900, Proposal for Decision ........81

---

Page 3

15    Memo, Review of Financial Management Practices
      of Santa Maria ISD on June 4, 1998 ...............83
16    Employee Complaint Form, Level One ................83
17    Memo, Level II Grievance ..........................85
18    Memo, Securing Sports and Other Related Activity
      Proceeds ..........................................85
19    Memo, Termination of Employment ...................87
20    Notice of Appeal to the Board at Level Three ......88

---

Page 4

    SALVADOR ACOSTA

having been first duly sworn, testified as follows:

          EXAMINATION

BY MS. NEALLY:

    Q. Mr. Acosta, could you please state your full name for
the record.

    A. Salvador Acosta.

    Q. Mr. Acosta, you sat through the deposition
of Mr. de la Rosa, right?

    A. That's correct.

    Q. And I'd like to have the same basic agreements with
you. You understand you just swore to tell the truth, right?

    A. Yes, ma'am.

    Q. But if I ask you a question you don't understand, you
need to let me know or I'm going to assume that all my
questions have been understood. Okay?

    A. Okay.

    Q. You need to take a break, let me know. Are you
running a fever today?

    A. Not as bad as Mr. de la Rosa.

    Q. Everybody has got the flu.

    A. Right.

    Q. Are you under any medication that would impair your
ability to answer questions?

    A. No, ma'am.

---

Page 5

1  Q. Have you ever given a deposition before?
2  A. Probably soon after I was terminated from --
3  Q. Okay.
4  A. -- Santa --
5  Q. And what was that in connection with?
6  A. The termination. It was a hearing, grievance, a
7  hearing.
8  Q. You actually appealed the -- whether or not you had a
9  contract with the district, right?
10  A. That's correct.
11  Q. To the Texas Commission of Education, right?
12  A. I don't believe we took it that far. I don't believe
13  so.
14  Q. Well, it went to a hearing officer, Victoria --
15  A. That's right, then.
16  Q. And procedurally that's how it goes to the
17  Commissioner of Education.
18  A. Very well.
19  Q. But the only issue that was before the commissioner
20  was whether or not you had a valid contract with the school
21  district; is that right?
22  A. That is correct.
23  Q. And that deposition, was it actually a deposition
24  where we're here in a formal proceeding or was that formally
25  in front of a hearing officer?

Page 6

1  A. It was in front of the hearing officer.
2  Q. And you gave sworn testimony in regard to that; is
3  that right?
4  A. Yes, ma'am.
5  Q. The questions you were asked were pretty much limited
6  to whether or not you had a contract, right?
7  A. Right. Uh-huh.
8  Q. Any other time that you have given any sworn
9  testimony, either in court or in a deposition?
10  A. No, ma'am.
11  Q. Okay. Let's get a little background. Where do you
12  live?
13  A. In Blue Town, Texas.
14  Q. In Blue Town, Texas?
15  A. Uh-huh.
16  Q. How far do you live from Mr. de la Rosa?
17  A. I want to say maybe half a mile or so.
18  Q. How long have you lived there?
19  A. Since 1976.
20  Q. Who lives with you at your residence?
21  A. My father.
22  Q. And is that all?
23  A. That's it.
24  Q. Were you married?
25  A. No, ma'am.

Page 7

1  Q. Have you ever been married?
2  A. No.
3  Q. Do you have any children?
4  A. No, ma'am.
5  Q. What's your physical address?
6  A. It would be Military Highway 281. That's all we
7  have, it's a rural -- very small community, so we don't even
8  have --
9  Q. Do you have --
10  A. -- road names or anything like that, or street names,
11  so --
12  Q. Okay.
13  A. -- that's the only military -- the only physical
14  address I use, Military Highway 281.
15  Q. Do you have a post office box?
16  A. Yes.
17  Q. Okay.
18  A. Post Office Box 293, Santa Maria.
19  Q. Where did you go to high school?
20  A. Mercedes High School.
21  Q. Were you living in Mercedes at the time?
22  A. No, ma'am. At that time, of course, Santa Maria
23  School only had up to eighth grade so they were transporting
24  students over to Mercedes.
25  Q. Did they used to take them to La Feria?

Page 8

1  A. Started with La Feria, Mercedes and ended up with
2  Progreso.
3  Q. In Progreso?
4  A. Yes, ma'am. Until we finally got a high school.
5  Q. How big is your high school?
6  A. I wanted to say peak enrollment about a hundred
7  thirty. Very small.
8  Q. How big is the actual, the entire Santa Maria ISD?
9  A. Peak enrollment is about five hundred twenty.
10  Q. How many employees do they have?
11  A. At that time about a hundred and twenty plus.
12  Approximately.
13  Q. And when you say at that time --
14  A. Uh-huh.
15  Q. -- do you mean --
16  A. When I was there.
17  Q. When you were at the --
18  A. Right.
19  Q. When did you graduate from Mercedes?
20  A. 1982.
21  Q. And then what did you do after you graduated?
22  A. I went to college, Pan American University.
23  Q. Pan Am?
24  A. Uh-huh.
25  Q. In Edinburg?

## Page 9

1    A. Pan Am.

2    Q. Did you get a degree?

3    A. Yes, ma'am, I did.

4    Q. What was your degree in?

5    A. In business administration.

6    Q. And when did you graduate?

7    A. 1988.

8    Q. And when you graduated -- I'm sorry.

9       While you were going to college, did you work?

10    A. Only in the summers, ma'am. We had a small farm back

11   home in Santa Maria.

12    Q. Okay.

13    A. And we did a lot of work there. Small farm.

14    Q. Okay.

15    A. It started like late -- I want to say late spring and

16   it would end -- the season would end in the late summer.

17    Q. What were you growing?

18    A. Okra.

19    Q. You still grow okra?

20    A. No. That's been long gone.

21    Q. You don't have a farm anymore?

22    A. No, no more.

23    Q. So but from '82 to '88, that's what you were doing?

24    A. Yes. In the summers. Only in the summers.

25    Q. In the summers?

## Page 10

1    A. Only the farm.

2    Q. Why did it take you six years to get through school?

3    A. Well, I guess I was undecided at first about my

4   career. I thought about education, another field, and

5   eventually I wound up in business. I lost some time in

6   between.

7    Q. You got a BA. Have you gotten any more education

8   since then?

9    A. No, ma'am.

10    Q. When you graduated in 1988, was it in May or January?

11    A. August.

12    Q. August?

13    A. August.

14    Q. When you graduated in August of 1998, did you go to

15   work?

16    A. I continued with the farm.

17    Q. With the farm?

18    A. Yes, ma'am. I'd say about another three months or so

19   after that.

20    Q. And then what was your first job?

21    A. I worked with the Texas Work Force Commission.

22    Q. When did you sell the farm? I take it you sold it?

23    A. I wasn't so much really -- we weren't the owners of

24   the farm, we were renting from the -- our lease from my dad's

25   boss.

## Page 11

1    Q. Okay.

2    A. My dad's boss. That's basically what it was.

3    Q. When did you quit doing that?

4    A. I want to say, oh, that may have been the last year.

5   I don't recall, '88. And we may have gone one more year after

6   that.

7    Q. Okay.

8    A. That's what I remember.

9    Q. So the first job you got was in what, about December

10   of '88 with the Texas Work Force Commission?

11    A. I want to say at the beginning of the following year,

12   in '89.

13    Q. So January, 1989. What were you doing for them?

14    A. I was the unemployment claims processor.

15    Q. And how long did you do that?

16    A. Approximately about a year. Approximately.

17    Q. So for the entire year of 1989?

18    A. Right.

19    Q. Then what did you do?

20    A. Then I went to the school district, Santa Maria ISD.

21    Q. When you went to work there who was the

22   superintendent?

23    A. Mr. Homero Garcia.

24    Q. And how long was he there?

25    A. I started in 1990, February of 1990. I believe he

## Page 12

1   was there at least four years.

2    Q. And what position did you take when you first went to

3   work?

4    A. I was the business manager.

5    Q. And is that the position that you held the entire

6   time you were working at the school district?

7    A. No.

8    Q. Okay.

9    A. Eventually the name was changed to administrative for

10   business and operations.

11    Q. So the same job?

12    A. Yeah. It was basically the same job, yes, ma'am.

13    Q. When you got moved from business manager to

14   administrator --

15    A. For business and operations.

16    Q. -- for business and operations --

17    A. Uh-huh.

18    Q. -- did that include a pay increase?

19    A. A small pay increase, that's correct.

20    Q. When you left there, what were you earning?

21    A. Approximately forty-six thousand.

22    Q. When you started there, do you remember what year?

23    A. At that time they put me -- I was on the teachers'

24   pay scale for about four or five years. I want to say about

25   twenty-one thousand starting pay.

**Page 13**

1   Q. And you said for how many years were you --
2   A. From February, '90, through September, 2000, a little
3 bit over ten years.
4   Q. I know that, but how long were you on the teacher pay
5 salary?
6   A. I want to say about at least five years.
7   Q. When you first came on board as the business
8 manager --
9   A. Uh-huh.
10   Q. -- had you really had any experience working as a
11 business manager before that?
12   A. Not really, no, ma'am.
13   Q. And no experience with school systems, right?
14   A. No, ma'am, no.
15   Q. So you had to learn as you went along?
16   A. I was learning on the job and this lady that was on
17 her way out was teaching me the ins and outs of running the
18 business office. She was only there for about three months.
19   Q. What's her name?
20   A. Viola Gomez.
21   Q. Do you know where she is now?
22   A. I believe she's somewhere up in Dallas. She's long
23 gone.
24   Q. When you were working with -- is it Mr. or
25 Dr. Garcia?

**Page 14**

1   A. Mr. Garcia.
2   Q. When you were working with Mr. Garcia, did he also
3 help train you?
4   A. Yes, ma'am, he did.
5   Q. Did you get along with him?
6   A. Yes. Very much so.
7   Q. Did he ever give you any reprimands?
8   A. Not that I recall, no, ma'am.
9   Q. Or any criticism that you can think of?
10   A. No.
11   Q. You filed a grievance as a result of your
12 termination, right?
13   A. That's correct.
14   Q. Had you ever filed any other grievances besides that?
15   A. No, ma'am.
16   Q. So he was there until about 1994, '95?
17   A. More or less, yes. More or less around that time.
18   Q. Then who was the next superintendent?
19   A. Mr. Hector Gonzalez.
20   Q. How long was Mr. Gonzalez there?
21   A. I know he left the district in '98. September '98.
22 He was there about three years.
23   Q. Did you have any problems working with him?
24   A. No, ma'am. None whatsoever.
25   Q. Did he ever give you any reprimands, counseling,

**Page 15**

1 anything --
2   A. No, ma'am.
3   Q. -- warnings?
4   A. No, ma'am.
5   Q. And then the next superintendent was Dr. Cantu; is
6 that right?
7   A. In between I was the interim superintendent from
8 September through April 16th, '99.
9   Q. From when?
10   A. From September the 10th, 11th, '98 --
11   Q. Okay.
12   A. -- through April 15th, '99. I believe Dr. Cantu was
13 hired April the 16th.
14   Q. Did you want to be the interim superintendent?
15   A. Not really. It was quite an ordeal for me.
16   Q. You had no training whatsoever to be a
17 superintendent, right?
18   A. No, ma'am. But working in the small district you're
19 a -- you wear all hats, all kinds of hats, so you definitely
20 get your feet wet, a little bit of everything --
21   Q. Right. But you --
22   A. -- in the school.
23   Q. You didn't have any credentials to be a
24 superintendent?
25   A. No, ma'am, I didn't.

**Page 16**

1   Q. Or to even be in the education field, you didn't have
2 any credentials in education?
3   A. No, ma'am. Huh-uh.
4   Q. Did you anticipate remaining interim superintendent?
5   A. I kept informing the board of the need to get
6 someone, to hire someone to be responsible.
7   Q. Had you ever -- besides that, that period from
8 September 10th, '98, until April 15th, '99, did you ever fill
9 in an interim superintendent before that?
10   A. No, ma'am. Huh-uh.
11   Q. Did they have any other interim superintendents
12 before that during the time you were employed?
13   A. I don't believe so, ma'am. I don't think so.
14   Q. Are you employed right now?
15   A. No, ma'am.
16   Q. When was the last time you held any job?
17   A. Back in February of this year.
18   Q. So February, 2002?
19   A. Right.
20   Q. How were you employed?
21   A. I was an accountant for Sun Glow Fellowship.
22   Q. For what?
23   A. Sun Glow Fellowship, Inc.
24   Q. How long did you work for them?
25   A. About eight or nine month. Eight or nine months.

Page 17

1    Q. So from approximately what to --
2    A. April previous year through February.
3    Q. So April, 2001, to February, 2002?
4    A. Right.
5    Q. And what -- you were just -- what did you do for them
6    besides accounting?
7    A. I did some inventory work, a lot of positing to the
8    general journal, general ledger. And mainly accounting work.
9    Mainly accounting work. Some tax returns here and there.
10   Q. Where is the Sun Glow Fellowship?
11   A. The main office would be in Harlingen, I believe the
12   address is 3201 South Expressway in Harlingen.
13   Q. Why did you leave your employment there?
14   A. I was laid off, ma'am.
15   Q. Why were you laid off?
16   A. Due to reorganization of the company.
17   Q. They gave your duties to somebody else?
18   A. I'm not sure if they replaced me. They probably did.
19   I have no idea, honestly. But they were downsizing. During
20   the time that I was there, it was happening quite a bit.
21   Q. What kind of a company is that?
22   A. It's a Delta health care. A Delta.
23   Q. Delta health care?
24   A. Uh-huh.
25   Q. You were terminated in September, 2001?

Page 18

1    A. September 2000.
2    Q. Between September, 2000, and April, 2001, did you
3    hold any other positions?
4    A. No, ma'am.
5    Q. So since your termination from the school district,
6    the only place that you have worked has been at Sun Glow
7    Fellowship?
8    A. That's correct. Uh-huh.
9    Q. Have you looked for jobs --
10   A. Yes, I have.
11   Q. -- since leaving Sun Glow?
12   A. Yes, I have.
13   Q. Where have you applied?
14   A. I applied at Lyford schools, Harlingen schools,
15   Progreso schools.
16   Q. Anywhere else?
17   A. Manpower Services. There's some others, I just can't
18   remember their names. I have applied to so many different
19   places.
20   Q. Are those the only school districts that you can
21   recall?
22   A. I have tried to get back into where I have an edge
23   with school districts and I haven't had much -- oh, of course,
24   Brownsville ISD as well.
25   Q. What kind of jobs are you applying for with these

Page 19

1    school districts?
2    A. Business manager. Mainly the business office.
3    Accounting. Accountants.
4    Q. Did you ever work with the present superintendent?
5    A. Yes, I did. I'm sorry. No, I didn't.
6    Q. Mr. Hernandez. Have you ever worked with
7    Mr. Hernandez?
8    A. No, ma'am.
9    Q. Have you had any problems with him?
10   A. No, ma'am. None whatsoever.
11   Q. Have you ever come in and talked to him about your
12   applying at other places whether he's going to give you a good
13   recommendation?
14   A. I have called him once to ask him if I could use him
15   as a reference. He said not a problem.
16   Q. He came in as the business manager, I think? No?
17   A. Not to my knowledge. It was -- the person that came
18   in after me was Mr. Oralio Turrubiates, T-u-r-r-u-e-i-a-t-e-s.
19   Q. T-s?
20   A. T-e-s, that sounds close.
21   Q. Okay. And how long was he there?
22   A. About a month and a half or so.
23   Q. And then who replaced him?
24   A. And then I believe, if I remember correctly, I
25   believe Mr. Hernandez was taking care of those duties.

Page 20

1    Q. Okay.
2    A. Until they hired someone.
3    Q. And who did they hire next?
4    A. Emma McColl.
5    Q. Do you know who's there now?
6    A. I believe they don't have one. I believe they left
7    to Lyford.
8    Q. Which was one of the jobs you applied for?
9    A. Right. That's correct.
10   Q. Do you know why Mr. Turrubiates left?
11   A. I believe, based on the conversation that I had with
12   him before I left, it was all related to the governing issues,
13   boards members getting involved too much with the meddling of
14   the daily operations. He went as far as writing a letter to
15   TEA that boards members were just going overboard. Nobody
16   listened.
17   Q. Did you ever write a letter to TEA?
18   A. No, I never did.
19   Q. Make any reports or complaints?
20   A. No. No, I did not.
21   Q. Did Mr. Turrubiates quit?
22   A. I believe so. He eventually decided to move on.
23   Q. He wasn't terminated?
24   A. Not -- not to my knowledge, ma'am, no.
25   Q. You said you had a conversation with him while he was

**Page 21**

1  still there?

2    A. While he was still there, that is correct.

3    Q. And when was that, in October of '99? I'm sorry,

4  October, 2000?

5    A. 2000. I want to say maybe -- because he was

6  already -- up until -- let me see. Let me get my dates

7  straight here. I was no longer business manager on August

8  17th, I believe.

9    Q. Right. You had been reassigned?

10    A. Reassigned, that's correct. So around that time

11  before I left, before they terminated me, I had that

12  conversation with him.

13    Q. Okay. So before September?

14    A. That is correct.

15    Q. Okay. And Mr. Turrubiates had already been hired?

16    A. He was, I guess, the appointed business manager, I

17  guess, until further notice.

18    Q. Okay.

19    A. But I think they were trying -- when I was there,

20  they were trying to negotiate the pay, and I don't know

21  exactly what they worked out. But I know that unofficially he

22  was the business manager.

23    Q. Okay.

24    A. He took over my duties and responsibilities.

25    Q. Right. What was his job before he was reassigned, or

**Page 22**

1  was he just hired?

2    A. I think he was just hired.

3    Q. He was newly hired?

4    A. He was newly hired.

5    Q. For that position or some other position?

6    A. Some other position.

7    Q. Do you know what other position?

8    A. He was the accounts payable slash accountant person.

9  He replaced Nora Jimenez.

10    Q. When you worked there, Nora Jimenez was your accounts

11  payable secretary?

12    A. That's correct. That is correct. Nora Jimenez.

13    Q. Who worked at the business office in 2000 besides

14  you? And I'm saying at the time you that were employed

15  there --

16    A. Uh-huh.

17    Q. -- who was in that office besides you?

18    A. It was, of course, Nora Jimenez. Rigo de la Rosa,

19  Sandra Reyes, Angelina Jimenez and Eddy Cavazos.

20    Q. And Jimenez?

21    A. Jimenez, uh-huh.

22    Q. And who was it?

23    A. Eddy Cavazos.

24    Q. Were you in charge of all these people?

25    A. Yes, ma'am.

**Page 23**

1    Q. You were their direct supervisor?

2    A. That's correct.

3    Q. Nora Jimenez, you said was an accounted payable?

4    A. Slash accountant.

5    Q. Accountant. Okay.

6    A. And secretary.

7    Q. Sandra Reyes was?

8    A. The payroll clerk.

9    Q. And Angelina Jimenez?

10    A. PEIMS clerk.

11    Q. And Eddy Cavazos?

12    A. Was technology coordinator.

13    Q. Who is still employed there of those people?

14    A. Aneglina Jimenez and Sandra Reyes.

15    Q. Are they still at the same positions, do you know?

16    A. From what I understand.

17    Q. What was your salary while you were working at Sun

18  Glow?

19    A. I want to say approximately twenty-nine thousand.

20    Q. So you took a cut in pay?

21    A. Yes, I did.

22    Q. Any other sources of income since you left the school

23  district?

24    A. Unemployment. Loans from friends and relatives and,

25  of course, my teacher retirement.

**Page 24**

1    Q. How much of your teachers retirement have you taken

2  out?

3    A. The full amount, which was after taxes about

4  twenty-eight.

5    Q. Twenty-eight?

6    A. Yes, ma'am.

7    Q. The loans from friends and relatives, how much would

8  you say that was?

9    A. I'd say about five or six thousand dollars, total.

10  Five to six thousand.

11    Q. You said you lived with your father; is that right?

12    A. That's right.

13    Q. Do you support your father? Does he have a source of

14  income?

15    A. He has a source if income.

16    Q. What's his source of income?

17    A. Social security, monthly checks. He's retired.

18    Q. The house you live in, is it his house or your house?

19    A. His house.

20    Q. And that's where you were living at the time you were

21  employed with the school district?

22    A. That's correct, yes, ma'am.

23    Q. Other than the school district from '90 to 2000, did

24  you have any other sources of income?

25    A. No, ma'am.

Page 25

1   Q. You are not self-employed in any kind of capacity
2   like you don't do tax returns on the side or anything?
3   A. No, ma'am.
4   Q. Have you ever been arrested, indicted, convicted,
5   given a military discharge other than honorable, anything like
6   that?
7   A. No.
8   Q. Have you ever filed any other lawsuits?
9   A. No, ma'am.
10   Q. How about anybody in your family?
11   A. None.
12   Q. You already told me other than the grievance over
13   this termination you've never filed any other grievances?
14   A. No, ma'am.
15   Q. Have you been to see any psychiatrist, clergy,
16   counselor, therapist or any kind of medical providers for any
17   kind of psychiatric treatment?
18   A. Yes, I have.
19   Q. Who have you seen?
20   A. Dr. Clay Ross.
21   Q. When did you see Dr. Ross?
22   A. Soon after the termination.
23   Q. How long did you see him?
24   A. I want to say maybe I saw him about three times or
25   so, and soon after that I couldn't afford to go see him

Page 26

1   anymore. He did prescribe some medication for me that lasted
2   about maybe four months or so.
3   Q. What kind of medication did he prescribe?
4   A. Effexor. Effexor.
5   Q. And that's an antidepressant?
6   A. That's correct.
7   Q. You took it for about four months?
8   A. Four months, and after that of course I wanted to
9   continue taking some type of medication that would help me
10   with my anxiety, with my depression. I couldn't sleep very
11   well at night so I went to see some doctors in Mexico for
12   that.
13   Q. Do you know the name of the doctors you saw in
14   Mexico?
15   A. I saw Dr. Contreras is the last name. Contreras.
16   Q. Is he a psychiatrist or some other kind of doctor?
17   A. It's a lady. She's a general -- it's a lady. She's
18   a -- the doctor's a lady. Just general medicine.
19   Q. Okay.
20   A. But she prescribed some sleeping medication.
21   Q. Did she prescribe any more antidepressants or
22   antianxiety?
23   A. I believe those -- that medication had some -- was
24   also for anxiety.
25   Q. Do you know the name of it?

Page 27

1   A. Off the top of my head, no, I don't.
2   Q. When was the last time you took it?
3   A. I'd say about two months ago.
4   Q. Have you taken it off and on since you left
5   Dr. Ross's?
6   A. Off and on; that's correct, yes, ma'am.
7   Q. For instance, when you were working at Sun Glow, were
8   you taking it?
9   A. I was taking some medication at the time, yes, ma'am.
10   Q. Same type?
11   A. Yes, ma'am.
12   Q. How about for any physical problems, have you been
13   under doctor's care in the last ten years for any kind of
14   physical problems?
15   A. Physical problems --
16   Q. High blood pressure, heart, anything like that?
17   A. Perhaps some high blood pressure. It didn't last too
18   long, though.
19   Q. That was while you were still employed?
20   A. That's correct.
21   Q. Since you have been employed -- unemployed, have you
22   had problems with high blood pressure?
23   A. No. Huh-uh.
24   Q. Any kind of accidents, anything like that, since you
25   have been -- in the last ten years?

Page 28

1   A. No, ma'am.
2   Q. What doctors did you see for the high blood pressure?
3   A. San Benito Medical Associates, they have so many
4   different doctors there. Dr. Lopez, Dr. Gonzalez,
5   Dr. Bothwell.
6   Q. Okay.
7   A. And I also went to Valley Diagnostic Clinic. They
8   referred me over there for similar problems, having to do with
9   anxiety, unable to sleep and those kinds of issues.
10   Q. And those were while you were still employed with the
11   school district?
12   A. Toward -- I want to say around my last six months
13   that I was employed there at the school, going through so
14   much, it was unbelievable.
15   Q. Before the last six months, is it your testimony that
16   you never had any problems with anxiety or depression?
17   A. That's correct, ma'am.
18   Q. So before the year 2000 you never had any problems
19   with anxiety or depression?
20   A. Not that I recall, no, ma'am.
21   Q. And you were never prescribed any medication for
22   anxiety or depression before the year 2000?
23   A. Honestly, ma'am, I don't remember. I don't recall.
24   Q. But you don't think you were; is that correct?
25   A. I don't think I was.

## Page 29

1    Q. I briefly spoke with Mr. de la Rosa regarding the

2 factions at the school board.

3    A. Uh-huh.

4    Q. Is that right?

5    A. That's correct.

6    Q. Are you friends with any particular board members at

7 the school district?

8    A. Yes, ma'am, I am.

9    Q. Who are you friends with?

10    A. With Ms. de la Rosa. You want full names?

11    Q. Well, just the last names.

12    A. Okay. Mr. Gonzalez. Mr. Martinez. And

13 Mrs. Martinez.

14    Q. All four of these are on the board right now?

15    A. Yes, ma'am.

16    Q. The three that you're not friends with, would you

17 describe them as being enemies or --

18    A. Yes, ma'am.

19    Q. And who are they?

20    A. Mr. Diaz. Mr. Rivera. And -- I can't say -- what's

21 his name? Mr. Saldivar. I wasn't there when he became a

22 board member, so.

23    Q. You don't really know him?

24    A. No, I don't really know him.

25    Q. Did you campaign or have you campaigned in the past

## Page 30

1 for Ms. de la Rosa, Mr. Gonzalez and Mrs. Martinez?

2    A. It was understood that I supported them, but, no, I

3 did not campaign for them.

4    Q. And when you say it was understood that you supported

5 them, what, in the community?

6    A. In the community. Yes, ma'am.

7    Q. For instance, if they have some type of function you

8 would go to their functions?

9    A. I was more -- yeah, but social functions, not so much

10 related to politics. Just as friends. Plus it was very

11 difficult for me to campaign for or against because I was the

12 elections administrator.

13    Q. Okay. And what years were you the elections

14 administrator?

15    A. The last three years that I was there.

16    Q. So '98, '99, and 2000?

17    A. Yes, ma'am.

18    Q. Who was on the board in '99?

19    A. Mrs. Ramon. Mr. Contreras. Mr. Diaz. Mr. Rivera,

20 if I remember correctly. Ms. Martinez, Ms. de la Rosa and

21 Mr. Gonzalez. I don't know. That's seven board members?

22    Q. It's seven. And who was in the majority then, the

23 first four?

24    A. The first -- Ramon Contreras, Diaz and Rivera, yes,

25 ma'am.

## Page 31

1    Q. How about in '98?

2    A. '98, with the exception of Mr. Rivera. I believe

3 Mr. Martinez was on the board at that time.

4    Q. So then the majority was a different majority in '98?

5    A. Yes, ma'am.

6    Q. It was Martinez, Martinez, de la Rosa and Gonzalez?

7    A. Right.

8    Q. Okay.

9    A. Ma'am, it could have been -- it's been awhile

10 already. I remember on Ms. Rivas, Ms. Rivas could have also

11 been -- she was -- if it's not Rivera, it's Ms. Rivas. She

12 was also with the majority.

13    Q. Which majority?

14    A. Of the Gonzalez and de la Rosa majority.

15    Q. Okay. But in '98 it was a different majority?

16    A. Yes, ma'am.

17    Q. '99 rolls around and from what I have been -- the

18 Diaz camp is the one that's in the majority?

19    A. That's correct. In '99.

20    Q. Tell me, who's the ringleader of both majorities?

21 Just shorten it to one name.

22    A. Probably Mr. Diaz.

23    Q. Mr. Diaz?

24    A. Yes, ma'am.

25    Q. And how about of the Martinez, Martinez, de la Rosa,

## Page 32

1 Gonzalez?

2    A. I want to say Mr. Gonzalez, because he was the

3 president.

4    Q. Okay.

5    A. If I may, ma'am?

6    Q. Yeah.

7    A. The majority came into being in late '99, like maybe

8 September, October.

9    Q. Why is that?

10    A. Because they reorganized the board, people basically

11 switched camps.

12    Q. Okay. And when they reorganized --

13    A. That's when everything started.

14    Q. They still had the same board members, right?

15    A. Yes, ma'am, that's right.

16    Q. Who switched camps?

17    A. If I remember correctly, it was Ms. Ramon and --

18 okay, and Mr. Rivas.

19    Q. Ms. Ramon and Mr. Rivas went with the Diaz camp?

20    A. No, Mr. Rivera.

21    Q. Rivera?

22    A. Yeah. Rivera.

23    Q. Ms. Ramon and Mr. Rivera went with the Diaz camp?

24    A. That's right. Uh-huh.

25    Q. Do you know why?

Page 33

1  A. I guess they were unhappy with certain things.
2  Q. Like what kind of things?
3  A. Maybe the way the school was being run. It's hard to
4  say, ma'am. It's hard to pinpoint exactly what the reasoning
5  was behind that.
6  Q. You don't remember what spurred it? Usually there's
7  like one incident and everybody -- somebody mad about somebody
8  getting fired or hired or --
9  A. No. All I remember is that they were unhappy about
10 certain decisions that were being -- I don't recall the
11 specifics of them.
12 Q. Well, tell me something, you were the interim the
13 year before, right?
14 A. Right.
15 Q. Right before the May elections, right?
16 A. Uh-huh.
17 Q. They hired Dr. Cantu?
18 A. That's correct.
19 Q. And that was the old majority?
20 A. Right.
21 Q. Then as soon as he comes on board, he ends up with a
22 different majority board?
23 A. As soon as Dr. Cantu come on board?
24 Q. Right.
25 A. It's -- if I may say, the honeymoon lasted about four

Page 34

1  or five months with the board that hired him.
2  Q. Okay.
3  A. And after that everything changed.
4  Q. And then after that, the board turned against
5  Dr. Cantu?
6  A. I don't -- I guess when you say the old majority or
7  the new majority --
8  Q. Right.
9  A. He basically switched sides, the old majority was the
10 one that hired him.
11 Q. Right.
12 A. And eventually he went over to the other side.
13 Q. When did you start to have problems?
14 A. I want to say in the spring of 2000.
15 Q. What started the problems with you?
16 A. I remember -- I remember that Dr. Cantu first -- that
17 very first time that I heard about things going on behind the
18 scenes that Mr. Cantu had been approached about -- by certain
19 board members to get rid of certain people, among them Mr. de
20 la Rosa, myself and Mrs. Jimenez, Mrs. Nora Jimenez. And for
21 awhile he was a little bit defiant. If I remember correctly,
22 he went as far as saying, I'm got not going to let those
23 people run over me, I'm not going to let those people fire
24 you. He was very -- he was -- I felt that he was sincere
25 about really going the extra mile for us and not let anything

Page 35

1  happen to us.
2  Q. Okay.
3  A. That's what I remember.
4  Q. This was in the spring of 2000, correct?
5  A. Yes. Uh-huh.
6  Q. Did you have a conversation with him?
7  A. Yes, regarding that, yes, ma'am.
8  Q. When was it, was it before the elections, the 2000
9  elections or after the 2000 elections?
10 A. I want to say before the elections.
11 Q. Okay.
12 A. On or before the elections, more or less.
13 Q. And what happened? Did he call you in his office and
14 say, look, I have been approached by these board members?
15 A. Yes, said he was under a lot of pressure to do a lot
16 of things that he didn't feel comfortable with.
17 Q. Did he ever tell you when he had the conversation?
18 A. I know he had the conversation -- that I -- that I
19 got to witness the conversation, I didn't get to hear what
20 they were saying, was outside the administration building.
21 Q. So you actually saw this conversation taking place?
22 A. Yes, ma'am. Yes, I did.
23 Q. And when was it?
24 A. I want to say in the spring of 2000.
25 Q. Could it have been as early as January of 2000?

Page 36

1  A. I don't believe so, ma'am.
2       MR. PRUNEDA: Could we go off the record for
3  five minutes?
4       MS. NEALLY: Sure. No problem.
5       (Brief recess.)
6       MS. NEALLY: Back on the record.
7  Q. (By Ms. Neally:) We were talking about the meeting
8  that Dr. Cantu had with the board members which you said kind
9  of started all the problems that you had?
10 A. Yes, ma'am. Uh-huh.
11 Q. March, 2000, does that sound about right?
12 A. Perhaps, ma'am. I'm sorry, I would have to go back
13 and check my files, my records. But more or less.
14 Q. Do you have notes regarding that?
15 A. Yes, some notes. But my attorney has all the
16 information.
17 Q. Okay.
18 A. Specific date I won't be able to tell you. But I
19 remember the spring.
20 Q. And these notes that you have, they would support the
21 testimony that you're talking about right now, what you're
22 telling me about now?
23 A. Yes, ma'am.
24 Q. And you were present that day; is that right?
25 A. Yes. Uh-huh.

**Page 37**

1   Q. And what do you recall happened?

2   A. Well, just that they were outside for about twenty,

3 thirty minutes. Of course, I was not there present listening

4 to the conversation, but soon after that I found out that

5 that's what they were discussing. I even found out from one

6 of the board members that they had asked that -- the board

7 members had asked Dr. Cantu if he had a tape recorder on him.

8 And they patted him down, basically.

9   Q. Who is they?

10   A. The person that patted him was Mr. Diaz.

11   Q. And this was in the spring of 2000?

12   A. Yes, ma'am.

13   Q. Before that you didn't have any problems with

14 Dr. Cantu?

15   A. No, ma'am, I did not. Everything was working.

16   Q. Did he question any of your business practices or the

17 way you were running the business office?

18   A. No, ma'am. None whatsoever.

19   Q. Did he ever address any concerns with you before that

20 meeting?

21   A. No, ma'am. Huh-uh.

22   Q. When did your problems with Dr. Cantu actually start?

23   A. I want to say around between April and May of 2000.

24   Q. And what happened?

25   A. Well, for some reason I started seeing all kinds of

**Page 38**

1 write-ups. It may have happened a little later than May, but

2 prior to seeing those reprimands, I -- he hadn't called me in

3 to discuss any matter, any issue of concern to him.

4   Q. How did you learn about the conversation that took

5 place with Mr. Diaz and who else?

6   A. And Ms. Ramon.

7   Q. Ms. Ramon?

8   A. Uh-huh.

9   Q. Did you actually -- let me ask this first. Did you

10 actually see them go outside?

11   A. Yes, ma'am, I did.

12   Q. But you didn't overhear anything?

13   A. No, I did not, no, ma'am.

14   Q. Did you overhear anything when they were inside the

15 building -- or did they never come --

16   A. They never came inside. Not all of them together.

17   Q. And do you remember what time this meeting took

18 place? Was it around noon?

19   A. Right before noon.

20   Q. Okay.

21   A. Right before noon, between eleven and twelve, ten

22 thirty, twelve. About that time.

23   Q. Was it odd to you, you know, or you didn't think

24 anything at the time about it?

25   A. I didn't think anything at the time.

**Page 39**

1   Q. So when did you learn there was something different

2 about this meeting?

3   A. I want to say soon after. I don't recall if it was

4 that same week or the week after that, that Dr. Cantu

5 mentioned that to me.

6   Q. And what happened with that; did he call you in,

7 what?

8   A. He called me in and he said, look, these people are

9 still roughing me up about getting rid of certain people, in

10 particular you three, and -- well, I'm fighting it as much as

11 I can.

12   Q. Okay.

13   A. That's what he said, basically.

14   Q. And how did you learn about the wire tap accusation?

15   A. A board member told me, Mr. Gonzalez and Ms. de la

16 Rosa that they had been told by Dr. Cantu.

17   Q. And was that soon after?

18   A. Soon after, yes, ma'am.

19   Q. Within a couple weeks?

20   A. Probably, yes, within a couple of weeks, more or

21 less.

22   Q. Then you said April, May, maybe a little bit after,

23 you started getting a lot of write-ups?

24   A. Yes, ma'am, I did.

25   Q. Had you gotten any write-ups before that?

**Page 40**

1   A. No, ma'am.

2   Q. What were the write-ups about?

3   A. Deposits, not making timely company deposits,

4 write-ups about, oh, having too many accounts for the school.

5 Deficiencies with accounting procedures. I don't recall, but

6 I know I saw at least four or five different issues.

7   Q. During this time was TEA involved with your district?

8   A. TEA was called in -- they called -- they called them

9 around July or August, 2000.

10   Q. Who called them?

11   A. It was Dr. Cantu to assist us with business office

12 procedures.

13   Q. Dr. Cantu called up TEA to come in during this to

14 assist him with the business office?

15   A. Yes, ma'am.

16   Q. Did --

17   A. I believe before they called TEA they called Region

18 I.

19   Q. Region I?

20   A. Yes.

21   Q. Who came down from Region I during this TEA?

22   A. From Region I, it was Mr. Albert Villalpondo.

23   Q. During this, when did he first come on board?

24   A. I want to say sometime in June.

25   Q. Of 2000?

Page 41

1   A. Yes, ma'am.
2   Q. During this how about in -- TEA, who came down from
3   TEA -- was that Mr. Kiebel?
4   A. Mr. Jerry Kiebel is the name I remember.
5   Q. And when did he come down?
6   A. As I mentioned, ma'am, sometime in July, if I
7   remember correctly.
8   Q. Do you know whether Dr. Cantu also called TEA
9   regarding business issues?
10   A. Not to my knowledge, ma'am. I don't recall.
11   Q. Why was Villalpondo called in from Region I regarding
12   the business office?
13   A. It was to investigate matters pertaining to the
14   cafeteria, handling of cafeteria funds, since it was also a
15   department under my supervision. Cafeteria.
16   Q. What departments were under your supervision?
17   A. I had, of course, the PIEMS department, technology
18   department, maintenance during this transportation department,
19   cafeteria during this custodial.
20   Q. How long had you been in charge of these departments?
21   A. I'm going to say for at least four, five years. When
22   I became the administrator for business and operations, those
23   duties were transferred over to me.
24   Q. So when they changed your title, they gave you a
25   small raise in 1995, you also inherited these departments?

Page 42

1   A. Yes, ma'am.
2   Q. During this you were in charge of supervising them,
3   making sure they were run correctly?
4   A. Yes, ma'am.
5   Q. Now, the PIEMS department, correct me if I'm wrong,
6   that's the department that controls attendance?
7   A. That's correct, yes, ma'am.
8   Q. And attendance is how you get your money --
9   A. Generated revenue.
10   Q. Your general revenue?
11   A. How you generate revenue for the school.
12   Q. Well, both through federal and state; is that right?
13   A. That's correct, ma'am.
14   Q. During this, that becomes -- is that your general
15   revenue, is that the general fund?
16   A. The general revenue -- general fund during this, then
17   federal funds are two separate.
18   Q. Two separate accounts, right?
19   A. Yes, ma'am.
20   Q. You can only spend monies out of these accounts for
21   certain things, right?
22   A. Especially out of federal funds.
23   Q. Especially out of federal funds, right?
24   A. Yes, ma'am.
25   Q. And PIEMS department is very important to a school

Page 43

1   district that it's run properly, you have to give the correct
2   accounting?
3   A. That's correct.
4   Q. Correct attendance numbers, right?
5   A. Yes, ma'am.
6   Q. Was there an incident the PIEMS account ended up the
7   school district had to pay money back, or was going to have to
8   pay money back because of a problem with accounting?
9   A. Not to my knowledge, ma'am. I do not recall. Toward
10   the end when I was there, or years prior or --
11   Q. No, I'm talking about when you were there. Toward
12   the end.
13   A. Frankly, I do not recall.
14   Q. During this how about your cafeteria department?
15   A. Okay.
16   Q. What problems were there with the cafeteria that you
17   had to call in Region I during this TEA?
18   A. Issues having to do with missing funds, lost funds.
19   Q. How much was missing?
20   A. They called itemizing funds for some reason -- well,
21   we basically -- what I did, they asked me to give them that
22   report, they compared revenue in sales from one year to the
23   next and the difference was three thousand dollars
24   approximately.
25   Q. Which years were they comparing?

Page 44

1   A. What was it? '98 -'99, during this '97-'98.
2   Q. So in '97-'98 you had three thousand dollars more
3   generated in revenue?
4   A. That's right.
5   Q. Compared to '98-'99?
6   A. That is connect.
7   Q. What was your explanation for why there was that
8   three thousand dollar difference?
9   A. It had to do with lax accounting at the cafeteria
10   level. We had a very inexperienced cafeteria manager. She
11   wasn't keeping proper track of the receipts during the sales
12   and what have you.
13   Q. Who was your cafeteria manager?
14   A. Nora Munoz.
15   Q. Is she still there?
16   A. No.
17   Q. Was she fired or what?
18   A. She was fired.
19   Q. During this she was fired because of this; is that
20   right?
21   A. Right. During this other issue.
22   Q. When was she fired? Before you, right?
23   A. No.
24   Q. After?
25   A. After. About a year after I was.

Page 45

1    Q. Did you ever work with her before Region I during the
2 TEA were called in regarding her accounting procedures?
3    A. Yes, I did. Yes, I did. I actually -- when we first
4 hired her, I gave her orientation about the requirements, ins
5 and outs of being a cafeteria manager.
6    Q. And what was her explanation or anybody's explanation
7 for why there was that three thousand dollar difference?
8    A. Her explanation -- because I was there when Dr. Cantu
9 called us in, she was there as well, her explanation was that
10 she hadn't collected all the -- all the monies.
11       Of course, due to the -- to the incorrect
12 positing of sales and those types of things. She just did not
13 have the accounting expertise to keep up with -- to keep close
14 tabs on those sales.
15    Q. When was she there?
16    A. She had already been there, I'd say, about two years,
17 maybe, at the time I left, more or less.
18    Q. About two years?
19    A. About two years.
20    Q. She was there from '98, '97-'98, and '98?
21    A. That's correct, uh-huh.
22    Q. She first came in 1997?
23    A. Again, ma'am, I wouldn't be able to give you a
24 specific date on that.
25    Q. And in 1997 you just had the duties of the business

Page 46

1 management, right?
2    A. When this supposedly happened, I was the -- I was
3 also the interim superintendent.
4    Q. So in 1997, though, when she got there, you weren't
5 the interim superintendent, correct?
6    A. No, no, ma'am.
7    Q. Then 1998-'99 you weren't the interim superintendent?
8    A. I was interim superintendent from -- for various
9 months, from September, '98, through April, '99.
10    Q. September -- okay. The second year you were?
11    A. Right.
12    Q. But that first year she was there you just had the
13 duties of --
14    A. Administrator for business.
15    Q. Administrator for business and operations, right.
16 Okay. Did you ever ask during that time period to see her
17 accounting?
18    A. I delegated that duty to my accountant, which was
19 Nora Jimenez.
20    Q. You delegated the duty of the cafeteria operations --
21    A. To oversee. She was receiving all the deposits on
22 the sales.
23    Q. She actually got the deposits, right?
24    A. That's correct.
25    Q. Did you ever see any of the deposits?

Page 47

1    A. Very few. Very few. I would check them on a
2 sporadic basis.
3    Q. You left that to Nora Jimenez?
4    A. Yes, ma'am.
5    Q. Since then have you seen the notebook that Nora Munoz
6 was keeping regarding the cafeteria sales?
7    A. I saw it at the time when I met with Dr. Cantu.
8    Q. And I believe --
9    A. I also saw little pieces of paper which she was
10 writing down names of people that owed her money.
11    Q. People that owed her money?
12    A. Yes. Little pieces of paper.
13    Q. And it was just basically a little like I'd call a
14 composition notebook?
15    A. It was a junior legal pad.
16    Q. Right.
17    A. Little handwritten things.
18    Q. She had several of these little pads and she just
19 wrote it down in longhand, right?
20    A. That's what I remember.
21    Q. And would also stick in little pieces of paper IOUs?
22    A. Stickums, there you go. Exactly.
23    Q. And there was no backup on the computer?
24    A. No, ma'am.
25    Q. No backup in any other form?

Page 48

1    A. No, ma'am.
2    Q. As far as you know, the money that had disappeared,
3 or the money that wasn't accounted for was just money that was
4 owed?
5    A. That was owed, that is correct.
6    Q. That was her explanation?
7    A. That's correct. That's correct.
8    Q. Did you ever do any investigation regarding this
9 difference?
10    A. I -- when we met that one time, I looked at her
11 records and her files and even Dr. Cantu assisted in that
12 endeavor. I think we came up with a couple of grand that was
13 still out there that was unaccounted for or missing, owed.
14 But I believe nothing ever became of that because she had
15 records that would go back a year or so, maybe two years, and
16 maybe it was determined that those funds were not going to be
17 collected.
18    Q. And when did you do that with Dr. Cantu, that first
19 meeting?
20    A. Oh, I'd say around May, late May or early June.
21    Q. Again, 2000?
22    A. 2000, yes, ma'am.
23    Q. And that was the first time that it was brought to
24 your attention?
25    A. Yes, ma'am. Again, ma'am, I want to emphasize this.

## Page 49

1 I made Dr. Cantu aware of that discrepancy.
2     Q. You made him aware?
3     A. Yes, ma'am.
4     Q. How did you make him aware?
5     A. By making a comparison of prior year sales to that
6 particular year in question.
7     Q. When did you do that?
8     A. Around April, May. Around that time.
9     Q. In the course of this investigation, in addition to
10 these poor record keeping that you had in the cafeteria --
11     A. Right.
12     Q. -- that was just, you know --
13     A. That was the bottom line.
14     Q. -- inexcusable --
15     A. Exactly.
16     Q. -- wasn't there also an issue regarding doctored
17 deposit slips?
18     A. Okay. Dr. Cantu told me about those as well.
19     Q. Okay. That was also brought to your attention,
20 right?
21     A. Yes. Uh-huh.
22     Q. What was your explanation for the deposit slips that
23 appeared to have been changed without --
24     A. After I was notified from Dr. Cantu -- by Dr. Cantu,
25 I called in Nora Jimenez and I questioned her about those

## Page 50

1 doctored deposit slips. And she told me that it had to do
2 with her cashing certain checks. She didn't tell me what the
3 checks were for, but just mainly cashing checks for employees.
4     Q. Cashing checks for employees?
5     A. Uh-huh.
6     Q. So her explanation for the change in the deposit
7 slips was that she was cashing --
8     A. Checks.
9     Q. -- the checks for employees?
10     A. Employees, yes, ma'am.
11     Q. Kind of like we were discussing Mr. de la Rosa's
12 situation earlier?
13     A. Right.
14     Q. And one of the things that he admitted to was that he
15 used the student activities fund to cash checks instead of
16 going to the bank, correct?
17     A. That's correct.
18     Q. And so people were using the business office to cash
19 checks instead of having to go to the bank?
20     A. Back at that time, yes, ma'am.
21     Q. And that's the only explanation you got from Nora
22 Jimenez?
23     A. That's the only explanation, of course, that she
24 would -- obviously she would make the deposits first, they
25 were correct at the offset, right and, eventually she would

## Page 51

1 hang onto the deposits maybe a week or two and then at that
2 time -- during that time she would get some checks and she
3 would -- instead of making a new deposit slip, she would
4 change the deposit tickets so it reflected the cashing of
5 checks and what you owe.
6     Q. Was it ever expressed to you that there was a
7 suspicion that monies were actually kept by someone?
8     A. No. It was brought to my attention after we called
9 her in, after we suspected -- suspected that that was going on
10 and we -- we found out a lot of things that she was doing.
11 And at that time that's when we -- it was determined that
12 either she was going to be forced to resign or be fired.
13     Q. And when did she leave?
14     A. She left around June.
15     Q. Now, what did you find out?
16     A. That she didn't really have a good explanation, just
17 that she didn't have time to take the deposits to the bank on
18 a timely basis.
19     Q. Were you involved with the -- actually they hired an
20 auditor, right, besides Mr. Villalpondo, another auditor, Pete
21 Espinosa, was hired?
22     A. Yes.
23     Q. When was Mr. Espinosa hired?
24     A. He's been with the district -- for this particular
25 investigation or --

## Page 52

1     Q. For this particular --
2     A. -- associated with this one?
3     Q. Associated with this one.
4     A. I would say maybe around June.
5     Q. June of 2000?
6     A. Uh-huh. Yes, ma'am. He was already our auditor.
7     Q. Right.
8     A. Hired auditor.
9     Q. Right. But he didn't audit your cafeteria?
10     A. I don't recall that, ma'am.
11     Q. Okay. Well, if they had audited your cafeteria
12 before now, he would have found out about the poor record
13 keeping and --right?
14     A. I think -- I think -- do you mean the prior years?
15     Q. Right.
16     A. Okay. No, he cleared all the departments. And I
17 don't know if he made that recommendation to upgrade or
18 automate the cafeteria bookkeeping. I do not recall. But he
19 did -- I mean as part of their -- it's part TEA requirement to
20 audit all those departments.
21     Q. Okay. Did you recall seeing an audit reported in
22 March from Mr. Espinosa?
23     A. Okay. Pertaining to?
24     Q. The cafeteria.
25     A. Was it the cafeteria or student activity fund?

## Page 53

1  Q. Okay. I think it was the student activity fund.
2  Do you recall seeing any reports from him
3  regarding the audit he did on the cafeteria, or did he do one?
4  A. Honestly, ma'am, I remember student activity funds, I
5  can't recall cafeteria funds. But I'm sure -- feel pretty
6  confident that he went ahead and did one for the cafeteria.
7  Q. Okay.
8  A. There was so many different entities involved, we had
9  Region I, TEA and then of course Pete Espinosa. I don't know
10  who was involved prior to that time.
11  Q. Okay.
12  A. But I do recall that they would ask me for
13  information, so I feel pretty confident that Mr. Espinosa did
14  do an audit for the cafeteria.
15  Q. Let's go back to Nora Jimenez. You said you learned
16  a lot of things from Nora Jimenez?
17  A. Uh-huh.
18  Q. Like what?
19  A. That she was keeping deposits for long periods of
20  time.
21  Q. She kept one deposit from like January and cashed it
22  months later; is that right?
23  A. Right, from what I understand, yes, ma'am.
24  Q. And you have seen these deposit slips, right, they
25  have gone over them with you?

## Page 54

1  A. Dr. Cantu showed me one or two, yes. Yes, the ones
2  that were doctored or changed?
3  Q. Have you looked at the documents that I have supplied
4  to your attorney regarding all of this?
5  A. No.
6  Q. And it's your testimony that you have never -- you
7  have seen one of two of the deposit slips?
8  A. Yes, soon after it was determined that she was doing
9  that, that's basically when everything came up.
10  Q. Well, wasn't there a concern that you might have been
11  involved? Didn't you want to clear yourself that you didn't
12  have anything to do with this?
13  A. Well, I did -- I did try my best to clear my name,
14  but obviously they were on a different agenda. It didn't
15  really matter what I said. We determined that she did so
16  much, so many wrongdoings here we had to decide to let her go.
17  Q. Okay.
18  A. So that was the resolve there to that matter.
19  Q. Do you remember being told by Dr. Cantu to write up
20  an explanation, to come up with why these deposit slips
21  were -- had been falsified?
22  A. No.
23  Q. Do you remember telling Nora Jimenez to come up with
24  one?
25  A. Yes, I did. I did tell her, but she said, I don't

## Page 55

1  know. I just -- lack of time, too busy with other matters, it
2  wasn't important --
3  Q. Okay.
4  A. -- to her.
5  Q. But it's your testimony that you didn't have anything
6  to do with these falsified --
7  A. No, ma'am.
8  Q. -- documents; is that right?
9  A. That is correct.
10  Q. Did you ever bring the deposits to the bank?
11  A. As a matter of fact, soon after she was released,
12  I -- Mr. -- Dr. Cantu gave me that assignment.
13  Q. That you?
14  A. Take care of all the deposits and taking them to the
15  bank.
16  Q. Prior to that, did you ever take the deposits to the
17  bank?
18  A. No. If I did, I mean it was when maybe she was
19  absent or other people couldn't do it, but it was very rare.
20  Very rare.
21  Q. Who would usually take the deposits to the bank?
22  A. Nora. Nora, my assistant.
23  Q. You left the -- besides the monies that came in from
24  the cafeteria, the monies that came in from the high school
25  account --

## Page 56

1  A. Uh-huh.
2  Q. -- what other cash flow did you have coming in, what
3  other accounts?
4  A. Activity funds. Of course, high school, middle
5  school and elementary. And, of course, the cafeteria.
6  Q. Any other ones?
7  A. No, ma'am.
8  Q. You left these duties up to --
9  A. Nora.
10  Q. -- Nora?
11  A. Uh-huh.
12  Q. And in supervising her, you never looked over her
13  shoulder to see, make sure she was doing it correctly?
14  A. No, I actually trusted that she was doing the right
15  thing of her responsibilities and duties to take care of.
16  Q. Was there any criticism about commingling funds in
17  different accounts?
18  A. It was brought up in one of the -- the reprimands
19  that I received.
20  Q. How many accounts did you have open?
21  A. I want to say approximately twenty accounts, more or
22  less.
23  Q. Twenty accounts?
24  A. Yes, ma'am.
25  Q. In the course of being a business manager, didn't you

Page 57

1 have to receive training as you went along like seminars?
2    A. Yes, yes, I did.
3    Q. Like TSB, TEA training?
4    A. I did receive that.
5    Q. What was the recommended number of accounts that you
6 have for a school district, especially a small school district
7 like yours?
8    A. There really isn't a recommendation, ma'am. I first
9 heard about the recommendation when the auditors did for us.
10 But even the auditors said, it's up to you, it's -- you have
11 more -- the more accounts you have, the better off you are at
12 commingling funds. But, of course, the work is a lot more.
13    Q. Better off you are commingling?
14    A. Yeah, the more accounts you have, the --
15    Q. The greater risk, you mean?
16    A. Yeah, greater risk, exactly.
17    Q. Where did you have all these accounts, the same bank
18 or --
19    A. At that bank, yes, ma'am.
20    Q. What were they for, for these different accounts, the
21 twenty different accounts that you had?
22    A. They consisted of general fund, the federal funds,
23 activity funds, and -- that was it. That was it. If I may,
24 ma'am, when I started working there we had like sixteen or
25 seventeen accounts. I was never responsible for opening up

Page 58

1 the accounts. It was the discretion of the superintendents.
2    Q. When you were working with Dr. Cantu, did he ever ask
3 you to open up any accounts?
4    A. I don't recall if he did, and perhaps if he did, it
5 was an activity fund for the elementary.
6    Q. I'm sorry?
7    A. If he did, it was probably an activity fund for the
8 elementary.
9    Q. I'm going to show you a document that we will mark as
10 Exhibit 1. Have you seen that document before?
11    A. Yes. Uh-huh.
12    Q. Okay. That's a document dated what date?
13    A. March the 3rd, 2000.
14    Q. And that's from you to --
15    A. Dr. Cantu.
16    Q. Dr. Cantu, right?
17    A. That's true.
18    Q. And it says -- the first sentence says, as per your
19 request?
20    A. Okay.
21    Q. Is that right?
22    A. Yes, ma'am.
23    Q. And then what's the rest of that?
24    A. The following is a report on total receipts on meal
25 sales for school years then '97-'98, '98-'99 and current

Page 59

1 school year.
2    Q. Okay. Can I see that? So that's dated March 3rd,
3 2000?
4    A. Yes, ma'am.
5    Q. This indicates that Dr. Cantu requested that you
6 gather a report; is that right?
7    A. After having conversation with me, after I told him
8 that I could provide him with that information.
9    Q. The document doesn't say that?
10    A. Right.
11    Q. Just says --
12    A. That's right.
13    Q. And then 1997-'98 there were meal sales of seven
14 thousand seven hundred and ninety-six dollars and seventy-nine
15 cents, right?
16    A. Right.
17    Q. 19 -- I'm sorry. 1998 to '99 meal sales of four
18 thousand two hundred and five dollars and eighty-six cents?
19    A. Okay.
20    Q. And then 1999-2000, six thousand seven hundred ninety
21 dollars and four cents?
22    A. Up until the cutoff date.
23    Q. Up until the March 3rd cutoff date of 2000. So that
24 wasn't even a complete year, right?
25    A. That's right.

Page 60

1    Q. But from '98 to '99 you had a difference of really
2 almost four thousand dollars, three thousand nine hundred and
3 ninety-three dollars and forty-two cents?
4    A. Yes.
5    Q. And when you saw that document or when you prepared
6 this document, did major alarms go off?
7    A. Yes.
8    Q. That there was a problem there?
9    A. Yes, they did. You have to understand this cafeteria
10 manager only -- had never worked for our school district
11 before.
12    Q. Okay.
13    A. She was very inexperienced.
14    Q. She started in 1997?
15    A. Yes, ma'am.
16    Q. Were you ever advised that -- TEA had been called in,
17 right?
18    A. Right.
19    Q. And Region I?
20    A. Right.
21    Q. Were you visited by Dr. Cantu or Mr. Flathouse,
22 Mr. Kiebel, Mr. Villalpondo that they had problems with the
23 way the business office was being run?
24    A. They had some concerns, yes, ma'am.
25    Q. What kind of concerns did either TEA or Region I

Page 61

1 address to you? And Region I is just an offshoot of TEA; is
2 that right?
3    A. That is correct.
4    Q. What kind of problems did they address to you?
5    A. Well, actually the only one that approached me with
6 those conditions was Dr. Cantu, not any of those officials.
7 It was just Dr. Cantu. Apparently what had been forwarded to
8 him by those agencies.
9    Q. And what kind of problems were you advised that they
10 were having?
11    A. The concern about the federal -- the food service
12 account. Why there was such a discrepancy from one year to
13 the next.
14    Q. What else? Were any other problems addressed?
15    A. The commingling of funds, that's what I recall. But
16 I still don't know what they meant by that, commingling of
17 funds. I was never cited by any auditor for commingling
18 funds.
19    Q. So you don't know what they're taking about with
20 that?
21    A. No.
22    Q. Anything else?
23    A. Student activity accounts being in the red.
24    Q. School activity accounts were in the red at what?
25    A. At the high school. Student activity accounts at the

Page 62

1 high school.
2    Q. Why was that a problem from your department?
3    A. Well, because -- it wasn't -- I guess I was just
4 being notified of many different things, whether they had
5 something to do with me or not. The only thing I was doing
6 with those accounts was reconciling the accounts as per the
7 bank, not as per clubs, and things of that nature.
8    Q. Were you aware -- I'm sorry.
9       Your testimony is that you first became aware
10 that employees were cashing checks through the student
11 activity funds or the cafeteria --
12    A. That's correct.
13    Q. -- accounts after May of 2000. That's when you first
14 became aware that that was being done?
15    A. On or before May 2000, yes, ma'am.
16    Q. On --
17    A. On or before May 2000.
18    Q. And that was your first knowledge that employees were
19 doing this?
20    A. From what I recall, yes, ma'am. Uh-huh.
21    Q. Did you know that that was incorrect, that that was
22 not something that should be done?
23    A. Well, no, not really, ma'am, because I recall years
24 prior to that that superintendents were cashing checks at the
25 high school level. I was -- I witnessed something like that

Page 63

1 at the high school level on their student activity accounts.
2    Q. You witnessed superintendents cashing checks?
3    A. Yes, ma'am, uh-huh.
4    Q. How about other employees, did you ever witness other
5 employees cashing checks?
6    A. Not that I remember, no, ma'am.
7    Q. Let me show you what we're going to mark as Exhibit
8 2. Did you ever -- and just the handwriting is Dr. Cantu's,
9 right?
10    A. Uh-huh.
11    Q. Do you recall this document being produced?
12    A. Yes. Yes, I do.
13    Q. Was that a document that was made after your meeting
14 with Dr. Cantu and he requested some type of documentation
15 regarding the deposits that were made --
16    A. Yes, it was.
17    Q. -- in 98-'99?
18    A. Yes, ma'am.
19    Q. Is that a document that Nora Jimenez generated or
20 something that had been kept all along?
21    A. This is something she generated and I requested this
22 information to simplify the interpretation of the report.
23 That was the reason behind this.
24    Q. Okay.
25    A. That's all we were trying to do.

Page 64

1    Q. Then it's the same thing with Exhibit 3?
2    A. Yes, ma'am. Uh-huh.
3    Q. I'm going to show you what we produced --
4    A. Okay.
5    Q. -- in response to -- supplemental response to first
6 request for production back in September of this year.
7    A. Okay.
8    Q. This is a copy of the documents that were kept at the
9 cafeteria. Does that look about like, you know, the records
10 that you saw?
11    A. Yes, ma'am.
12    Q. That looks like the documents --
13    A. Yes.
14    Q. -- that we were talking about, that's the kind of
15 record keeping that the cafeteria was doing in '97, '98, '99?
16    A. Yes, ma'am.
17    Q. What were they doing before that?
18    A. The money receipts, we had a cafeteria manager prior
19 to her that had about eight years of experience.
20    Q. I'm going to show you some documents that I provided
21 to your attorney already, but this is Exhibit 4. That's dated
22 November 5th, 1999?
23    A. That's correct, ma'am.
24    Q. And that's a letter that you received -- do you
25 remember receiving that?

Page 65

1    A. I believe so, yes, ma'am.
2    Q. It's a write-up about punctuality by Dr. Cantu?
3    A. I discussed that memo with him, I recall, and he said
4 that the only reason he was sending it to me was because he
5 was getting, I guess, influenced by certain people, either
6 board members or what have you to try to bring up something
7 against me. I don't know if that was the beginning, but I
8 discussed it with him. He told me, don't worry about it, I
9 know you're at work, that you work extra hours, twenty, thirty
10 hours a week extra, you're committed to your job, so this is
11 just a formality, don't pay too much attention to it, I just
12 have to do it in case they asked me for it.
13    Q. That's a document, though, you got, though, in
14 November --
15    A. Yes.
16    Q. -- of 1999, right?
17    A. Correct.
18    MS. NEALLY: object to the responsiveness of the
19 answer.
20    Q. (By Ms. Neally:) How about this document, November
21 5th, 1999, Exhibit 5, regarding a high school student
22 incident. Do you remember receiving that?
23    A. Yes, I do.
24    Q. What was that incident about?
25    A. This has to do with my ex-girlfriend's association

Page 66

1 with this young girl. I believe she got the number from
2 Ms. Ramirez, which was my girlfriend at the time, and for some
3 reason or another she started calling me. I wasn't
4 influencing her in any form or fashion, I was being nice about
5 it. I was just very cordial with the conversation that I had.
6 But it had to do -- she was trying to get in touch with
7 Ms. Ramirez.
8    Q. Okay.
9    A. And a lot of times she would call me after hours
10 hoping that Ms. Ramirez would be there with me or around so
11 she could talk to her.
12    Q. What do they mean by TTY calls?
13    A. She's -- I don't know -- what do you call it?
14    Q. Speech impaired?
15    A. Yes, ma'am, that's correct.
16    Q. So she would actually type --
17    A. From what I understand. I don't know exactly how it
18 works, but that's more or less how that situation turned out.
19    Q. Okay.
20    A. Her association with Ms. Ramirez was very close and
21 somehow some way I got involved in the picture.
22    Q. We will mark this as Exhibit 6. Dated May 3rd. Do
23 you recall getting that document?
24    A. Yes. Yes, I do.
25    Q. And that's the start of the cafeteria problems,

Page 67

1 right?
2    A. That is correct. Uh-huh.
3    Q. I mean actually this started in March, right, that
4 was the -- that was the first exhibit, March 3rd, 2000, is
5 when they learned about the three thousand dollar discrepancy?
6    A. Right.
7    Q. That's when they called in the TEA, Region I, right?
8    A. TEA and Region I were not involved until May.
9    Q. Until May, after you got this letter?
10    A. Right.
11    Q. And addresses concerns that he had regarding
12 collections and deposits of revenue, the high school activity
13 fund; is that right?
14    A. Yes, ma'am.
15    Q. And then the cafeteria funds?
16    A. Yes, ma'am.
17    Q. And then this is a document dated July 11th, 2000.
18 This is the first reprimand that you got, other than the
19 documents I have already given you, this is an actual official
20 reprimand; is that right?
21    A. That is correct, uh-huh.
22    Q. We will mark that Exhibit 7.
23    And that you were being reprimanded about the
24 cafeteria account?
25    A. About the cafeteria, right.

Page 68

1    Q. And it's your testimony that Nora Jimenez was
2 actually the culprit here because you had assigned this task
3 to her and you expected her to follow through?
4    A. Nora Jimenez related to the deposits or in general.
5    Q. No, you said you had given her that assignment,
6 right?
7    A. That assignment, to take care of the deposits, yes,
8 ma'am.
9    Q. Not necessarily just the deposits, but to make sure
10 the cafeteria was running?
11    A. That's correct.
12    Q. And it's your testimony in response to that -- and I
13 know you have written your own response --
14    A. Exactly.
15    Q. -- that you felt that it was her job, you trusted her
16 to do it correctly?
17    A. That's right.
18    Q. Okay. And that your -- you know, when you noticed
19 the discrepancy in the years that you said -- your testimony
20 is when you noticed the discrepancy between the years, that's
21 when you brought it to Dr. Cantu's attention; is that right?
22    A. Yes, ma'am.
23    Q. Which is contrary to the thing that we saw which said
24 in response to my request that you do this?
25    A. Okay.

1    Q. This is a memo dated July 13th, 2000. So two days
2 later you get another letter of reprimand; is that right?
3    A. I got a whole bunch, ma'am.
4    Q. And that's Exhibit No. 8.
5    A. That's correct.
6    Q. This letter of reprimand -- the first one had to do
7 with the cafeteria, right?
8    A. Right.
9    Q. The second one dated July 13th has to do with the
10 high school activity account, right?
11    A. Right. Even though I had nothing to do with their
12 bookkeeping.
13    Q. And it indicates that a final audit had been
14 completed?
15    A. Right.
16    Q. You got that in July of 2000?
17    A. Yes, ma'am.
18    Q. And the results of the audit indicated that because
19 of lack of accountable procedures both accounts audited, and
20 by that they mean the cafeteria and the high school activity
21 fund --
22    A. High school activity fund, right.
23    Q. -- reflect severe problems which require that these
24 findings be reported to the proper regulatory agencies and you
25 were reprimanded for mismanaging responsibilities related to

1 your office; is that right?
2    A. Yes, ma'am.
3    Q. And that has to do with the actual deposits that were
4 made?
5    A. Actual deposits that were made --
6    Q. The deposits were made through your office, right?
7    A. Through my office.
8    Q. Right, because Mr. Medina at the high school didn't
9 deposit those funds, he would get the money and he would bring
10 it to your office, right?
11    A. Right.
12    Q. And then it was one of Ms. Jimenez's duties to make
13 sure that those funds were deposited?
14    A. That's correct.
15    Q. And as you said, you know, at some point, what, May
16 of 2000 you were told you have to do them directly; is that
17 right?
18    A. May or June, yes, ma'am.
19    Q. But before that you, again, the same --
20    A. I hardly got involved in that.
21    Q. Right. And it's the same thing as this July 11th,
22 2000, reprimand with regard to the activity funds it was
23 your -- it's your testimony that Ms. Jimenez was taking care
24 of that and Mr. Medina; is that right?
25    A. That's correct.

1    Q. That you didn't have any responsibility for it?
2    A. That's right.
3    Q. The next exhibit, which is 9, is a memo dated August
4 8, 2000. Do you remember receiving a copy of that?
5    A. Yes, ma'am. Uh-huh.
6    Q. And the reference on that is failure to perform
7 duties; is that right?
8    A. That is correct.
9    Q. Let me get it back, it's the only copy I have got.
10       In this document I have some questions about it,
11 because I want to make sure I understand it. Number one
12 criticism in the complaint by Dr. Cantu about neglecting to
13 perform your duties is one failure to roll the 1998-'99
14 account balances to 1999-2000 accounts.
15    A. Yes.
16    Q. What does he mean by that?
17    A. Starting balances, so we weren't -- at that time we
18 were having some complications with the RS Triple C programs.
19 We couldn't roll over anything because we couldn't get our
20 system up and running and we just had so many problems.
21    Q. Well, you said the RS Triple C programs --
22    A. Region I.
23    Q. -- you're talking about a computer system?
24    A. That's correct, yes, ma'am.
25    Q. So he criticized you for the rollover not being done

1 until the first week of August?
2    A. Right.
3    Q. And it's your testimony that was out of your hands
4 because it was Region I?
5    A. That's right.
6    Q. Number two was failure to amend school budgets for
7 the 2000-2001 school year in a timely manner.
8    A. When he first came to our district I had made him
9 aware of all the guidelines that we had in place, if he wanted
10 to change them somewhat he could advise me. And one of those
11 guidelines that I informed him about was the amendment, we
12 usually do those at the end of the year. And perhaps because
13 Region I came in and TEA and what have you, maybe they
14 recommended that we do them on a regular basis. But for the
15 last -- since I have been there we had been doing them at the
16 end of the year before we closed the budget year.
17    Q. And it's your testimony that you weren't made aware
18 that that was not good accounting procedures --
19    A. Exactly.
20    Q. -- until TEA and Region I came in --
21    A. Yes, ma'am.
22    Q. Let me finish, okay?
23    A. Yes, ma'am.
24    Q. Until May or June of 2000?
25    A. Yes, ma'am.

Page 73

1   Q. You have to let me finish my question; he can't take
2 us both down talking, okay?
3   A. That's fine.
4   Q. If I interrupt you, I apologize, sir. We have got to
5 be careful of that.
6      Number three was failure to submit to TEA the
7 transportation report in a timely manner. This forced TEA to
8 estimate zero revenues in the summary of finances for 2000 and
9 2001.
10      Tell me about this transportation report, that's
11 something you're responsible for, your department is, right?
12   A. Right. That's right.
13   Q. Now, is this like the utility fund and cafeteria
14 where you had delegated that to one of your employees?
15   A. No, I actually completed that report, but it had some
16 discrepancies on it and they returned it back, they rejected
17 it. But eventually corrected that and they sent us the funds
18 that we had -- that we were eligible for that same year.
19   Q. When did you get those funds? After you had already
20 been -- after you had left?
21   A. I want to say before I left.
22   Q. Before September?
23   A. Before September, yes, ma'am.
24   Q. But after the date of this?
25   A. Right.

Page 74

1   Q. After the August date?
2   A. Those reports have so many different requirements
3 that if you're off a certain number here or there they
4 won't -- they won't run it through. But we went ahead and got
5 those funds anyway, it wasn't really a problem.
6   Q. Number four, failure to accurately respond to the TEA
7 monitor whether an interest and sinking fund account is in
8 existence.
9      What is an interest and sinking fund?
10   A. That's -- that fund is used to repay bond
11 indebtedness. We did have it, we did have that account. I
12 really didn't understand that concern. The account has been
13 with us since 1994 or '95, interest and sinking fund. Where
14 the confusion lies is in that -- in the fact that we weren't
15 using that fund to repay our bonds, and the reason we were not
16 using that fund to repay our bonds was because we hadn't
17 earmarked a certain tax rate to repay our bonds, we were
18 paying our bonds out of the general fund.
19   Q. That's a wrong procedure; is that right?
20   A. No, it's not wrong. Nothing wrong with that.
21   Q. Is it wrong to use the interest and sinking funds to
22 pay other things?
23   A. That is wrong, yes.
24   Q. Okay.
25   A. They were never used to pay other things.

Page 75

1   Q. What were they doing just sitting?
2   A. We were earning interest. The interest that we were
3 earning on our bonds were deposited into that account.
4   Q. And he goes on to say these I&S payments need to be
5 reflected in the books by August 31, 2000, or the district
6 will be in serious trouble. That's true, right?
7   A. Right.
8   Q. I&S funds should never be commingled with other
9 funds; that's true also?
10   A. Right. But they were not commingled.
11   Q. Five is misleading the board and superintendent on
12 whether a hundred and eighty-nine thousand dollar TEA/IFA
13 payment was opened as a CD and not spent as directed by the
14 board.
15   A. He was made aware of this, ma'am, when we cashed in
16 the CD. We needed funds to operate the district, obviously,
17 and we went ahead and cashed it in. He was notified about
18 that in advance.
19   Q. When did that happen?
20   A. March, April of 2000. Yeah, March, April, 2000.
21   Q. What had the board directed that it be spent on?
22   A. Be set aside, earn interest on it and see what
23 happens, because it was still up in the air whether we were
24 going to keep that money or not.
25   Q. And you said that you actually spent it?

Page 76

1   A. We used it for operating funds, yes, we did. For
2 cash flow purposes.
3   Q. And I'm confused because it says misleading the board
4 and superintendent on whether a hundred and eighty-nine
5 thousand dollar TEA/IFA payment was opened as a CD and not
6 spent as directed by the board. Because this implies to me
7 that you were supposed to have spent it.
8   A. We had it as a CD.
9   Q. Okay.
10   A. He implied we hadn't opened up a CD, and we did. We
11 had it as a CD with the First National Bank. Eventually on or
12 before March or April of 2000 we had some cash flow problems
13 because the month of March TEA does not release the general
14 revenue funds to the school district, and therefore we had
15 that problem where we couldn't afford to even pay -- meet
16 payroll obligations. So we did not have a choice in the
17 matter and I made him fully aware of that. He said, okay, we
18 get the monies later on, we can put it back as a CD.
19   Q. What about failure to respond to my requests for
20 reported on outstanding invoices, too many bills are not being
21 paid in a timely manner?
22   A. He -- we had very few bills that were not paid and
23 the reason they were not paid was because there was some
24 issues that had to be resolved with the companies. There was
25 one instance where, you know, Uni First, the rental company

Page 77

1  for uniforms, was charging us for the holidays for the -- for
2  the Christmas vacations and Thanksgiving vacations and I was
3  trying to resolve those matters where they would give us
4  credit. There were very few companies for which we had
5  outstanding bills on. Very few. That was very minimum.
6      Q. You also were criticized for publishing a wrong
7  notice for the 2001 tax rated and budget hearing?
8      A. I was not involved with that, ma'am. I don't know
9  where that came from. He was -- at that time I was no longer
10  the business manager. Someone was responsible for those --
11  publishing those notices. It wasn't me.
12      Q. When were they published?
13      A. I want to say August, late August, maybe September.
14  I don't recall. But they realized that they made a mistake on
15  the hearing notice and attendance and requirement and what
16  have you and of course at that time they were, sorry to say,
17  blaming me for everything.
18      Q. Were you told by him to keep the cafeteria open on
19  Fridays during the summer to feed school-age children ?
20      A. If I was told, I did keep it open on Fridays. If I
21  was told. The only reason that I had a concern was because
22  that was not -- that day was not part of the budget but we
23  went ahead and okayed it anyway, left it open, if I remember
24  correctly.
25      Q. Okay.

Page 78

1      A. We weren't going to get paid for that day.
2      Q. Okay.
3      A. Put it that way.
4      Q. You deny that you were insubordinate by not doing
5  that?
6      A. Honestly, I do not recall. I remember having
7  conversations with the cafeteria manager, with Nora Munoz,
8  about that.
9      Q. Okay.
10      A. But he gave that order, it came afterwards.
11      Q. This, Exhibit 10, August 16th, you were reassigned to
12  a different position; is that right?
13      A. That's correct.
14      Q. September 1st, got another reprimand?
15      A. Now, this one --
16      Q. That's 11.
17      A. Okay. The only thing I want to add on to that,
18  ma'am, of Mr. Turrubiates was already our business manager
19  unofficially, I was helping him throughout the time that he
20  was there assisting him in anything and everything that had to
21  do with the business office, including completing the
22  2001-2002 school budget. I was involved with completing that
23  task.
24      Q. September 1st you got another, Exhibit 11?
25      A. This reprimand, just for the record, I did not see

Page 79

1  this reprimand until -- until the date of the hearing with the
2  examiner, which was November the 1st or December the 1st, I
3  can't recall the exact date. But I had never seen that
4  document up until that date.
5      Q. Okay. This is about your contract?
6      A. Yes.
7      Q. Which is what that big appeal was about?
8      A. Yes, ma'am.
9      Q. And then did you see this one, Exhibit 12, September
10  1st reprimand regarding the failure to provide the correct tax
11  rate?
12      A. I recall in one. I believe I received this one at
13  home.
14      Q. Okay.
15      A. When I was at home. Again, the only thing I have to
16  add to this was that that was not my responsibility.
17      Q. You were notified on what date that you were
18  terminated?
19      A. I believe it was the same day that I got the letter.
20  September 15th, maybe.
21      Q. September 15th. September 1st you were placed on
22  suspension, right, Exhibit 13?
23      A. Again, this one is also one that I got way after the
24  fact.
25      Q. I'm having trouble locating the termination, but it

Page 80

1  was just a single sentence saying you were terminated, right?
2      A. Right.
3      Q. Just a single sentence saying, please be advised that
4  you have been terminated?
5      A. That's right. Due to the -- I believe it said
6  something due to the effect where it had to do with failure to
7  submit the contract. That's what I recall. Maybe not.
8  Failure to submit the contract on a timely basis.
9      Q. That's why you were terminated?
10      A. Yes, ma'am.
11      Q. That's what the letter said?
12      A. That's what I remember.
13      Q. We're going to have to take a break and I'm going to
14  have to find the actual letter, then.
15      A. Due to the fact that I did not have a contract on
16  file, something like that.
17      Q. You were regarded as an at-will employee at the time
18  you were terminated, is that correct, according to the school
19  district?
20      A. Well, up until that point I was under the impression
21  that I was a contract employee.
22      Q. Okay.
23      A. Which I had been approved in March or February of
24  that year by the board to renew my contract.
25      Q. I understand that, and in fact you had a whole

Page 81

1  hearing regarding whether or not you were a contract employee;
2  is that right?
3      A. That's correct.
4      Q. And it was TEA's decision in the termination and
5  determination that you did not have a contract, right?
6      A. From what I understand, yes, ma'am.
7      Q. In fact, I'll show you what we're going to mark as
8  Exhibit No. 14, where the Hearing Officer concluded that. And
9  it is not an issue in your lawsuit whether or not you have a
10 contract; is that correct?
11     A. My attorney --
12     Q. Well, you know, I need to know because otherwise I'm
13 going to have to go into -- we're going to have to be here for
14 several more hours to discuss whether or not that's an issue.
15        And it was not, you did not appeal the decision
16 of the TEA. In fact, if you will look at the end of this, the
17 hearing officer's recommendation was:  I hereby recommend that
18 a written contract did not exist between the parties and this
19 case be dismissed for lack of jurisdiction.
20        Is that what the last sentence says on Exhibit
21 14?
22     A. Yes, ma'am.
23     Q. Now, when you were terminated you appealed the
24 termination to the board; is that right?
25     A. Right.

Page 82

1      Q. And there was a level three hearing?
2      A. That's correct.
3      Q. And you hired an attorney to represent you?
4      A. That's correct.  Uh-huh.
5      Q. And it was Kevin O'Hanlan; is that right?
6      A. No.
7      Q. Who did you hire?
8      A. Oh, it was Michael Skirk.
9      Q. Oh, Mr. Skirk.  So Mr. Skirk represented you at the
10 level three hearing?
11     A. Level three would be with the board, ma'am, or the --
12 or with the hearing.
13     Q. The board.
14     A. The board.  Yes, ma'am.
15     Q. Did you have any level one or a level two --
16     A. Yes, ma'am.
17     Q. -- or go straight to the board?
18     A. Level one and two.
19     Q. Who heard your level one?
20     A. Doctor -- I believe I bypassed level one and went to
21 level two.
22     Q. Okay.
23     A. Dr. Cantu.  Mr. Hinojosa was the attorney and
24 Ms. Gonzalez the NEA representative.  Local representative.
25     Q. They were present for the level two?

Page 83

1      A. Yes, ma'am.
2      Q. And did Dr. Cantu deny your level two?
3      A. I believe so -- yes.  Yes, he did.
4      Q. And then you appealed it to level three which was
5  before the board; is that correct?
6      A. I don't recall going before the board.  If I did --
7  would I have to be present if I did do that?  Because they did
8  not call me in.
9      Q. So you don't know whether or not you had a level
10 three?
11     A. I do not recall, ma'am.
12     Q. When did you first learn that the school district did
13 not think that you had a contract?
14     A. When I got the -- the -- the letter of termination.
15     Q. Let me show you what we're going to mark as Exhibit
16 15.  Do you recall seeing a copy of that?  It's a 1998
17 document.
18     A. Yes, I do.
19     Q. Did you implement new practices as a result of that?
20     A. Yes.  Yes, I did, ma'am.
21     Q. Okay.
22     A. At that time we were having all kinds of cash flow
23 problems because we were in the process of constructing
24 various facilities for the school district.
25     Q. Let me show you what we will mark as Exhibit 16.

Page 84

1  This was a level one complaint you had about your
2  reassignment.  Did that actually get heard?
3      A. I believe so, ma'am.
4      Q. So you had a grievance regarding your reassignment.
5  And you had a grievance regarding actually whether you had a
6  contract, right?
7      A. Correct.
8      Q. But you can't remember whether that was heard by the
9  school district?
10     A. That's correct.
11     Q. But there was a grievance -- I mean there was a
12 hearing before a hearing officer that had been appointed by
13 the commissioner of education --
14     A. Correct.  Uh-huh.
15     Q. -- regarding the contract, and it's your
16 understanding that the TEA concluded that you did not have a
17 contract; is that right?
18     A. That's right, uh-huh.
19     Q. And you did not appeal the TEA's decision regarding
20 whether or not you had a contract, correct?
21     A. Correct.
22     Q. And you have not pled in your present lawsuit any
23 allegations regarding any breach of contract?
24     A. Right.
25     Q. And is it your understanding you don't intend to?

**Page 85**

1  A. No.
2  Q. Is that correct?
3  A. That's correct.
4  Q. Here's a document, Exhibit 17, it's a document dated
5  September 14th, 2000. That has to do with the level two
6  grievance; is that right?
7  A. Yes, ma'am.
8  Q. And you still -- based on that, you don't remember
9  whether or not you appealed to the --
10  A. To the --
11  Q. -- board of trustees?
12  A. To the board?
13  Q. Uh-huh.
14  A. No, ma'am.
15  Q. Let me though show you another memo dated February
16  25, 2000, Exhibit No. 18. Did you get a copy of that?
17  A. Yes, I did.
18  Q. And that has to do with monitor -- the last sentence
19  of that, what does it say?
20  A. Also in the future as business manager please monitor
21  this process as was approved administratively.
22  Q. And what process is he talking about?
23  A. Securing the gate receipts from sport-related
24  activities.
25  Q. And who was responsible for that?

**Page 86**

1  A. I was.
2  Q. What was the problem that they had with that in
3  February of 2000?
4  A. They felt that too many people were getting involved
5  with securing those proceeds. They wanted to centralize it.
6  Q. If you were offered your job back, would you take it?
7  A. I would consider it, ma'am, depending on the
8  circumstances.
9  Q. And what circumstances would those be?
10  A. Well, that's something that I would leave to my
11  attorney to discuss or present to --
12  Q. What concerns would you have about going back then?
13  A. Well, for one thing, board member still there, the
14  ringleader, so to speak. That would be my only concern. I
15  feel that I would still be harassed or --
16  Q. So you would have concerns about going back to work
17  there?
18  A. Maybe. Perhaps.
19  Q. What damages are you seeking?
20  A. That's something that my attorney would have to
21  decide.
22      MS. NEALLY: I need to take a short break to
23  look for some documents, so let go of the records for a
24  minute, okay?
25      (Short recess.)

**Page 87**

1  Q. (By Ms. Neally:) Exhibit 19 is the actual letter you
2  received regarding your termination, right?
3  A. That's correct.
4  Q. Are you aware of the pleading that your attorney
5  filed on your behalf?
6  A. I'm sorry, ma'am?
7  Q. Are you aware of pleadings that your attorney filed
8  on your behalf?
9  A. Yes, I remember it, a little bit about them.
10  Q. And you filed suit under the Texas Constitution,
11  right?
12  A. Right.
13  Q. Are you aware that your only relief under the Texas
14  Constitution would be to be rehired as the business manager?
15  A. I was not aware of that, no.
16  Q. And that's something that you're not even sure that
17  you would want to do; is that right?
18  A. It's something that I would consider very much. But,
19  again, if anything would hold me back, it would be something
20  like that, but --
21  Q. Let me show you what we're going to mark as Exhibit
22  19, the September 15th termination letter --
23  A. Right.
24  Q. -- it indicates in here that -- it just says please
25  be advised that, effective immediately, you are relieved of

**Page 88**

1  your employment with Santa Maria Independent School District.
2      Although the school board voted to extend you an
3  offer for employment for the 2001 school year, you failed to
4  timely return the contract by May 15th, 2000, as required.
5  And I know you denied that in your appeal to the commissioner
6  of education, okay?
7  A. That's correct.
8  Q. Then it goes on to say: As a non-contract employee
9  you may be terminated by the superintendent.
10  A. That's correct.
11  Q. And you understood that at the time you were
12  terminated on September 15th, 2000, you were regarded as an
13  at-will employee by the superintendent?
14  A. That's correct.
15  Q. And you acknowledge that the superintendent has the
16  authority to hire and fire --
17  A. At-will --
18  Q. -- at-will employees, right? Is that correct?
19  A. That's correct.
20  Q. And I'll show you Exhibit 20 just to see if it
21  refreshes your memory. I asked your earlier did you file a
22  level three and you said you couldn't remember whether you
23  did. Does that refresh your memory since it is a level three
24  form?
25  A. Yes, it does. This is the one that I thought was

Page 89

1  level two with Ms. Gonzalez.

2  Q. Well, I have seen that document, too. In fact, we've

3  got a copy of that document already, but then there was a

4  level three, in fact it's exhibit -- Exhibit 17 evidences that

5  you had a level two hearing and this was the decision which is

6  dated September 14th. It indicates you had a level two on

7  September 7.

8  A. Okay.

9  Q. And this document is signed September 20. Is that

10  your signature?

11  A. That's correct.

12  Q. Signed September 20, it's a level three?

13  A. This is probably the one we had in the presence of

14  Mr. Hinojosa and the school attorney.

15  Q. But do you remember if the trustees voted --

16  A. No, I don't.

17  Q. -- about your grievance?

18  A. No, I don't.

19  Q. So you don't recall that the trustees ever confirmed

20  or denied the grievance that was submitted to you?

21  A. They denied it and I heard -- that information was

22  passed on to me by Mr. Skirk.

23  Q. So Mr. Skirk went without you being present?

24  A. Honestly, ma'am, I don't remember the board meeting.

25  I honestly don't remember. I don't recall being there with

Page 90

1  the board on the level three hearing.

2  Q. Were you under any kind of medication at that time?

3  A. Yes, I was.

4  Q. You could have been present and you just don't

5  remember?

6  A. Something like this, I would remember.

7  Q. Okay. So you don't remember being present, though --

8  A. Right.

9  Q. -- for the level three before the board?

10  A. Right.

11  Q. And you don't know what trustees voted?

12  A. No.

13  Q. Or how they voted or anything like that?

14  A. No.

15  Q. What conversations have you had with any trustees

16  regarding your termination?

17  A. Just that Mr. Diaz was the one that pressured

18  Dr. Cantu to terminate us at whatever the cost.

19  Q. Do you recall your earlier testimony to me about the

20  meeting that was in March, 2000 --

21  A. Right.

22  Q. -- where Mr. Diaz and Ms. Ramon --

23  A. Ms. Ramon.

24  Q. -- met with Dr. Cantu outside of the administration

25  building, right?

Page 91

1  A. That's correct, uh-huh.

2  Q. And you testified that it was in a couple of weeks

3  that Dr. Cantu came to you, said, look, you know, I'm not

4  going to terminate you based on the pressure that I'm getting

5  from these individuals, right?

6  A. Right. That's right.

7  Q. Do you personally know of anything that changed

8  regarding that with Dr. Cantu?

9  A. For one thing, ma'am, it was constant pressure that

10  he was getting from the board, from those particular board

11  members, he was getting calls on a daily basis.

12  Q. About terminating you?

13  A. About pressure to find a way to get us out. I mean I

14  knew about that because he would tell me. And I feel that

15  eventually he caved in, he gave in, mainly because they

16  promised him an extension on his contract and he basically

17  followed those rules, those requirements.

18  Q. But he never got an extension on his contract, right?

19  A. He did. He got one year.

20  Q. But he had gotten that one before all this ever

21  happened?

22  A. I believe he got one year, the year soon after I left

23  he got an extension.

24  Q. Well, he left in 2001, right?

25  A. He left late 2001, if I'm not mistaken.

Page 92

1  Q. He did, he left in 2001, right?

2  A. So he still had like maybe six months left on his

3  extension.

4  Q. You don't know when he got the extension for sure?

5  A. I want to say soon after I was terminated.

6  Q. And that's based on what? You weren't there, right?

7  A. That's correct. Based on what I heard out in the

8  community.

9  Q. So that's your theory about what happened?

10  A. That's correct.

11  Q. Is that right?

12  A. That is correct.

13  Q. And all of these reprimands and the discrepancies

14  with the cafeteria fund, the high school activity fund,

15  roll-over account, all that documentation was just as cover

16  for going along with them; is that right?

17  A. That is correct.

18  Q. So if he testifies that he did not take it, their

19  pressuring, into consideration when he made the determination

20  to terminate you based on the business practices that are

21  evidenced by these documents that I have shown you today, then

22  he's not telling the truth; is that right?

23  A. That's correct.

24  Q. And what reason does he have to lie about that now?

25  MR. PRUNEDA: Objection; form.

**Page 93**

1   Q. (By Ms. Neally:) If you know of any.
2   A. That's very difficult to say, ma'am. He even -- he
3   even went as far as telling some of my colleagues and friends,
4   quote/unquote, that Mr. Acosta has done nothing wrong. What
5   Mr. Acosta did or what supposedly I wrote him up on could be
6   easily corrected. But he had done -- he kept saying to people
7   that Mr. Acosta did nothing wrong, it was just pressure that
8   kept coming my way and I couldn't -- I couldn't avoid it.
9   Q. And who did he tell that to?
10   A. He told that to Mr. Turrubiates, he told that to
11   Mr. Medina, board members, couple of the board members,
12   Mr. Gonzalez, de la Rosa. He even told that to one of my --
13   one of our salesmen that we had there for athletic insurance,
14   and --
15   Q. Who was that?
16   A. Mr. Ortiz. Gilbert Ortiz. Gilbert Ortiz.
17   Q. Uh-huh.
18   A. And those are all the names I recall at this time.
19   Q. And these are people that he told this to after you
20   were terminated?
21   A. That's right. Uh-huh.
22   Q. Did you ever have a discussion with him after you
23   received that letter on September the 15th, 2000?
24   A. No, I did not.
25   Q. When was the last time you talked to Dr. Cantu?

**Page 94**

1   A. I want to say maybe June, July of -- the only
2   communication that I had with him after that was through his
3   memos. That was it. And I don't recall ever communicating
4   with him about other matters.
5   Q. So the last time you ever talked to him was in June
6   or July of 2000; is that right?
7   A. That's right. Uh-huh.
8   Q. Have you ever confronted the trustees that are
9   supposedly the ones that pressured Dr. Cantu?
10   A. No, ma'am.
11   Q. Have you ever -- do you know why they would pressure
12   Dr. Cantu? Did you ever have -- did you personally ever have
13   any conflict with any of them?
14   A. I want say that perhaps because I was with the other
15   party or the impression was that I was with the other party.
16   And also because one of the board members -- I kept insisting
17   to Dr. Cantu to try to collect some monies that one of the
18   board members owed, in particular Mr. Rivera, Rambaldo Rivera.
19   The school district had paid his wife's flight expense to Ana
20   national convention and this was done back in February or
21   March of 2000. When I was terminated, to my knowledge, we
22   still hadn't recovered those funds. And I kept reminding
23   Dr. Cantu that we needed to collect on that.
24   And also the same board member involved, on or
25   before July 20th they went to a convention -- let me correct

**Page 95**

1   the date. I believe it was on or before June 30th they went
2   to a convention up in San Antonio and we gave them a check for
3   per diem, lodging and other expenses that they were going to
4   incur. The check that was given to the board members was in
5   excess of the amount due in this particular case by the hotel.
6   The hotel turned around and refunded the money, the
7   difference, which was about three hundred dollars, to that
8   particular board member. That board member up until the time
9   that I was there, he did not return the money. And I also
10   advised or reminded Dr. Cantu about the need to address that
11   matter. And I don't know if he ever did.
12   Q. And that was Mr. Rivera?
13   A. That's correct.
14   Q. And that was something that occurred June 30th, 2000?
15   A. Right.
16   Q. By the time you learned that he hasn't been refunded,
17   that would have been the July 20th figure you're telling me?
18   A. July 20th. No, I corrected that date, ma'am.
19   Q. No, I know that. But you said they went to
20   conference --
21   A. Right.
22   Q. -- June 30th and that they gave a check to the hotel?
23   A. Hotel, right.
24   Q. And that the hotel reimbursed about three hundred
25   bucks?

**Page 96**

1   A. Back to Mr. Rivera, that's correct. Cash.
2   Q. And did that happen at the hotel or later on down the
3   line?
4   A. At the hotel.
5   Q. And when did you learn about that this had happened?
6   A. Soon after they brought the -- I believe the
7   conference was for about three or four days. I learned about
8   it soon after they submitted the receipt.
9   Q. Did you have any documents that reflect that?
10   A. Yes, I do.
11   Q. You have them in your possession?
12   A. No. No, my attorney has them.
13   Q. Your attorney has them?
14   A. Yes, ma'am.
15   Q. Well, hopefully your attorney will provide those
16   documents to me as I have provided a request for production in
17   connection with those kind of documents, okay?
18   A. Okay.
19   Q. Anything else that you can think of, any other
20   motivation on behalf of any of these trustees? For instance,
21   you told me this is by Mr. Rivera; is that right?
22   A. That's correct.
23   Q. And you told me this happened in July of 2000, right?
24   A. Right.
25   Q. But the pressuring that you know about for sure,

1  right --
2     A. Yes.
3     Q. -- was by Mrs. Ramon and Mr. Diaz, right?
4     A. They were all the same team.
5     Q. Okay, I understand that. But I'm just saying can you
6  think of any reason why Mr. Diaz would have it out for you?
7     A. Just political.
8     Q. It's just political, just because of the --
9     A. Right.
10     Q. Any other incidents like you described for me here as
11  concerns any of these trustees?
12     A. Well, this would be pertaining to Dr. Cantu. I
13  had -- they had checked out a camera from my office about an
14  eight hundred dollar camera, and the superintendent's
15  officials checked it out, and this belonged to the middle
16  school principal or campus. And they checked it out from my
17  office and they had it in their possession for about two
18  weeks. When it came time for the middle school to request
19  that camera, I went ahead and notified the superintendent's
20  office where the camera was, or asked them for the camera.
21  And his secretary told me that Dr. Cantu had misplaced it or
22  lost it.
23      So that camera was never returned back and I
24  told Ms. Pena, the superintendent's secretary, to find a way
25  to get it back because the middle school campus needed it as

1  soon as possible. And she said, there's nothing I can do,
2  Dr. Cantu lost it or who knows where it's at. That's all she
3  told me.
4     Q. So you never recovered that camera?
5     A. That is correct.
6     Q. And when was that?
7     A. Late June, early July. It was right before she left,
8  Ms. Pena, the superintendent's secretary. She resigned. I
9  believe right before I was fired.
10     Q. So it was sometime in the summer?
11     A. Yes, ma'am. Uh-huh.
12     Q. Do you have documentation that you can provide to
13  your attorney regarding that?
14     A. I do not recall, ma'am, but it's possible. It's
15  possible.
16     Q. What documents did you supply to your attorney?
17     A. All the memos, the memos that I provided to -- to
18  Mr. Skirk, the TEA -- I mean NEA attorney.
19     Q. Okay.
20     A. That's all I remember.
21     Q. And you said you provided them documents regarding
22  the incident regarding Mr. Rivera?
23     A. That's correct, yes, ma'am.
24     Q. And you said you also made notes?
25     A. Made notes, yes, ma'am.

1     Q. Okay, your notes. Any other documents that you can
2  think of that you provided to your attorney?
3     A. That's all I can remember at this time.
4     Q. Did you keep copies of things that happened at the
5  school district?
6     A. I kept a lot of the copies, yes.
7     Q. For instance, the responses to the memos that were
8  sent to you, did you keep copies of those?
9     A. Yes. Uh-huh.
10     Q. Do you remember anything about a book fair?
11     A. A book fair?
12     Q. Irregularities with the book fair?
13     A. All I remember, ma'am, was that those monies were
14  deposited into the general fund. For some reason after I left
15  they couldn't locate them.
16     Q. Okay.
17     A. For some reason. But they have always been there.
18  They have always been there.
19     Q. Any kind of money that's generated within the school
20  district runs through the business office; is that right? Is
21  that how it was supposed to work?
22     A. That's the way it's supposed to work. But when
23  the -- since we have had activity funds at the campus level, a
24  lot of funds that they generate go through their activity
25  fund, their activity accounts.

1     Q. Right. But then it's supposed to come to the
2  business office and the business office is supposed to account
3  for it, right?
4     A. Exactly. Exactly.
5     Q. Is that how it worked while you were there?
6     A. That's how it worked, the majority of the time.
7     Q. Including like means from the book fair?
8     A. Yes. We had a library and for some reason could
9  not -- could not follow certain rules. A lot of the times she
10  would deposit that money into the activity funds herself, or
11  hand it over to the secretary there at the campus level
12  instead of taking it straight to us.
13      What happened with those activity funds was
14  that, for some reason, it would stay in the activity fund and
15  it would take -- she would take about six or seven months to
16  request payment for that book fair. That book fair works in a
17  way where it's what you deposit is what you pay. That's
18  basically it. If she never receives a bill, she doesn't pay,
19  so the money can stay there for long periods of time.
20      But the end results was that money was taken
21  over to the business office and it was deposited into the
22  general funds.
23     Q. Okay.
24     A. And I have no idea to this day if they're saying they
25  can't find it. It's beyond me.

**Page 101**

```
 1    Q. When you were working there, did you notice you had a
 2  problems with turning the money over for six or seven months?
 3    A. Ms. -- okay, the librarian?
 4    Q. Yes.
 5    A. Yes.  She had been -- she had been -- she was at the
 6  middle school.  The time that I was there we went through four
 7  or five different principals, so we almost had to remind her
 8  on a yearly basis what she needed to do.
 9    Q. And did you do that or did you assign somebody else
10  to do that?
11    A. I, myself, and the principal as well.
12        MS. NEALLY: Thank you for your time, sir.
13        THE WITNESS: Thank you very much, ma'am.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 102**

```
 1        ERRATA SHEET / SIGNATURE PAGE
 2  PAGE  LINE        CHANGE        REASON
 3    ___ ___   _____
 4    ___ ___   _____
 5    ___ ___   _____
 6    ___ ___   _____
 7    ___ ___   _____
 8    ___ ___   _____
 9    ___ ___   _____
10    ___ ___   _____
11    ___ ___   _____
12    I, SALVADOR ACOSTA, have read the foregoing deposition
13  and hereby affix my signature that same is true and correct,
    except as noted above.
14
15        _____
              SALVADOR ACOSTA
16  THE STATE OF TEXAS
17  COUNTY OF HIDALGO
18    Before me, _____, on this day
    personally appeared SALVADOR ACOSTA, known to me to be the
    person whose name is subscribed to the foregoing instrument
19  and acknowledged to me that the said witness executed the same
    for the purposes and consideration therein expressed.
20
21    Given under my hand and seal of office this _____ day of
    _____, 2002.
22
23        _____
24        Notary Public in and for The State of Texas
25
```

**Page 103**

CAUSE NO. 2002-07-2652-E

| | |
|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA<br>Plaintiffs | ) IN THE DISTRICT COURT |
| vs. | ) |
| SANTA MARIA INDEPENDENT SCHOOL DISTRICT and Employees, Agents and all those Acting in Concert or at their Discretion | ) CAMERON COUNTY, TEXAS |
| Defendants | ) 357TH JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
SALVADOR ACOSTA
DECEMBER 3, 2002

I, THURMAN J. MOODY, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, SALVADOR ACOSTA, was duly sworn by the officer and that the transcript of the ORAL deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on December 23, 2002, to counsel for the witness for examination, signature, and return to Dorsey & Associates, 8318 Jones Maltsberger, Suite 112, San Antonio, Texas 78216, by January 6, 2003;

That the amount of time used by each party at the deposition is as follows:
Michael Pruneda - 0 hours 0 minutes
Elizabeth G. Neally - 2 hours 11 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

MICHAEL PRUNEDA
THE PRUNEDA LAW FIRM, P.L.L.C.
944 West Nolana, Suite B
Post Office Box T
Pharr, Texas 78577-1220
ELIZABETH G. NEALLY

**Page 104**

ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78550

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to by me on December 23, 2002.

_____
THURMAN J. MOODY, Texas CSR No. 2861
Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

Page 105

CAUSE NO. 2002-07-2652-E

| | |
|---|---|
| SALVADOR ACOSTA and | X  IN THE DISTRICT COURT |
| RIGO DE LA ROSA | X |
| Plaintiffs | X |
| vs. | X |
| | X |
| SANTA MARIA INDEPENDENT | X |
| SCHOOL DISTRICT and | X  CAMERON COUNTY, TEXAS |
| Employees, Agents and all | X |
| those Acting in Concert | X |
| or at their Discretion | X |
| | X |
| Defendants | X  357TH JUDICIAL DISTRICT |

SUPPLEMENTAL CERTIFICATE UNDER TRCP 203
TO THE ORAL DEPOSITION OF
SALVADOR ACOSTA
DECEMBER 3, 2002

The original deposition of SALVADOR ACOSTA taken on December 3, 2002, was ( ) was not ( ) returned to the deposition officer on January 6, 2003.

If returned, the attached changes and signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Elizabeth G. Neally, Custodial Attorney.

That $_____ is the deposition officer's charges to Defendant for preparing the original deposition transcript and any copy of exhibits;

That the deposition was delivered in accordance with Rule 203, TCRP, and that a copy of this certificate was served on all parties shown herein and filed with the clerk.

Subscribed and Sworn to by me on _____, 2003.

THURMAN J. MOODY, Texas CSR No. 2861
Expiration Date: 12-31-03
Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

**SANTA MARIA INDEPENDENT SCHOOL DISTRICT**
P.O. BOX 448
SANTA MARIA, TEXAS 78592
(956) 565-6308 (956) 565-0598

To: Dr. I. Cantu, Superintendent

From: Mr. S. Acosta, Admin. For Business & Operations

Date: March 03, 2000

Re: **Food Service Sales**

As per your request, the following is a report on the total receipts on meal sales for school years 1997-98, 1998-99, and the current school year(September 01, 1999 through March 03, 2000):

- 1997 -98 - $ 7,796.79
- 1998-99 - $ 4,205.86 — *actual $ 3,943.42 (5/1)00 SC*
- 1999-00 - $ 6,790.04

If additional information is needed, please do not hesitate to contact me.

*Dec. of 1998 - Prices went up - sales went down*
*Will look at a detail report for 98-99*

*Sent with base charge — $10.00*
*As paying → have a ledger — date name, date, and if paid or credit.*

*5/1/00 - Talked to Nora about the discrepancy in the amount of revenue deposit for 98-99 school year. She called Mr. Acosta, since he was absent. According to Nora, after she call he tried her that the auditor gave him the $4,205.86 amount.*

Acosta

EXHIBIT NO. 1

THURMAN MOODY

(137.5)

5/4/00

This document was requested in meeting with Lois Springmet Lopez, Lisa Reyna by Nora Jimenez. According to Mr. Acosta, this document was kept by Nora after every deposit. I asked for document to be brought in about 11:00 am Mr. Acosta, came back saying Nora had it and had stopped it. I requested for Nora 12:05, she said Acosta had it. Document came in about 2:30 p.m. (approved by Lois 8/15)

| 98-99 | | Rec'd by |
|---|---|---|
| 10/6/98 | 202.00 | NJ |
| 10/13/98 | 425.00 | NJ |
| 10/26/98 | 182.00 | NJ |
| 10/23/98 | 362.42 | NJ |
| 11/16/98 | 721.02 | NJ |
| 11/26/98 | 134.45 | NJ |
| 1/22/99 | 56.00 | NJ |
| 1/22/99 | 455.00 | NJ |
| 2/1/99 | 107.00 | NJ |
| 2/17/99 | 120.50 | NJ |
| 3/3/99 | 103.50 | NJ |
| 3/4/99 | 259.98 | NJ |
| 3/15/99 | 235.55 | NJ |
| 4/2/99 | 258.00 | NJ |
| 5/17/99 | 106.50 | NJ |
| 5/19/99 | 168.50  } 315.00 | NJ |
| 5/19/99 | 40.00 | NJ |
| 6/18/99 | 268.44 | NJ |

Acosta
EXHIBIT NO 2
THURMAN MOODY

5/4/00
This document hand delivered, and put on Secretary's Desk.

5/5/00 According to Nora Jimenez, this document was never in existence and was produced between 2:00-2:30 pm on same day of request. This is falsification of records if Mrs. Jimenez statement is correct.

5/9/00 met with Mr. Acosta, Nora and, as a witness, Mr. Medina. I asked Nora if she kept a log of deposits made from the cafeteria. She said she did not and that some deposits she made, but others she did not. I asked Mr. Acosta when she had stated to Mrs. Lopez and me that such a record was kept. He respond

*iff.s*

98-99

| | |
|---|---|
| 10/7/98 | ✓202.00 - Meals |
| 10/20/98 | ✓56.00 - Meals |
| 10/20/98 | ✓425.00 - Meals |
| 10/26/88 | ✓362.45 - Meals |
| 10/26/98 | ✓182.00 - Meals |
| 11/17/98 | ✓721.02 - Meals |
| 11/27/98 | ✓134.45 - Meals |
| 1/25/99 | ✓56.00 - Meals |
| 1/25/99 | ✓455.00 - Meals |
| 2/19/99 | ✓120.50 - Meals |
| 2/19/99 | ✓107.00 - Meals |
| 2/26/99 | ✓103.50 - Meals |
| 3/5/99 | 259.98 - Meals |
| 3/12/99 | ✓235.55 - Meals |
| 4/1/99 | ✓258.00 - Meals |
| 5/3/99 | ✓106.50 - Meals |
| 5/19/99 | ✓168.50 - Meals |
| 5/19/99 | ✓40.00 - Meals |

Summer - should not be included

Why 7/1 Depos...

$4205.86 purchased are not in logs

what happened to deposits 48 to 5/26?

Meeting 5/4/00
NOA, Lisa & me

Purpose of Meeting – Review 98-99 Deposits

Cafeteria Manager states ① Deposit slips presented are not the
ones she prepared for the deposits. ② Her deposit slips to C.O.
were broken down by currency, coins & checks. Bank deposit slips received are
not in same format as those she allegedly states she turned in C.O.
③ The $106 total for April (Example) according to her records should
have be $1021.30.

acosta
EXHIBIT NO. 3
THURMAN MOODY

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone: 956-565-6308           Fax: 956-565-4422

TO:        Mr. Salvador Acosta

FROM:     Dr. Ismael Cantu, Superintendent

DATE:      November 5, 1999

RE:        Time Punctuality

This memorandum is to document that on November 4, 1999 I met with you to discuss the following:

    1.      Your responsibility to be at your office by 8:00 a.m. unless a viable excuse for your absence is recorded in my office by 8:00 a.m.

    2.      That the lunch hour consists of one hour for all employees, unless there exists a valid business luncheon excuse.

I will expect all personnel under you to adhere to the same rules.



Acosta 4

EXHIBIT NO._____

THURMAN MOODY

---

Dr. Ismael Cantu, Superintendent      Mr. Benito Contreras, Jr., Secretary      Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President           Mr. Jose F. Gonzales, Member        Mrs. Consuelo De Le Rosa, Member
Mr. Rambaldo Rivera, Vice-President      Mr. Jose Noe Diaz, Member

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone: 956-565-6308                          Fax: 956-565-4422

TO:        Mr. Salvador Acosta

FROM:      Dr. Ismael Cantu, Superintendent

DATE:      November 5, 1999

RE:        High School Student Incident

This incident is regarding the case of a Santa Maria ISD High School student placing TTY calls to your office.

The High School Principal, Mr. Medina and a female Counselor, Mrs. Molina were involved in the investigation. The investigation took place Thursday and Friday, November 4 & 5, 1999. The findings are as follows:

1.   We have reviewed the TTY Transcript of the telephone conversation between you and the student and find no evidence that would suggest a Title IX violation.

2.   We have met with the mother of the student, she feels comfortable that based on her talking to her daughter there is nothing going on between you and this student, however, there are concerns that her child has gotten involved in a personal situation between you, Ms. Ramirez, Mr. Luna, and Ms. Saldana.

Administratively, we are in agreement with the mother, that the written record of the discussion indicates personal involvement of this student in non-school related business.

I have assured the mother that we have professional and administrative responsibility to this student. The mother requests that there be no further communication of a personal nature between the parties mentioned in this letter and her daughter.

You are therefore requested to do the following:

1.   You are to stop all personal communication with this student immediately.

2.   If this student is to call you, I am to be notified immediately

3.   Your e-mail address needs to be given out for official school business only.

In closing, let me assure you that I am here to protect your rights as well as this student's rights.



EXHIBIT NO. 5

THURMAN MOODY

Dr. Ismael Cantu, Superintendent        Mr. Benito Contreras, Jr., Secretary      Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President              Mr. Jose F. Gonzales, Member              Mrs. Consuelo De Le Rosa, Member
Mr. Rambaldo Rivera, Vice-President      Mr. Jose Noe Diaz, Member

# Santa Mari   i Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone:  956-565-6308                                Fax: 956-565-4422

TO:        Mr. Salvador Acosta, Administrator for Business and operations

FROM:      Dr. Ismael Cantu, Superintendent of Schools

DATE:      May 3, 2000

RE:        Present Status of Business Office

There are some very serious situations arising out of inquiries from my office, regarding the
High School Student Activity Accounts and Food Services. In order to assure that the
integrity of the inquiries are kept at the highest level, please assure the following:

1.    Implement administrative procedures for each of the procedural elements identified in
      my May 1, 2000 administrative memorandum regarding Collection and Deposits of
      Revenue.
2.    Meet with Mr. Espinoza and High School staff to prepare a rationale and
      understandable explanation of causes related to the variance of High School ledger
      balances to bank balances.
3.    Assure that all deposits from the High School Student Activity account were in fact
      deposited. Presently, I have evidence that one deposit was never made.
4.    Keep for records, the deposit slip dated September 1999, as well as the check written
      by Mrs. Jimenez's son dated same date.
5.    Do not make that deposit until you receive a direct order from my office.
6.    Meet with Mrs. Nora Munoz, Cafeteria Manager, and me, as soon as possible, to
      discuss the 1998-99 Cafeteria revenues and imbalances that are surfacing due to this
inquiry.



EXHIBIT N

THURMAN N

| | | |
|---|---|---|
| Ismael Cantu, Superintendent | Mr. Benito Contreras, Jr., Secretary | Mrs. Alicia Martinez, Member |
| rma Ramon, President | Mr. Jose F. Gonzales, Member | Mrs. Consuelo De Le Rosa, Member |
| Mr. Rambaldo Rivera, Vice-President | Mr. Jose Noe Diaz, Member | |



**SANTA MARIA INDEPENDENT SCHOOL DISTRICT**
P. O. Box 448
Santa Maria, Texas 78592
Phone: (956) 565-6308
Fax: (956) 565-0598 or (956) 565-4422

To:       Salvador Acosta, Administrator for Business and Operations

From:     Dr. Ismael Cantu, Superintendent

Date:     July 11, 2000

Re:       Letter of Reprimand

At the July 10, 2000 School Board of Trustees Meeting, The Food Services Program Review conducted by Mrs. Margaret Lopez, Region One ESC Consultant, was presented. This letter is to officially reprimand you for not assuring the District that the proper documentation required by the Program Regulations, be kept in proper order by the Cafeteria Manager. The inadequate documentation areas of concerns are numbers 1 to 4 in the attached report. Until further notice, you will be required to at a minimum, meet with Mrs. Nora Munoz, Cafeteria Manager, on a monthly basis to verify that the documentation has in fact been produced and is administratively acceptable.

The attached report will be used to monthly verify the monitoring to my office. Items 5 and 6 of the report are critical items that also need your immediate attention. If you have any questions about this letter, see me immediately.

cc:  Personnel File

Acosta

EXHIBIT NO. 7

THURMAN MOODY

## Santa Maria ISD

A review of the National School Lunch Program (NSLP) and School Breakfast Program (SBP) for the 1999 school year revealed inadequate and missing documentation to substantiate claims for reimbursable meals starting in December 1998. A review of the program by TEA on October 28, 1998 indicated inadequate documentation on production records, but in subsequent months, the documentation was minimal or non-existent.

1. **Daily Record of Income** was not maintained for the 1998-1999 year and has not been maintained through April 2000. Money was handed over to the business office for deposit. The only record of this money is from bank deposit slips, mingled with money form other sources and made to the general fund.

2. **Daily Record of Meals Served** was not available for the months of December 1998 and March 1999. Since this is a provision 2 school, this document is used to convert total meals to free, reduced, and full price meals for the monthly claim for reimbursement. As such, it is a part of the reimbursement claim. There were no records provided to substantiate the claim for reimbursement for the months of December and March.

3. **Accuclaim Edit Check**, a daily required internal audit of meals served to identify and resolve possible over counting of meals, was not done after the TEA review month and has not been done this year through April 2000.

4. **Food Production Records** were incomplete. This was also sighted on the TEA review of the Child Nutrition Program on October 28, 1998. The required parts of this record are: menu, portion size, servings planned, quantity of food produced, food left over or short, number of meals served (student, adult, and total). This document could supply information needed to reconstruct the daily record of meals served, but the information needed was not consistently found on the Food Production Records. For the current year, the Food Production Records continue to be incomplete or non-existent through April.

5. **Claim for Reimbursement** is filed via the Child Nutrition Program Information Management System (CNPIMS). History shows multiple entries and adjustments to the November, December, March and May claim for reimbursement changing ADA, approved free and reduced and number claimed.

6. **On-Site Reviews** were not done by the required date of January 31, 1998, as sighted on the TEA compliance review. The 2000 On-Site Review has not been done either.

# FOOD SERVICES MONTHLY DOCUMENTATION REPORT

| MONTH/YEAR | Daily Record Of Income | Daily Record of Meals Served | Accuclaim Edit Check | Food Production Records |
|---|---|---|---|---|
| AUGUST 2000 | | | | |
| SEPTEMBER 2000 | | | | |
| OCTOBER 2000 | | | | |
| NOVEMBER 2000 | | | | |
| DECEMBER 2000 | | | | |
| JANUARY 2001 | | | | |
| FEBRUARY 2001 | | | | |
| MARCH 2001 | | | | |
| APRIL 2001 | | | | |
| MAY 2001 | | | | |
| JUNE 2001 | | | | |



**SANTA MARIA INDEPENDENT SCHOOL DISTRICT**
P. O. Box 448
Santa Maria, Texas 78592
Phone: (956) 565-6308
Fax: (956) 565-0598 or (956) 565-4422

---

To:        Salvador Acosta, Administrator for Business and Operations

From:      Dr. Ismael Cantu, Superintendent of Schools

Date:      July 13, 2000

Re:        Letter of Reprimand

The final audit for the High School Student Activity and Food Services Accounts has been completed and reported to the Board of Trustees. Results of this audit indicate that because of a severe lack of accountability procedures, both accounts audited reflect severe problems which required that these findings be reported to the proper regulatory agencies. The Food Services Revenue Audit is attached for your review.

This letter is to officially reprimand you for mismanaging responsibilities related to your office. You are therefore directed to assure this District that accountability standards, of the highest level, be immediately implemented in the Business Office.

If you have any questions about this memorandum, see me.

cc:  Personnel File

Acosta

EXHIBIT NO. 8

THURMAN MOODY

SANTA MARIA I.S.D
FOOD SERVICE OPERATION
FISCAL YEAR 1998-99
REVENUE AUDIT

The 1998-99 food service operation was audited to ascertain the local operating revenues related to meal sales. The documentation needed to do a one hundred percent audit was lacking or non-existent. Documentation for approximately forty-one days of sales was not available. All available documentation was used to compile as complete a picture as possible for the year in question.

This audit was prompted by the analysis of meal sales as follows.

- Meal sales for the 1997-98 school year totaled $7,795.79
- Meal sales for the 1998-99 school year totaled $4,205.86
- As of May 31, 2000, meal sales for the 1999-00 school year totaled $10,599.48.

Findings of the audit is as follows:

- Deposits were not made during the months of August 98, September 98, December 98, and April 99.

- Cafeteria manager stated that she submitted deposits every two weeks

- Deposits did not always make it to the bank as prepared by cafeteria manager (as per cafeteria manager).

- Cash constituted thirty-eight percent and checks constituted sixty-two percent of deposits.

- On a few occasions generic deposits slips were used. There is no way to ascertain how many times deposit were replaced with generic deposits were used since cafeteria manager did not keep a copy.

- Collections for one hundred thirty-nine days of operation totaled $7,490.05

- At least $3,284.19 is unaccounted for.

Recommendation:

- Cash management procedures will be implemented.

Post-It® Fax Note   7671   Date 7/13   # of pages 1
To Dr. Cantu          From A. Villalbazo
Co./Dept. Santa Maria  Co. ESC-01
Phone #               Phone #
Fax # 565-4422        Fax # 484-6089

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

2000-2001

Telephone:  956-565-6308                          Fax: 956-565-4422

TO:         Mr. Salvador Acosta, Business Manager

FROM:       Dr. Ismael Cantu, Superintendent

DATE:       August 8, 2000

RE:         Failure to Perform Duties

*Acosta*

**EXHIBIT NO. 9**

THURMAN MOODY

My office is extremely concerned of your neglect to perform the following duties of your office:

1   Failure to roll the 1998-99 Account Balances to 1999-2000 accounts. A true budget for 2000-01 could never be accomplished because of this. The rollover was not done until the fist week in August of 2000.

2   Failure to amend school budgets for the 2000-01 school year in a timely manner.

3   Failure to submit to TEA the Transportation Report in a timely manner. This has forced TEA to estimate zero revenues in the Summary of Finances for 2000-01.

4   Failure to accurately respond to the TEA Monitor whether an Interest and Sinking Fund account is in existence. These I & S payments need to be reflected in the books by August 31, 2000 or the District will be in serious trouble.  I & S funds should never be co-mingled with other funds.

5   Misleading the Board and Superintendent on whether a $189,000.00 TEA/IFA payment was opened as a C.D. and not spent as directed by the Board.

6   Failure to respond to my request for a report on outstanding invoices. Too many bills are not being paid in a timely manner.

You are expected to set up an appointment with me immediately to discuss the above.

*I understand you went be in to work Monday, I would have preferred to discuss this w/ you immediately is you stated in your 8/8/00 memo.*   *received 8/11/00*

Dr. Ismael Cantu, Superintendent          Mr. Benito Contreras, Jr., Secretary       Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President               Mr. Jose F. Gonzales, Member               Mrs. Consuelo De Le Rosa, Member
Mr. Rambaldo Rivera, Vice-President        Mr. Jose Noe Diaz, Member

9



# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

2000-2001

Telephone:  956-565-6308                     Fax: 956-565-4422



TO:        Mr. Salvador Acosta, Administrator for Business and Operations

FROM:      Dr. Ismael Cantu, Superintendent

DATE:      August 16, 2000

RE:        Reassignment

Effective immediately, you will be reassigned from your present position as Administrator for Business and Operation to the existing position of Textbook Coordinator, and Fixed Assets/ Shipping and Receiving Clerk. Your salary will remain the same. If you have any questions, please call my office.



Dr. Ismael Cantu, Superintendent          Mr. Benito Contreras, Jr., Secretary          Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President               Mr. Jose F. Gonzales, Member                 Mrs. Consuelo De Le Rosa, Member
Mr. Rambaldo Rivera, Vice-President        Mr. Jose Noe Diaz, Member

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone:  956-565-6308                          Fax: 956-565-4422

TO:        Mr. Salvador Acosta

FROM:      Dr. Ismael Cantu, Superintendent

RE:        Reprimand

DATE:      September 01, 2000

It has been brought to my attention that your contract for the 2000-01 school year has not been turned in to the Personnel Office.  Please be informed that the contract stipulates that the offer for employment expires unless the contract is signed, and returned, to the Superintendent on or before May 15, 2000.

IC:br

Cc:  Personnel File

*Acosta*

EXHIBIT NO. *11*

THURMAN MOODY

Dr. Ismael Cantu, Superintendent        Mr. Benito Contreras, Jr., Secretary
Mrs. Norma Ramon, President             Mr. Jose F. Gonzales, Member         Mrs. Alicia Martinez, Member
Mr. Rambaldo Rivera, Vice-President      Mr. Jose Noe Diaz, Member            Mrs. Consuelo De Le Rosa, Member

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone:  956-565-6308                    Fax: 956-565-4422

**CONFIDENTIAL**

TO:        Mr. Salvador Acosta

FROM:      Dr. Ismael Cantu, Superintendent

RE:        Reprimand

DATE:      September 01, 2000

Last week, I was informed that the public hearing notice to discuss the 2000-01 proposed tax rate and budget was not published in accordance to the Truth in Taxation laws.  Your failure to give proper notice  now jeopardizes the legality of the approved budget  of August 14, 2000.  Omission of the established legal procedures also could have a profound effect on the proposed 2000-01 tax rate, since timelines were not adhered to.   This procedural error has been reported to the State Comptroller's Office, and the Texas Education Agency Monitor.  Knowledge of this legal procedure falls within the responsibilities related to your office.   This reprimand will be placed in your personnel file.

IC:br

Cc:  Personnel  File



Acosta

EXHIBIT NO. 12

THURMAN MOODY



# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone:  956-565-6308                          Fax: 956-565-4422

TO:        Mr. Salvador Acosta

FROM:      Dr. Ismael Cantu, Superintendent

RE:        Contract Status

DATE:      September 01, 2000

You are hereby notified that effective immediately you are suspended with pay pending completion of the Business Office investigation by Regulatory Agency Official.  You are to turn in your keys in to my office immediately.  Attached, please find policy DGBA (Legal) and DGBA (Local).

IC:br

Cc:  Personnel File

Acosta
EXHIBIT NO. 13
THURMAN MOODY

Dr. Ismael Cantu, Superintendent          Mr. Benito Contreras, Jr., Secretary
Mrs. Norma Ramon, President               Mr. Jose F. Gonzales, Member          Mrs. Alicia Martinez, Member
Mr. Rambaldo Rivera, Vice-President        Mr. Jose Noe Diaz, Member             Mrs. Consuelo De Le Rosa, Member

TEA DOCKET NO. 009-LH-900

| | | |
|---|---|---|
| SANTA MARIA INDEPENDENT | § | BEFORE THE INDEPENDENT |
| SCHOOL DISTRICT, PETITIONER | § | |
| | § | |
| VS. | § | |
| | § | |
| SALVADOR ACOSTA, RESPONDENT | § | HEARING EXAMINER |

## PROPOSAL FOR DECISION

### Statement of the Case

Petitioner, Santa Maria Independent School District is represented by the Hon. Gilbert Hinojosa; Magallanes, Hinojosa & Trevino; 1713 Boca Chica Blvd.; Brownsville, Texas 78520.

The Respondent, Salvador Acosta, is represented by the Hon. Michael Shirk; Texas State Teacher's Association; 316 W. 12th Street; Austin, Texas 78701.

Victoria Guerra is the Certified Hearing Examiner appointed by the Texas Education Agency.

The sole issue presented is whether a valid contract existed between the parties, thereby invoking my jurisdiction, as well as the provisions of CH. 21 Tex. Educ. Code, Subchapters E and F.

### Factual Background

Respondent was employed as an administrator for the Business and Operations, or Manager of Financial Affairs for Santa Maria I.S.D. (28: 14-25; 50: 6-25; 102: 18-25; 103: 1-23). He worked for Santa Maria I.S.D. since 1989. (29: 8-15; 99: 4-12). The Board of Trustees voted to renew Respondent's term contract based on Superintendent, Dr. Cantu's recommendation on March 21, 2000. (61: 7-12). Pursuant to the terms of the contract, the contract needed to have been signed and returned to Lisa Pena by May

Acosta
EXHIBIT NO. 14
THURMAN MOODY

1

15, 2000. (39: 16-18; 68: 1-3). Respondent asserts that he did in fact sign the contract and instructed his secretary Nora Jimenez, to deliver it to Lisa Pena on April 14, 2000, the very same day that the contract was given to him. (101: 4-21). Petitioner asserts that it never received the signed contract from Respondent. (68: 14-17; 75: 5-12). Petitioner reminded Respondent of the missing contract on several occasions. (40: 4-9; 69: 3-13; 72: 15-22; 73: 5-22; 19: 14-20; 20: 4-5, 10-21).

At a certain time, Dr. Cantu, the Superintendent, took personnel action against the Respondent by reassigning him to the position of textbook coordinator and inventory clerk, away from the business office. (32: 1-3). Then, further personnel action of employment termination was taken against Respondent for the same reasons as the reassignment. (32: 4-11). As a result of the reassignment, Respondent requested a level 2 grievance, wherein he asked for an expunction of the stated ground for his reassignment from his personnel file. (17: 18-25; 18: 15-19; 19: 1-3; 32: 12-25). At the level 2 grievance hearing, Respondent was once again asked for the contract. (19: 14-20; 20: 4-5, 10-21). Ms. Gonzalez, Respondent's T.S.T.A. representative for the level 2 grievance subsequently obtained a copy of the contract from Respondent and did provide it to Petitioner. (20: 10-21).

The sole issue presented is whether a contract existed between the parties, thereby invoking the jurisdiction of the undersigned hearing examiner.

### Findings of Fact

1.  Respondent has been employed by the Santa Maria Independent School District since 1989. (29: 8-15; 99: 4-12).

2.      Throughout his tenure with the Petitioner, Respondent started off as a book keeper for one year, and after that became the business manager for Petitioner. (29: 8-15).

3.      Respondent's duties included being in charge of the business office, accounts payable, cafeteria and food services, maintenance, grounds, transportation, federal programs, budget and fiscal matters. (29: 1-7; 103: 1-20).

4.      No evidence exists that Respondent held a certificate under the definition of CH. 21, TEX. EDUC. CODE, Subchapters B and E.

5.      The Petitioner Board of Trustees voted to renew its contract with Respondent for the 2000-2001 school year. (61: 7-12).

6.      In April of 2000, Lisa Pena prepared a "One-Year Term Contract for Certified Administrator Position (Exhibit "1") for the 2000-2001 school year. (66: 15-18, 24-25; 67: 1-13).

7.      Lisa Pena was the authorized agent for the Petitioner's Superintendent in all matters dealing with the Respondent's one-year term contract for the 2000-2001 year. (78: 14-16).

8.      This contract (Exhibit "1") was given to Respondent on April 14, 2000 for his signature and it needed to have been returned to Lisa Pena by May 15, 2000. (39: 16-18; 67: 10-22; Exhibit 1).

9.      Respondent signed the contract on April 14, 2000, the day he received it. (100: 1-19).

10.      Respondent instructed his secretary Nora Jimenez to deliver the signed contract to Lisa Pena on April 14, 2000. (101: 20-21).

11.   No evidence exists that the contract was actually delivered to Lisa Pena or to the Superintendent's office. (68: 4-7, 14-17; 69: 1-2).

12.   Petitioner never received the signed contract from Respondent until 6-7 days after the grievance hearing (34: 13-25), which took place sometime during the first week and a half in September 2000 (25: 1-3). Yolanda Gonzalez, Respondent's T.S.T.A. representative at the grievance hearing, obtained the contract from Respondent and submitted it to Petitioner via facsimile approximately 6-7 days after the grievance hearing (20: 10-21), but only after Dr. Cantu telephoned Ms. Yolanda Gonzalez, 6-7 days after the level 2 grievance hearing to again ask for the contract. (34: 13-25; 35: 3-18).

13.   Ms. Norma Ramon, President of the Board of Trustees of Petitioner was presented with the contracts from Petitioner for her to sign sometime between June 13, 2000 through June 15, 2000.

14.   Ms. Ramon never received a signed contract by the Respondent for her to sign. (92: 10-15).

15.   Respondent was reminded several times of his need to sign and return the "One-Year Term Contract for Certified Administrator Position". (19: 4-16; 38: 21-23; 40: 4-9; 69: 3-13; 72: 15-22; Petitioner's Exhibit "1" and Petitioner's Exhibit "3").

16.   The first time Respondent was reminded of the fact that he had not signed or returned the "One-Year Term Contract for Certified Administrator Position" was in June, at the time that Ms. Ramon had signed all of the other employment contracts for the Petitioner and had asked why Respondent's contract had not been included in the rest of the contracts for signature. On this occasion, Ms. Ramon asked Lisa Pena why

Respondent had not returned his signed contract and Lisa Pena called him and inquired about it. (72: 19-22).

17.    The second time Respondent was reminded to sign and return his contract was late in June. Lisa Pena walked to his office and asked why he had not returned his contract. (72: 5-18).

18.    Respondent was given a letter of reprimand written by Dr. Ismael Cantu dated September 1, 2000 wherein it states: "It has been brought to my attention that your contract for the 2000-01 school year has not been turned in to the Personnel Office. Please be informed that the contract stipulates that the offer for employment expires unless the contract is signed, and returned, to the Superintendent on or before May 15, 2000." (Petitioner's Exhibit "3").

19.    During the time of July 1, 2000 (the first working date of the contract (50: 1-5) until the time that the Respondent was terminated from employment, Respondent did provide services to the Petitioner. (105: 16-22).

20.    No evidence was presented that Petitioner did not receive and accept the services of Petitioner from May 15, 2000 to the time that he was terminated in September 2000.

21.    Respondent was terminated from employment on September 1, 2000 under an at-will employee theory. (58: 22-25).

22.    The One-Year Term Contract states in part:

> 1. Employee shall be employed on a 12 month basisi for the school year 2000-2001, according to the hours and dates set by the District as they exist or may hereafter be amended.

8.  In accordance with Texas Education Code, Chapter 21, Subchapters E and F, the Board may terminate this contract and discharge Employee or suspend Employee without pay during the term of this contract for good cause as determined by Board.  A suspension without pay may not extend beyond the end of the school year.

13.  Renewal or nonrenewal of this contract shall be in accordance with state law; Texas Education Code, Chapter 21, Subchapter E;  and Board policy.

17.  This offer of employment for the 2000-2001 school year shall expire unless this contract is signed and returned to the Superintendent on or before May 15, 2000.  Failure to return the signed contract by this date shall constitute a rejection of the employment offer and current employment, if any, shall terminate at the end of the existing contract term.

## Conclusions of Law

1.      A written contract did not exist between the parties.

2.      Where an offer prescribes the time and manner of acceptance, its terms in that respect must be complied with to create a contract, and the use of a different method of acceptance by the offeree will not be effectual unless the original offeror thereafter manifests his assent to the other party.  Town of Lindsay v. Cooke County Electric Cooperative Association, 502 S.W. 2d 117 (Tex. 1973).

3.      Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a prior act which did not then legally bind that person and which that person had the right to repudiate.  Facciolla v. Linbeck Contruction Corp., 968 S.W.2d 435 (Tex. App.—Texarkana 1998, no writ) and K.B. v. N.B., 811 S.W.2d 634 (Tex. App.—San Antonio 1991, writ denied).  Ratification of a contract occurs when a party recognizes the validity of the contract by acting under the contract, performing under the contract, or affirmatively acknowledging the contract.  Sun Operating Ltd. Partnership v. Oatman, 911 S.W.2d 749 (Tex. App.—San Antonio 1999, writ denied).

4.     An administrative officer employed by schools as directors of maintenance and of fiscal affairs does not qualify as a "teacher" within the meaning of CH. 21, Tex. Educ. Code, Subchapters. Hightower v. State Commissioner of Education, 778 S.W.2d 595 (Tex. App.—Austin 1989, no writ). This case was followed in Wendell Carroll v. Wichita Falls Independent School District, Docket No. 196-R10-899 (April 26, 2000) wherein it was decided that "coaches" do fall within the classification of "other full-time professional employees", but there is no requirement that a school district provide a Chapter 21 contract to any other full time professional employee, as such the coach could not avail himself to the provisions of CH. 21, Tex. Educ. Code.

5.     CH. 21, TEX. ED. CODE, Subchapter E applies to "teachers" which is defined as "a superintendent, principal, supervisor, classroom teacher, counselor, or other full-time professional employee who is required to hold a certificate issued under Subchapter B or a nurse. The term does not include a person who is not entitled to a probationary, continuing, or term contract under Section 21.002, an exiting contract, or district policy..."

6.     Parties, by contract, cannot impair the validity of a law, nor control or limit the provisions of a statute. McFarland v. Haby, 589 S.W.2d 521 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.).

7.     Jurisdiction is not proper under Texas Education Code §21.251.

## Discussion

Even though the contract was very specific as to time and manner of acceptance by the Respondent, which apparently was not strictly followed, the Petitioner nevertheless, continued to employ the Respondent without regard to his failure to follow

the exact terms of acceptance of the contract. The Petitioner had every right to repudiate the contract knowing that it had not timely received a signed contract from the Respondent by May 15, 2000, yet it failed to do so until September, 2000, at least four months after Respondent was supposed to have signed and turned in the contract to the Superintendent.

Assuming *arguendo* that an implied contract does exist between the parties, the terms of the contract makes reference to CH. 21, Tex. Educ. Code. Specifically, the contract states in part:

> 8. In accordance with Texas Education Code, Chapter 21, Subchapters E and F, the Board may terminate this contract and discharge Employee or suspend Employee without pay during the term of this contract for good cause as determined by Board. A suspension without pay may not extend beyond the end of the school year.

> 13. Renewal or nonrenewal of this contract shall be in accordance with state law; Texas Education Code, Chapter 21, Subchapter E; and Board policy.

Counsel for Respondent argues that CH. 21 Tex. Educ. Code, §21.204 is not applicable to him because he is not a "teacher" as defined by §21.201(1), therefore, he did not need to have a written contract to avail himself of the provisions of §21.206 or §21.211. This argument is non-sensical and leads to an absurd result of partial enforcement of the statute. One cannot exclude himself from the applicability of one provision of the statute and expect to receive benefits and protections from another provision of that same statute.

Assuming *arguendo* that an implied, unsigned contract does exist between the parties, the terms of the implied contract would be that which is contained within the unsigned contract. The terms of the contract incorporates the above provisions, citing CH. 21, Tex. Educ. Code. By its specific terms, CH. 21, Tex. Educ. Code, §21.204

provides: "(a) A term contract must be in writing and must include the terms of employment prescribed by this subchapter." As cited in the conclusion of law above, parties, by contract, cannot impair the validity of a law, nor control or limit the provisions of a statute. McFarland v. Haby, 589 S.W.2d 521 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.). To allow the Respondent to avail himself of the provisions of CH. 21, Tex. Educ. Code, without a written contract, would impair the validity of §21.204 or control or limit its provisions.

In addition to the foregoing, no evidence was presented at the hearing that Respondent held a "certificate" under Subchapter B of CH. 21, Tex. Educ. Code. As such, it can be argued consistently with Respondent's own argument that since Respondent is not a "teacher" within its definition of CH. 21, Tex. Educ. Code, §21.201, he cannot avail himself of the provisions of CH. 21, Tex. Educ. Code, Subchapters E and F.

## Recommendation

After due consideration of the record, evidence and argument presented, matters officially noticed and the foregoing Findings of Fact and Conclusions of Law, in my capacity as hearing examiner, I hereby recommend that a written contract did not exist between the parties and that this case be dismissed for lack for jurisdiction.

SIGNED this 28th day of November, 2000.

Victoria Guerra
Certified Hearing Examiner

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I have served a copy of the foregoing Proposal for Decision upon person named below, by placing a copy of the Proposal for Decision in the United States Mail, Certified Mail, Return Receipt Requested and by Facsimile as indicated below. I also certify that pursuant to CH. 157, TEX. ADMIN. CODE, §157.1103, I have complied with supplying my report to the Commissioner of Education as indicated below.

SIGNED this 28th day of November, 2000.

Victoria Guerra

Ms. Norma Ramon
President, Board of Trustees
Santa Maria Independent School District
P.O. Box 448
Santa Maria, Texas 78592-0448
(956) 565-4422 (facsimile)

**VIA: FACSIMILE and CMRRR**
**Z 440 333 067**

Dr. Ismael Cantu, Superintendent
Santa Maria Independent School District
P.O. Box 448
Santa Maria, Texas 78592-0448
(956) 565-4422 (facsimile)

**VIA: FACSIMILE and CMRRR**
**Z 440 333 068**

Mr. Gilbert Hinojosa
Magallanes, Hinojosa & Trevino
1713 Boca Chica Blvd.
Brownsville, Texas 78520
(956) 544-4290 (facsimile)

**VIA: FACSIMILE and CMRRR**
**Z 440 333 069**

Mr. Michael Shirk
Staff Counsel
Texas State Teachers Association
Austin, Texas 78701
Facsimile: (512) 474-9589

**VIA: FACSIMILE and CMRRR**
**Z 440 333 070**

Mr. Jim Nelson
Commissioner, Texas Education Agency
1701 N. Congress Ave.
Austin, Texas 78701-1494

**VIA: CMRRR**
**Z 440 333 071**

Proposal for Decision

10

TOTAL P.13

RECEIVED JUN 1 9 1998

*[handwritten: 6-18-98]*

*[handwritten: copy to Mr. Acosta Please review, also please follow-up on recommendations especially on cash flow for this year Please review with me on Monday morning. H. G.]*

<u>M E M O R A N D U M</u>

TO:        Hector Gonzales

FROM:      Ed Flathouse

DATE:      June 15, 1998

SUBJECT:   Review of Financial Management Practices Of Santa Maria ISD On June 4, 1998

This memorandum is a followup to the Texas Education Agency's (the TEA) on-site review on June 4, 1998, of the Santa Maria Independent School District's budget status for the fiscal year ending August 31, 1998. The TEA's on-site visits to review the status of districts' budgets are intended to provide assistance to districts on an informal basis. In most instances, a written report is not provided as a part of our informal process; however, this informal report is being provided in order to ensure appropriate communication of our observations and recommendations to the district. In some cases, the findings of our visit may result in more formal actions being taken, such as investigative audits or the appointment of a fiscal monitor or master.

Our observations are as follows:

- The district ended fiscal year 1997 with a $322,094 fund balance deficit in the General Fund (10.4% of budgeted estimated revenues in the General Fund for fiscal year 1998);

- At our entrance conference on June 4th, district officials stated that the fund balance deficit in the General Fund would be eliminated by August 31, 1998;

- Our analysis of the district's budget status did not support statements made by district officials that the fund balance deficit would be eliminated by August 31, 1998. Our analysis indicated that the fund balance deficit position may improve but it is not likely to be entirely eliminated by August 31, 1998;

- It appeared that estimated expenditures in the district's budget may have been understated by approximately 5%;

- District officials had not prepared a cash flow analysis per month showing estimated future cash receipts and disbursements for the General Fund. This analysis is an essential fiscal management tool to benchmark month-to-month status and to benchmark budget status goals; and

- According to the district's bank statements for April, 1998, the general operations account was overdrawn on several days during the month in amounts ranging up to $210,314.30. Furthermore, although the April, 1998 bank statement showed a positive ending balance, the book balance for cash at the end of April was negative $87,636.96 (according to the district's general ledger account summary) which is attributable to checks that had not cleared the bank at April 30th. The district's business manager stated that the district's negative cash position during April was neither communicated to the superintendent nor to the board of trustees.

Our recommendations are as follows:

- Prepare cash flow estimates for cash receipts and disbursements per month through August, 1999;

- Prepare detailed operational plans for activities and expenditures through August 31, 1998, in order to further improve the district's budget status;

- Manage cash flows in order to avoid overdraft amounts in the depository bank;

*[stamp: Acosta   EXHIBIT NO. 15   THURMAN MOODY]*

*[handwritten: TEA Ann: Ed Flathouse Address - Division of State Fund 1701 North Congress Austin, TX. 78701-14.]*

*[handwritten: Pete app 2. 8/6/98]*

Hector Gonzales
June 15, 1998
Page 2 of 2

- Communicate an amended budget analysis record to the board and to TEA, as soon as possible, showing by fund estimated revenues, appropriations, actual revenues and expenditures, encumbrances, and balances for all funds for fiscal year 1998; and

- Prepare a deficit reduction plan through August, 1999, describing in detail how the fund balance deficit in the General Fund is to be eliminated, and subsequently improved to an amount that equals about 12% to 20% of the district's budget in the General Fund.

Although this memorandum represents an informal report, the observations made during our visit indicated certain deficiencies in financial management processes. Accordingly, the district must take appropriate action as soon as possible.

Based upon the district's response, we may revisit the district in July or August. It is important that the district take advantage of the window of opportunity between now and August 31st to improve the district's budgetary status.

If you any questions, please feel free to contact me at (512) 463-5899.

cc: Linda Mora
    Joe Wisnoski
    Tom Canby

*Notes:*

*Please advise or address in the letter that upon approval of the 1998-99 Budget, we will forward a Cash Flow Statement (Schedule L) the 1998-99 school yr.*

*T-y*

Personnel Management Relations                              DGBA(Exhibit)
Employee Complaints/ Grievances

Exhibit A

### Employee Complaint Form-Level One

Any employee filing a complaint must fill out this form completely and submit it to his or
her principal or immediate supervisor.  All complaints will be processed in accordance
with DGBA(Legal) and (Local) or any exceptions outlined therein.

1. **Name:** Salvador Acosta
2. **Position:** Administrator            **Campus/Department:** Textbook Coordinator
3. **Please state the date of the event or series of events causing the complaint.**

   Reassignment notice received August 17, 2000.

4. **Please state your complaint including the individual harm alleged.**

I have been wrongfully reassigned based on false information and lack of support from the
administration.

5. **Please state specific facts of which you are aware to support your complaint (list in
   detail).**

### See Attachments

The findings concluded in the memorandums are misleading and do not fully disclose all facts
and information available.  The superintendent did not make an objective and non-biased
assessment.

6. **Please state the remedy you seek for this complaint.**

I am seeking that all documentation in the personnel file be expunged and that no record or
document exist which relates to the questionable and trivial findings being discussed in the
memos dated June 28, July 11, July 13, August 8, August 16 and August 17, 2000.

Salvador Acosta                                          **August 29, 2000**
_____                              _____
**Employee Signature**                                     **Date Submitted**

Acosta

**EXHIBIT NO.** *16*

THURMAN MOODY

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

2000-2001

Telephone:  956-565-6308                              Fax: 956-565-4422

TO:            Mr. Salvador Acosta

FROM:      Dr. Ismael Cantu, Superintendent

DATE:        September 14, 2000

RE:            Level II Grievance

Your Level II grievance heard Thursday, September 7, 2000 has been denied.  Under Board Policy
DGBA (LOCAL) you have the right to appeal this decision to the Board of Trustees.   Your
decision to appeal  must be received in accordance to Board Policy.  Attached you will find Policy
DGBA (LEGAL)/(LOCAL) and the appropriate form necessary for your appeal.

IC/br



Acosta

EXHIBIT NO. 17

THURMAN MOODY

Dr. Ismael Cantu, Superintendent        Mr. Benito Contreras, Jr., Secretary        Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President            Mr. Jose F. Gonzales, Member              Mrs. Consuelo De Le Rosa, Memb
Mr. Rambaldo Rivera, Vice-President    Mr. Jose Noe Diaz, Member

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

Telephone:  956-565-6308                                    Fax: 956-565-4422

TO:          Mr. Salvador Acosta, Business Manager

FROM:        Dr. Ismael Cantu, Superintendent

DATE:        February 25, 2000

RE:          Securing Sports and Other Related Activity Proceeds

As has been discussed prior at Board meetings and administration meetings, Santa Maria ISD established procedures earlier this school year regarding the securing of sports and other related activity proceeds.

It has come to my attention by a board member that in one Basketball game these procedures were not followed. Please inquire, from the appropriate administrator, who's responsibility it was to assure that these procedures were followed.

Also, in the future, as Business Manger, please monitor this process as was approved administratively.



Acosta

EXHIBIT NO. 18

THURMAN MOODY

Dr. Ismael Cantu, Superintendent        Mr. Benito Contreras, Jr., Secretary        Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President              Mr. Jose F. Gonzales, Member               Mrs. Consuelo De Le Rosa, Member
Mr. Rambaldo Rivera, Vice-President      Mr. Jose Noe Diaz, Member

# Santa Maria Independent School District

Military Highway 281
P.O. Box 448
Santa Maria, TX 78592

2000-2001

Telephone: 956-565-6308                    Fax: 956-565-4422

**TO:**        Mr. Salvador Acosta

**FROM:**    Dr. Ismael Cantu, Superintendent

**DATE:**    September 15, 2000

**RE:**        <u>Termination of Employment</u>

Please be advised that, effective immediately, you are relieved of your employment with Santa Maria Independent School District.

Although the School Board voted to extend you an offer for employment for the 2000-01 school year, you failed to timely return the contract by May 15, 2000 as was required. As a result of this failure, the district's offer of employment to you under the proposed contract was automatically withdrawn as a result of your failure to timely execute and return the contract by May 15, 2000. As a non-contract employee, you may be terminated by the Superintendent. You will be required to surrender your keys, computer passwords, safe combination, all District-issued equipment, and any District records in your possession immediately.

In the event that you wish to challenge my determination, you may proceed with a grievance under Santa Maria ISD policy DGBA (LOCAL). A grievance form and a copy of the policy are attached for your convenience.

IC/br



Acosta

EXHIBIT NO. 19

THURMAN MOODY

---

Dr. Ismael Cantu, Superintendent        Mr. Benito Contreras, Jr., Secretary        Mrs. Alicia Martinez, Member
Mrs. Norma Ramon, President              Mr. Jose F. Gonzales, Member                 Mrs. Consuelo De Le Rosa, Member
Mr. Rambaldo Rivera, Vice-President      Mr. Jose Noe Diaz, Member

FROM : ACOSTA                    PHONE NO. : 9567973370                Sep. 19 2000 01:29AM P12

PERSONNEL–MANAGEMENT RELATIONS:                                        DGBA
EMPLOYEE COMPLAINTS/GRIEVANCES                                         (EXHIBIT)

EXHIBIT E

## NOTICE OF APPEAL TO THE BOARD AT LEVEL THREE

This form must be filled out completely by an employee appealing a Level Two decision, or
the lack of a timely response after a Level Two conference, to the Board, in accordance with
DGBA(LEGAL) and (LOCAL) or any exceptions outlined therein.

1.  Name __Salvador Acosta__

2.  Position __Fixed Assets/Textbook__    Campus/Department __Administrator__

3.  To whom did you last present your complaint? __Dr. Ismael Cantu__

    Date of conference __September 7, 2000__

4.  If you will be represented in pursuing your complaint, please identify the individual or
    organization representing you.

    Name __Yolanda Gonzalez/ Texas State Teachers Association__

    Address __2202 South 77 Sunshine Strip Ste. H__

    __Harlingen Texas 78550__

    Telephone __(956) 423-6493__

5.  Attach a copy of your original complaint.

6.  Attach copies of the Level One and Level Two decisions, if applicable.

_____                __September 20, 2000__
Employee signature                        Date submitted

Acosta

EXHIBIT NO. 20

THURMAN MOODY

1 of 1

DATE ISSUED: 06/07/2000

Cause No.: 2002-07-2652-E

| | | |
|---|---|---|
| SALVADOR ACOSTA and | )( | IN THE DISTRICT COURT |
| RIGO DE LA ROSA | )( | |
| | )( | |
| VS | )( | CAMERON COUNTY, TEXAS |
| | )( | |
| SANTA MARIA INDEPENDENT | )( | |
| SCHOOL DISTRICT, etc. | )( | 375TH JUDICIAL DISTRICT |

## STIPULATIONS TO THE DEPOSITIONS OF
## SALVADOR ACOSTA and RIGO DE LA ROSA

taken on December 3, 2002, at 855 West Price Road, Suite 9, Brownsville, Texas, before THURMAN J. MOODY, Certified Shorthand Reporter No. 2861 in and for the State of Texas.

• • • • • • • • • • • •

In accordance with Rule IV.B of the Standards and Rules for Certification of Certified Shorthand Reporters, Dorsey & Associates has agreements with some clients to do their reporting work at reduced rates. These same rates will be charged to all parties wherein these clients are involved.

• • • • • • • • • • •

### THIS DEPOSITION WILL BE TAKEN PURSUANT TO:

(X ) NOTICE
( ) AGREEMENT
( ) COURT ORDER

### STIPULATIONS REGARDING OBJECTIONS:

(X ) Pursuant to the Rules: All objections will be reserved until the time of trial, except objections as to the form of the question and the responsiveness of the answer, which objections are waived if not made at the taking of the deposition.

( ) All objections will be reserved until the time of trial.

( ) All objections will be made at the time of taking of the deposition or they will be waived.

## STIPULATIONS REGARDING SIGNATURE OF THE WITNESS

(X )    Pursuant to the Rules: the Depositions are to be submitted to the attorney producing the witness for reading and signature and that the witnesses have twenty (20) days from the receipt of the deposition to read and sign the depositions.  If the depositions are not signed after the expiration of twenty (20) days, a copy will be filed with the custodial attorney in lieu of the signed originals.

(  )    The deposition is to be sent directly to the witnesses to sign before any notary public.  The witness will have twenty (20) days in which to return the signed deposition.  If the witnesses do not return signed depositions after the expiration of twenty (20) days, a copy will be filed with the custodial attorney in lieu of the signed originals.

(  )    The depositions are to be held in the court reporter's office for signature.  The witnesses will be notified by Certified Mail that the depositions are being held for reading and signature for a period of twenty (20) days in the court reporter's office.  If the depositions are not signed at the expiration of twenty (20) days, a copy will be filed with the custodial attorney in lieu of the signed originals.

(  )    The witnesses' signatures will be waived.

## STIPULATIONS REGARDING DEPOSITION EXHIBITS:

(  )    Pursuant to the Rules: A copy of the exhibits produced at the deposition will be attached to the original transcript and filed with the custodial attorney and the produced exhibits returned to the producing party.

(X )    The Exhibits to be filed with the original transcript will be attached to the original transcript when sent to the witness for reading and signature.  A copy of exhibits will not be maintained in the custody of the court reporter.

(  )    The Exhibits produced to the court reporter at the deposition will be attached to the original transcript in lieu of copies and filed with the custodial attorney.

. . . . . . . . . . . . . . . . . . . . . .

(**X** )   Any stipulations other than those set forth above will be made on the record and included in the deposition transcript.


**WE**, the undersigned, do hereby agree to the stipulations as indicated herein and request that **DORSEY & ASSOCIATES** furnish me with the items indicated below.

Executed on this the 4th day of December 2002.


| | | |
|---|---|---|
| Copy of Deposition: | Yes ( ) | No (X) |
| Copy of Exhibits: | Yes ( ) | No ( ) |
| ASCII Format: | Yes ( ) | No ( ) |
| Condensed Transcript | Yes ( ) | No ( ) |
| Format: | Four per page ( ) | six per page ( ) |

Attorney for: _Plaintiffs_


| | | |
|---|---|---|
| Copy of Deposition: | Yes ( ) | No ( ) |
| Copy of Exhibits: | Yes ( ) | No ( ) |
| ASCII Format: | Yes (X) | No ( ) |
| Condensed Transcript | Yes (X) | No ( ) |
| Format: | Four per page (✓) | six per page ( ) |

Attorney for: _____

CAUSE NO. 2002-01-153-E

| | | |
|---|---|---|
| NORMA ORTIZ, *ET AL* | § | IN THE 357TH DISTRICT |
| | § | |
| *vs.* | § | COURT OF |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, *ET AL* | § | CAMERON COUNTY, TEXAS |

FILED 8:00 O'CLOCK a M
AURORA DE LA GARZA DIST. CLERK
SEP - 4 2002
DISTRICT COURT OF CAMERON COUNTY, TEXAS
DEPUTY

## MOTION TO STRIKE PLAINTIFFS' THIRD AMENDED PETITION

1.  Defendants Randy Dunn, Noe Sauceda and Eddie Errisuriz move the Court for an order striking Plaintiffs' Third Amended Petition as to said defendants, and in support thereof would show as follows:

2.  This case was commenced by Plaintiffs' Original Petition, filed on or about January 11, 2002. Paragraph VI of said Petition included the statement that "Plaintiffs hereby give notice to all that they only allege state claims in this suit and specifically exclude *and do not intend to litigate herein, any federal cause of action. The only causes of action that they intend to litigate in this Court are those concerning rights arising under the laws of the sovereign State of Texas.*" [emphasis supplied]

3.  Plaintiffs' First Amended Original Petition was thereafter filed on or about June 26, 2002. Paragraph VI of said pleading again included the statement that "Plaintiffs hereby give notice to all that they only allege state claims in this suit and specifically exclude and do not intend to litigate herein, any federal cause of action. The only causes of action that they intend to litigate in this Court are those concerning rights arising under the laws of the sovereign State of Texas."



EXHIBIT
7

4.      On or about July 12, 2002, Defendants filed their Motion for Summary Judgment and "No Evidence" Motion for Summary Judgment" seeking dismissal of all of Plaintiffs' claims. Hearing on said Motions were scheduled for hearing before the Court on September 3, 2002.

5.      On or about August 27, 2002, seven days before the hearing on Defendants' Motions for Summary Judgment, Plaintiffs filed their Third Amended Original Petition in this matter. [No Second Amended Original Petition appears in the record.] Such pleadings include claims arising under federal law, including claims premised on Title 42 U.S.C. § 1983, and other new theories of liability arising under Texas law.

6.      While the Certificate of Service in Plaintiffs' latest petition indicates that the pleading was served on counsel on August 27, 2002, prior to the three day Labor Day holiday, such pleading was not received in the offices of counsel for Defendants until Tuesday, September 3, 2002. This is not the first time counsel for Plaintiffs has attempted to use delay in mail transmission to his advantage. The Court is asked to take notice of Defendants' Response to Plaintiffs' Motion for Continuance wherein Defendants demonstrated that Plaintiffs' Certificate of Service indicated a service date of July 19, 2002, but that the postmark on the envelope containing the Motion was July 30, 2002, an unexplained delay of nearly two weeks.

7.      Defendants would show that Plaintiffs' Third Amended Original Petition constitutes unfair and unwarranted surprise in this matter, and has been filed at the "eleventh hour" as a means of avoiding the merits of Defendants' Motions for Summary Judgment. Plaintiff has, until one week before the hearing on Defendants' Motions, scrupulously avoided any inference that Plaintiffs intended to pursue any federal claim, and has expressly denied any intent to do so. Plaintiffs' depositions have been taken in this matter on July 22, 2002 without the benefit of any pleadings asserting federal claims, and therefore with no reason for Defendants to seek

deposition testimony with which to challenge such claims. It defies credibility that the timing of Plaintiffs' "change of heart" regarding federal causes of action and other new theories of liability is coincidental.

8.     While a party does not need to seek leave to file an amended pleading seven days before trial, the right to do so is by no means unlimited where the amendment constitutes surprise and/or prejudice. *See,* Tex. R. Civ. P. 70 [permitting courts to assess costs associated surprise pleadings and to "make such other order with respect thereto as may be just."]; TEX. R. CIV. P. 63; TEX. R. CIV. P. 66. *See also, Stevenson v. Koutzarov,* 795 S.W.2d 313, 321 (Tex. App.— Houston [14th Dist.] 1990, writ denied) (pretrial amendment adding causes of action should have been struck because it was not based on newly discovered matters).

9.     For the foregoing reasons, the Defendants request that the Court strike the Plaintiffs' Third Amended Petition as it constitutes surprise and the amendment asserts new causes of action and, therefore, is prejudicial on its face. *Hardin v. Hardin,* 597 S.W.2d 347 ( Tex. 1980) (if the amended pleading was a substantive change, on appeal, the burden is on the party who received the adverse ruling to show that the court abused its discretion); *State Bar v. Kilpatrick,* 874 S.W.2d 656, 658 (Tex. 1994) .

Wherefore, premises considered, Defendants pray that Plaintiffs' Third Amended Original Petition be stricken in its entirety and that such pleadings not be considered in conjunction with Defendants Motions for Summary Judgment. Defendants further request such other and further relief to which they may be justly entitled.

Respectfully submitted,

WALSH, ANDERSON, BROWN,
SCHULZE & ALDRIDGE, P.C.
70 NE Loop 410, Suite 800
San Antonio, Texas 78216
TEL NO. (210) 979-6633
FAX NO. (210) 979-7024

By:

JOE A. DE LOS SANTOS
State Bar No. 24007100

DANIEL M. "MATT" BURNS
State Bar No. 03443900

ATTORNEYS FOR DEFENDANTS
BROWNSVILLE INDEPENDENT SCHOOL
DISTRICT, ET. AL.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Objections and Motion to Strike Plaintiffs' Summary Judgment Evidence has been served via hand delivery on this 3rd day of September, 2002:

Michael Pruneda
The Pruenda Law Firm, P.L.L.C
P.O. Box T
Pharr, Texas 78577

↳ certified mail

_____
JOE A. DE LOS SANTOS

09/03/2002  17:02    9568693400    LAW OFFICE OF SAENZ    PAGE  07/07

CAUSE NO. 2002-01-153-E

| | | |
|---|---|---|
| NORMA ORTIZ, *ET AL* | § | IN THE 357TH DISTRICT |
| | § | |
| *vs.* | § | COURT OF |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT, *ET AL* | § | CAMERON COUNTY, TEXAS |

## ORDER ON DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' THIRD AMENDED ORIGINAL PETITION

On this day came on to be considered the Motion to Strike Plaintiffs' Third Amended Original Petition filed herein by Defendants Randy Dunn, Noe Sauceda and Eddie Errisuriz. The Court, having reviewed the Motion, the time of filing of the amended pleading at issue, and the remaining pleadings in this matter, is of the opinion that the Motion is meritorious and should be GRANTED. It is therefore:

ORDERED, that Plaintiffs' Third Amended Original Petition be and hereby is

STRICKEN.

_____                    _____
Date Signed                                                Judge Presiding

CAUSE NO. 2002-01-153-E

| | | |
|---|---|---|
| NORMA ORTIZ and CATALINA GARCIA | ♦ | IN THE 357ᵗʰ DISTRICT COURT |
| | ♦ | |
| V. | ♦ | |
| | ♦ | |
| | ♦ | |
| BROWNSVILLE INDEPENDENT SCHOOL | ♦ | OF |
| DISTRICT, RANDY DUNN, NOE SAUCEDA | ♦ | |
| and EDDIE ERRISURIZ, in their official and | ♦ | |
| individual capacity, *and employees, agents, and all* | ♦ | |
| *those acting in concert or at their discretion* | ♦ | CAMERON COUNTY, TEXAS |

### ORDER DENYING DEFENDANTS'
### MOTION TO STRIKE

On this day came to be considered the Defendants' Motion to Strike, the Court after reviewing

the motion, response and arguments of counsel, if any, is of the opinion that the motion should be

DENIED.

It is THEREFORE ORDERED, ADJUDGED AND DECREED that Defendants' Motion to

Strike is hereby DENIED.

SIGNED this ____ day of _____, 2002.


_____
JUDGE PRESIDING


COPIES TO:

Joe A. De Los Santos
WALSH, ANDERSON, BROWN, SCHULZE & ALDRIDGE
100 NE Loop 410, Suite 1000
San Antonio, Texas 78216

Michael Pruneda
THE PRUNEDA LAW FIRM, P.L.L.C.
P.O. Box T
Pharr, Texas 78577