

United States District Court
Southern District of Texas
FILED

MAR 1 0 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | § § § § |
| vs. | § § CIVIL ACTION NO. B-03-041 § |
| SANTA MARIA INDEPENDENT SCHOOL DISTRICT, and employees, agents, and all those acting in concert or at their discretion | § § § § § |

## DEFENDANT SANTA MARIA INDEPENDENT SCHOOL DISTRICT'S RESPONSE TO PLAINTIFF'S MOTION FOR REMAND

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW, SANTA MARIA INDEPENDENT SCHOOL DISTRICT,** Defendant in the above-styled and numbered cause and files and serves this its Response to Plaintiff's Motion for Remand, and would show unto the court the following:

### I.

1.     Plaintiffs has filed a Motion for Remand asserting that they gave Defendant notice of a possible cause of action under the United States Constitution when he filed a response to request for disclosures.   In fact, this is just another example of the subterfuge that Plaintiffs have used in this case in a manner to deceive both the court and Defendant.

2.    Plaintiffs' Original Petition specifically stated:

V.  <u>EXCLUSION OF FEDERAL CLAIMS</u>
*Plaintiffs hereby give notice to all that they only allege state claims
in this suit and specifically exclude, and do not intend to litigate
herein, any federal cause of action.  The only causes of action that
they intend to litigate in this Court are those concerning rights
arising under the laws of the sovereign State of Texas.*
*Plaintiffs' Original Petition*, Paragraph V. — Exclusion of Federal Claims,
[emphasis added] (**Exhibit "1"**)

With this language in place, it does not matter what Plaintiffs discovery responses state since

Defendant believed and the court would believe and there is no cause of action raised or that could

possibly be raised since Plaintiffs specifically stated they were excluding any federal causes of

action and did not intend to litigate any federal causes of action.  In none of the cases relied on by

Plaintiffs was there a specific pleading that excluded all federal causes of action.  Defendant had

no reason to believe that Plaintiffs would state a different cause of action.  In fact,  Plaintiff

Salvador Acosta was asked during his deposition about the fact that the case was filed under the

Texas Constitution.

7    *Q.   Are you aware of pleadings that your attorney filed*
8   *on your behalf?*
9    *A.   Yes, I remember it, a little bit about them.*
10    *Q.   And you filed suit under the Texas Constitution,*
11   *right?*
12    *A.   Right.*
13    *Q.   Are you aware that your only relief under the Texas*
14   *Constitution would be to be rehired as the business manager?*
15    *A.   I was not aware of that, no.*
*Deposition of Salvador Acosta*, p.87, L.7-15 *(Exhibit "2")*

Plaintiffs' counsel made no attempt to correct Defendant and after receiving the attached correspondence from Plaintiff made no attempt to correct this impression. Instead, Plaintiffs waited until a Motion for Summary Judgment was filed based on their only live pleading to suddenly change their position and assert federal causes of action.

3.    While Plaintiffs' Original Petition was the only live pleading in place and it excluded any possible federal causes of action, there was no cause for defense counsel to believe otherwise.

4.    This is strikingly different from the cases relied on by Plaintiffs  where the pleadings were silent as to whether there might be room for a possible federal cause of action or there was a possibility for release on a federal claim.

5.    Defendant should be allowed to rely on Plaintiffs' pleading to prepare their defenses and strategy in a case.   A statement by Plaintiffs and signed by Plaintiff's counsel that "...*they only allege state claims in this suit and specifically exclude, and do not intend to litigate herein, any federal cause of action. ... [and] that they intend to litigate ... rights arising under the laws of the sovereign State of Texas. "*  would have no meaning  were the court to allow Plaintiffs to remand this case and would allow an injustice to Defendant and fraud on the court.

6.    This appears to have been an intentional subterfuge by Plaintiff to mislead Defendant into a false security by reliance on Plaintiffs' pleadings, when in fact Plaintiff intended to wait until an opportune moment to revise his pleadings and request federal recovery.

7.    Plaintiffs' intentional attempt in its request for disclosures to defeat a petition for remand is another example of the necessity for sanctions in this case to prevent Plaintiffs from this practice in the future.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that Plaintiffs' Petition for Remand be denied and for such other and further relief to which they may be justly entitled, and for other such relief to which this Defendant is entitled.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Attorneys for Petitioner

By _____
ELIZABETH G. NEALLY
Texas Bar No. 14840400
Federal Bar No. 8044

JEFFREY D. ROERIG
Texas Bar No. 17161700
Federal Bar No. 1503

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing **DEFENDANT BROWNSVILLE INDEPENDENT SCHOOL DISTRICT'S RULE 12(f) MOTION TO STRIKE** has been mailed, Certified, Return Receipt Requested vis U.S. Postal Service to counsel of record, to wit:

Michael Pruneda
The Pruneda Law Firm
P. O. Box T
Pharr, Texas 78577

on this _10_ day of March, 2003.

_____
Elizabeth G. Nealy

# EXHIBIT "1"

## PLAINTIFFS' ORIGINAL PETITION

CAUSE NO. *2002-07-2652-E*

| | | |
|---|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | ◆ | IN THE 357 DISTRICT COURT |
| | ◆ | FILED _12_ O'CLOCK _P_ |
| | ◆ | AURORA DE LA GARZA DIST. CLER. |
| V. | ◆ | |
| | ◆ | OF      JUL 03 2002 |
| | ◆ | |
| SANTA MARIA INDEPENDENT SCHOOL | ◆ | DISTRICT COURT CAMERON COUNTY TEX |
| DISTRICT *and employees, agents, and all those* | ◆ | |
| *acting in concert or at their discretion* | ◆ | CAMERON COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME, PLAINTIFFS SALVADOR ACOSTA and RIGO DE LA ROSA (hereinafter referred to as "Plaintiffs"), complaining of SANTA MARIA INDEPENDENT SCHOOL DISTRICT and employees, agents, and all those acting in concert or at their discretion, (hereinafter called by name or referred to as "Defendant"), and for such causes of action shows unto the court the following:

I.
### DISCOVERY LEVEL

The cause of action should be governed in accordance with Discovery Level 2 of the Texas Rules of Civil Procedure.

II.
### PARTIES

Plaintiff, SALVADOR ACOSTA, is a resident of Cameron County, Texas.

Plaintiff, RIGO DE LA ROSA, is a resident of Cameron County, Texas.

Defendant, SANTA MARIA INDEPENDENT SCHOOL DISTRICT, is a governmental entity in Texas operating under color of law that can be served by delivering citation to its superintendent Al Hernandez at P.O. Box 448, Santa Maria, Texas 78592 or wherever found.

Venue is proper in Cameron County, Texas in that the acts made the basis of this cause of action occurred in Cameron County. Further, both Plaintiffs and Defendants are located within and/ or are residents of Cameron County, Texas.

III.
### FACTUAL ALLEGATIONS

Plaintiffs were long-time loyal employees of Santa Maria I.S.D. that were dedicated and hard working employees. Despite Plaintiffs' performance, dedication, and efforts, Defendant failed to give Plaintiffs the opportunity to work free of political hostility, harassment, humiliation, and retaliation during their employment and continue in their positions. Ultimately, Plaintiffs were both

terminated for political reasons. Plaintiff De La Rosa was terminated on or about July 7, 2000 and Plaintiff Acosta was terminated on or about September 15, 2000.

Plaintiffs believe that following political changes on the Defendant's School Board, they were targeted by Defendant. Plaintiffs believe that the reasons given for their terminations were false and that that the true reasons were based on their political speech and associations.

As a result, Plaintiffs sue the Defendant for violation of their civil rights arising under the Constitution and laws of the sovereign state of Texas.

IV.
CONSTITUTIONAL CAUSE OF ACTION—
*FREE SPEECH & FREEDOM OF ASSOCIATION*

Plaintiffs allege that the Defendant's actions were committed with a deliberate indifference and were arbitrary, capricious, unreasonable, unlawful, unconstitutional and discriminatory which resulted in the denial of the Plaintiffs' civil rights under and in violation of, *Article I, section 8* of the Constitution of the State of Texas. These acts that subjected Plaintiffs to the deprivations of rights guaranteed to all individuals the freedom of speech, political expression, political affiliation and association were unlawful in that they were based to an impermissible extent on Plaintiffs speech and association. .

V.
EXCLUSION OF FEDERAL CLAIMS

Plaintiffs hereby give notice to all that they only allege state claims in this suit and specifically exclude, and do not intend to litigate herein, any federal cause of action. The only causes of action that they intend to litigate in this Court are those concerning rights arising under the laws of the sovereign State of Texas.

VI.
JURY TRIAL REQUEST

Plaintiffs request that a jury be convened in order that issues the basis of this lawsuit be tried.

VII.
ACTUAL DAMAGES

As a result of the incidents described above that are made the basis of this suit, Plaintiffs have suffered from an infringement of their civil rights. In all reasonable probability, Plaintiffs will continue to suffer such for a long time into the future, if not for the balance of their natural lives. Such injury will likely exist for the remainder of Plaintiffs' lifetime. Plaintiffs seek to recover all damages to which they may be appropriately entitled and the court deems proper.

VIII.
INJUNCTIVE RELIEF

The continuing nature of the denial of Plaintiffs' fundamental rights that arbitrarily and irrationally have been denied and will deny to Plaintiffs rights and entitlements under the laws described above, is resulting in immediate and irreparable harm to the Plaintiffs. Plaintiffs are therefore entitled to temporary and permanent injunctive orders restraining the Defendant from

continuing with such actions and future action. Additionally, Plaintiffs request that this court order a permanent injunction, based on the customary nature of the unlawful acts, that Defendant and employees, agents and all those acting in concert with them or at their discretion refrain from denying Plaintiffs the rights infringed upon in this action. Thereafter, Defendant shall comply, follow, govern, and enforce such orders.

## IX.
## DECLARATORY RELIEF

This lawsuit involves an actual controversy within this Court's jurisdiction. Thus, the Court may declare the rights and other legal relations of the Plaintiffs and grant such other necessary and proper relief allowed by a declaratory judgment.

## X.
## DISCOVERY REQUESTS

Attached to the Original Petition, Plaintiffs propounded to the Defendant:

1.    Plaintiffs' Request for Disclosure to Defendant;

2.    Plaintiffs' First Set of Interrogatories to Defendant; and

3.    Plaintiffs' Request for Production to Defendant.

These discovery requests should be answered accordingly and in compliance with the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Honorable Court grant the following:

a).    Entering a permanent injunction, declaratory judgment, restraining and enjoining the Defendant, its officers, agents, employees, attorneys, and successors in office, and all other persons in active concert and participation with them, from retaliating against the Plaintiffs or otherwise violate their rights; and

b).    such other appropriate relief as Plaintiffs may be justly entitled and the Court deems proper.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____
MICHAEL PRUNEDA
State Bar No. 24025601

ATTORNEY FOR PLAINTIFFS

CAUSE NO. 2002-07-2682-2

| | | |
|---|---|---|
| SALVADOR ACOSTA and RIGO DE LA ROSA | ◆ | IN THE 357 DISTRICT COURT |
| | ◆ | |
| V. | ◆ | |
| | ◆ | OF |
| | ◆ | |
| SANTA MARIA INDEPENDENT SCHOOL | ◆ | |
| DISTRICT *and employees, agents, and all those* | ◆ | |
| *acting in concert or at their discretion* | ◆ | CAMERON COUNTY, TEXAS |

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA, DIST. CLERK
JUL 0 3 2002
DISTRICT COURT OF CAM...

## PLAINTIFFS' REQUEST FOR JURY TRIAL

COME NOW Plaintiffs, SALVADOR ACOSTA and RIGO DE LA ROSA, requesting that

a jury trial be held on said cause.  Pursuant to 216 of the Texas Rule of Civil Procedure a jury fee in

the sum of $30.00 has been paid to the District Clerk's office.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____

*MICHAEL PRUNEDA*
State Bar No. 24025601

ATTORNEY FOR PLAINTIFFS

# EXHIBIT "2"
## DEPOSITION TRANSCRIPT
## PLAINTIFF SALVADOR ACOSTA

**NO. 2002-07-2652-E**

| | | |
|---|---|---|
| SALVADOR ACOSTA AND | | |
| RIGO DE LA ROSA | * | IN THE DISTRICT COURT |
| | | |
| VS. | * | 357TH JUDICIAL DISTRICT |
| | | |
| SANTA MARIA INDEPENDENT | | |
| SCHOOL DISTRICT, ETC. | * | CAMERON COUNTY, TEXAS |

### FILING CERTIFICATE OF THE ORAL DEPOSITION OF
### RIGO DE LA ROSA

I, **THURMAN MOODY**, a Certified Shorthand Reporter in and for the State of Texas, hereby certify pursuant to the Rules and/or agreement of the parties present to the following:

That this deposition transcript is a true record of the testimony given by the witness named herein, after said witness was duly sworn by me.

That $ **283.50** is the charge for the preparation of the completed original deposition transcript and any copies of exhibits attached to the original, charged to **ELIZABETH NEALLY**.

That the deposition transcript was submitted on DECEMBER 23, 2002 to **MICHAEL PRUNEDA** for signature and returned to DORSEY & ASSOCIATES by JANUARY 13, 2003.

That the deposition transcript was___ was not _X_ returned to the deposition officer by the witness.

That the original deposition transcript, or a copy thereof, together with copies of all exhibits, was delivered to the attorney of party who asked the first question appearing in the transcript on DECEMBER 23, 2002.

That pursuant to information made part of the record at the time said testimony was taken; the following includes all parties of record:

| | | |
|---|---|---|
| MICHAEL PRUNEDA | Attorney for | PLAINTIFF |
| | | |
| ELIZABETH NEALLY | Attorney for | DEFENDANT |

**Page 1**

CAUSE NO. 2002-07-2652-E

SALVADOR ACOSTA and )(   IN THE DISTRICT COURT
RIGO DE LA ROSA )(
            )(
    Plaintiffs )(
            )(
vs.         )(
            )(
SANTA MARIA INDEPENDENT )( OF CAMERON COUNTY, TEXAS
SCHOOL DISTRICT and )(
Employees, Agents and all)(
those Acting in Concert )(
or at their Discretion )(
            )(
    Defendants )( 357TH JUDICIAL DISTRICT

ORAL DEPOSITION OF
RIGO DE LA ROSA
DECEMBER 3, 2002

      ORAL DEPOSITION OF RIGO DE LA ROSA, produced as
a witness at the instance of the Defendants, and duly sworn,
was taken in the above-styled and numbered cause on December
3, 2002, before THURMAN J. MOODY, Certified Shorthand Reporter
No. 2861 in and for the State of Texas, at the offices of
Roerig, Oliveira & Fisher, 855 West Price Road, Brownsville,
Texas, pursuant to the Texas Rules of Civil Procedure and the
provisions attached hereto.

---

**Page 2**

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFFS:

    MICHAEL PRUNEDA
    THE PRUNEDA LAW FIRM, P.L.L.C.
    944 West Nolana, Suite B
    Post Office Box T
    Pharr, Texas 78577-1220

FOR THE DEFENDANTS:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78550

I-N-D-E-X

Appearances .............................................. 2

RIGO DE LA ROSA
    Examination By Ms. Neally ............................3

Errata Sheet ............................................57

Reporter's Certificate ..................................58

Attached to End of Transcript ................. Stipulations

EXHIBITS

NO.   DESCRIPTION                      PAGE

1   Memo, Re: Termination of Employment ..................30
2   Memo, Denial of Level III Grievance .................34
3   Authorization for Release of Information ............36
4   Xerographic Copy, six checks ........................36
5   Xerographic Copy, Two Checks, Cash Ticket,
     Deposit Slip ......................................44
6   Xerographic Copy, Three Checks, Cash Ticket .........45
7   Xerographic Copy, Two Checks, Cash Ticket,
     Deposit Slip ......................................47
8   Xerographic Copy, Four Checks, Cash Ticket ..........48

---

**Page 3**

1            RIGO DE LA ROSA

2 having been first duly sworn, testified as follows:

3            EXAMINATION

4 BY MS. NEALLY:

5    Q. Mr. de la Rosa, my name is Elizabeth Neally. I'm the

6 attorney that's representing the Santa Maria Independent

7 School District. You understand that, right?

8    A. Uh-huh. I do.

9    Q. Have you ever had your deposition taken before like

10 this in front of a court reporter?

11    A. Yes. Not mine. Came an employee that got fired

12 about fifteen years ago.

13    Q. At the school district?

14    A. Yes.

15    Q. And you were deposed or you sat through a deposition?

16    A. I don't even -- they asked me a few questions.

17    Q. Okay.

18    A. I don't even recall who was the employee or -- but I

19 remember being here in this building.

20    Q. In this particular building?

21    A. Somewhere around here.

22    Q. Okay.

23    A. Price Road.

24    Q. We understand that you just swore to tell the truth,

25 right?

---

**Page 4**

1    A. Yes, ma'am.

2    Q. If I ask you a question you don't understand, I need

3 you to tell me that so that -- otherwise I'm going to assume

4 you're understanding all my questions. Okay?

5    A. I will.

6    Q. And then you need to answer out loud yes or no so the

7 court reporter can take down everything you say. Okay?

8    A. Yes, ma'am.

9    Q. If at any time you need to take a break, just let me

10 know. Okay?

11    A. Okay.

12    Q. Where do you live?

13    A. I live in a little town called Blue Town.

14    Q. That's right outside of Santa Maria?

15    A. Two miles from Santa Maria.

16    Q. How long have you lived there?

17    A. Since I was -- I lived in that area since I was about

18 six years old.

19    Q. And your physical address?

20    A. It's Farm to Market Road 506, Blue Town.

21    Q. And how long have you been at that address?

22    A. Since 1969.

23    Q. Who lives with you at that address?

24    A. My wife and my children.

25    Q. And your wife's name is?

Page 5

1    A. Consuelo de la Rosa.
2    Q. And Mrs. de la Rosa is a trustee of the school
3    district?
4    A. Yes.
5    Q. How long has she been a trustee of the school
6    district?
7    A. I don't know if she's been there two terms or three
8    terms.
9    Q. So eight to twelve years, somewhere in there?
10   A. Each term is three years.
11   Q. Oh, three years. Okay. So six to nine years?
12   A. Yes.
13   Q. Somewhere around there. Had she ever served before
14   that?
15   A. No.
16   Q. How about you, have you ever been a trustee with the
17   school district?
18   A. No, ma'am.
19   Q. Any other relatives that are trustees of the school
20   district?
21   A. No, ma'am.
22   Q. And you have how many children?
23   A. Four.
24   Q. What are their names and ages?
25   A. Eduardo, seventeen. Roxanne, fifteen. Andrew is

Page 6

1    eleven. And Breanna is six, I believe.
2    Q. Where did you go to high school?
3    A. La Feria High School.
4    Q. Did you graduate?
5    A. Yes, ma'am.
6    Q. And what year was that?
7    A. 1977.
8    Q. After you graduated, did you go to work, go to
9    school, what did you do?
10   A. I was a migrant worker.
11   Q. And how long did you do that?
12   A. From '77 to '83.
13   Q. Where were you doing that at?
14   A. I was working in a tomato cannery in San Jose,
15   California.
16   Q. When did you get married?
17   A. 1985.
18   Q. So after 1983 what did you do? Did you go back to
19   work in the Valley?
20   A. 1983 I started working at the school district.
21   Q. When you started working with the school district in
22   '83, what was your position?
23   A. Teacher paraprofessional.
24   Q. Were you a teacher's aide --
25   A. Yes.

Page 7

1    Q. -- or bus driver, what?
2    A. Teacher's aide.
3    Q. Okay.
4    A. And bus driver.
5    Q. So that was in 1983. Was that the first job you held
6    in the Valley?
7    A. Yes.
8    Q. Have you worked anywhere besides the school district
9    in the Valley?
10   A. What dates are you talking about?
11   Q. Until you were terminated from the school district.
12   A. Until I was terminated? I worked in the fields.
13   Q. During the summer?
14   A. Yes.
15   Q. After 1983?
16   A. After? No.
17   Q. Since you started to work for the school district,
18   have you worked anywhere else until you got your job after you
19   were terminated?
20   A. No, ma'am.
21   Q. So during that time the school district was your sole
22   source of income?
23   A. Yes, ma'am.
24   Q. How about your wife, does she work?
25   A. Yes.

Page 8

1    Q. Where does she work?
2    A. Military Highway Water Supply Corporation.
3    Q. How long has she worked there?
4    A. I don't recall. About, I'd say, twelve years.
5    Q. And how about now, are you working now?
6    A. Yes, ma'am.
7    Q. Where do you work?
8    A. I work as an Immigration Inspector in the Port of
9    Entry of Hidalgo.
10   Q. How long have you been doing that? When did you get
11   hired?
12   A. I got hired on April the 21st.
13   Q. Of what year?
14   A. Of -- I'm going to be there -- I'm going to -- I'm
15   going to be there for a year this coming April.
16   Q. So 2002?
17   A. Yes, ma'am.
18   Q. Between the time that you were terminated in August
19   of -- July of 2000, right?
20   A. Uh-huh.
21   Q. July of 2000 was when you were terminated, right?
22   A. Yes.
23   Q. The exact date. Let's see. July 11th, 2000?
24   A. Uh-huh.
25   Q. Between July 11th, 2000, and April of 2002, did you

**Page 9**

1 work?

2    A. Yes, ma'am.

3    Q. Where did you work?

4    A. Safeguard Pest Control in Harlingen.

5    Q. And what did you do there?

6    A. I was a certified applicator. Pest applicator.

7    Q. And when did you go to work for them?

8    A. In, I believe it was, March.

9    Q. Of 2001?

10    A. Yes.

11    Q. Between July, 2000, and March, 2001, did you work at

12 all?

13    A. No, ma'am.

14    Q. How about doing any kind of work, you know, painting,

15 anything that, you know, just to make a few bucks here and

16 there?

17    A. No, ma'am.

18    Q. And then did you work with Safeguard Pest Control

19 from March, 2001, until April, 2002?

20    A. No, it was -- yes, I believe so.

21    Q. Did you go from one job to the other?

22    A. Yes.

23    Q. There was no gap in between?

24    A. No, I was still working there. I just got a week

25 off.

**Page 10**

1    Q. What did you earn at Safeguard Pest Control?

2    A. I started earning -- I think it was six dollars, if

3 I'm correct, and then they gave me another dollar raise after

4 a month or two.

5    Q. So after a month or two you made seven dollars an

6 hour?

7    A. Yes.

8    Q. And then did you get any more raises before you left?

9    A. Afterwards I was -- I was on a -- it depend on the

10 work that I did, the amount of work.

11    Q. Do you mean you got overtime or you would get

12 bonuses?

13    A. No, no overtime. We had our customers and it depends

14 on the customers if you -- that you did, they would pay you

15 a --

16    Q. How --

17    A. What's the word I'm looking for?

18    Q. Commission?

19    A. Right.

20    Q. Okay.

21    A. I was on a commission basis.

22    Q. In a year's time what would you say you earned there?

23    A. I don't know, ma'am.

24    Q. What would you bring home on a monthly basis, on the

25 average?

**Page 11**

1    A. On a monthly basis it depends -- when I was

2 working -- when I was getting paid on commission or seven

3 dollars an hour?

4    Q. Well, no, when did you start getting on a commission?

5 How many months were you there before you started getting on

6 commission?

7    A. I don't really recall.

8    Q. You were there about a year, right?

9    A. Yes. Let's say maybe nine months or --

10    Q. Nine months before you started on commission?

11    A. Yes.

12    Q. And when you got on the commission, how much were you

13 earning?

14    A. I'd say on a monthly basis about fifteen hundred.

15    Q. Okay.

16    A. But I would have to work from the morning to nine or

17 ten at night.

18    Q. During the time that you were not employed -- and I'm

19 assuming you lived off of your wife's salary; is that right?

20    A. Right.

21    Q. Did you have to take out any loans or anything?

22    A. I don't recall. I think so. I think we did.

23    Q. Did you take them out from family or from the bank?

24    A. From the bank.

25    Q. Which bank?

**Page 12**

1    A. From Harlingen Area Teachers Credit Union. But I'm

2 not sure if it was when I was working with Safeguard or

3 before. It was somewhere there.

4    Q. But until you started working with Immigration --

5    A. Yes.

6    Q. -- at some point in there you had to take out some

7 loans?

8    A. Yes, ma'am.

9    Q. How much would you say you had to take out in loans?

10    A. Maybe about six thousand.

11    Q. Did you receive any other kind of aid or government

12 help or anything else during that time period?

13    A. Unemployment wages.

14    Q. Didn't have to go on food stamps or anything like

15 that?

16    A. Not food stamps.

17    Q. Any other sources of income or, you know, ways of

18 getting money besides getting a loan that you can think of --

19    A. No, ma'am.

20    Q. -- and unemployment?

21    A. No, ma'am.

22    Q. How long did you receive unemployment?

23    A. Maybe a year or less.

24    Q. When you left the district, you didn't get any type

25 of severance, is that correct, other than unemployment?

**Page 13**

1 A. The only -- the only thing that I got was I had about
2 over thirty -- about thirty-five days and they paid me all of
3 those days.
4 Q. For sick leave?
5 A. Sick leave.
6 Q. How about your retirement, did you have to get into
7 your retirement or your wife's retirement account?
8 A. Yes, ma'am.
9 Q. And did you clean them out completely or just take
10 out some of it?
11 A. My retirement, yes, ma'am.
12 Q. How much did you take out?
13 A. All. It's -- I think they gave me seventeen three.
14 Q. Seventeen thousand three hundred dollars?
15 A. Yes, ma'am.
16 Q. And you took out all of that?
17 A. Yes, ma'am.
18 Q. So you don't have anything left in retirement now; is
19 that right?
20 A. I don't have anything.
21 Q. How about at Immigration, what are you earning now?
22 A. I'm earning about twelve dollars an hour.
23 Q. What were you earning at the school district when you
24 left?
25 A. Eleven twenty-two.

**Page 14**

1 Q. That's what you earned when you left --
2 A. When I left.
3 Q. -- in July of '99, right?
4 A. 2000?
5 Q. I'm sorry, 2000. July, 2000. Do you know if you
6 would have earned more had you stayed on? Did they have any
7 cost of living increases?
8 A. Yes, I believe so.
9 Q. Right now you're earning twelve dollars an hour?
10 A. Yes, ma'am.
11 Q. Are you regularly getting overtime with Immigration?
12 A. Yes.
13 Q. How much overtime do you get usually in a month's
14 period?
15 A. In a month I'd say I work about maybe -- maybe
16 forty-eight hours.
17 Q. Forty-eight hours of overtime or forty-eight hours a
18 week?
19 A. Of overtime.
20 Q. Overtime. Okay. And that's at time and a half?
21 A. They pay time and a half and double time, so it
22 depends which one.
23 Q. So you're making more money at Immigration; is that
24 right?
25 A. Yes, ma'am.

**Page 15**

1 Q. If you were offered your job back at the school
2 district, would you take your job back, or would you rather
3 stay with Immigration?
4 A. I'd stay with Immigration.
5 Q. It's a better paying job?
6 A. Yes, ma'am.
7 Q. Better benefits?
8 A. Yes, ma'am.
9 Q. Did you like it better?
10 A. Yes, ma'am.
11 Q. Other than high school, have you received any other
12 kind of educational training?
13 A. Yes, ma'am. I went to Texas Southmost College.
14 Q. And when did you go there?
15 A. When I started working in the school district.
16 Q. In 1983?
17 A. Yes.
18 Q. More or less? And how long did you go there?
19 A. I would go after work. I would go in the evenings.
20 Q. How many years, or how many credits?
21 A. I have sixty-three.
22 Q. Credits?
23 A. Yes.
24 Q. And did you get any type of degree like an associate
25 degree?

**Page 16**

1 A. No, ma'am.
2 Q. What were you studying for?
3 A. Bilingual education.
4 Q. During the time that you were unemployed, did you
5 substitute teach at all?
6 A. No, ma'am.
7 Q. Any other -- besides that sixty-three credits at
8 Texas Southmost, any other specialized training that you have
9 had, any educational training?
10 A. No, ma'am.
11 Q. When you started working at Immigration, did you go
12 through some training with them?
13 A. Yes.
14 Q. Where did you go do that?
15 A. Glynco, Georgia.
16 Q. Glynco?
17 A. Glyn County and then --
18 Q. And how long were you there?
19 A. I believe it was eight or nine weeks.
20 Q. And were you paid while you were --
21 A. Yes.
22 Q. -- there? Any other educational training that you
23 have had, schools that you have attended?
24 A. No, ma'am.
25 Q. What are your -- what's your job title where you are

Page 17

1  right now?
2      A. Immigration Inspector.
3      Q. And who's your supervisor?
4      A. We have a -- many different supervisors, so --
5      Q. Who's the main person that you answer to?
6      A. Sylvia Briones.
7      Q. And what -- you said it's Hidalgo County. Where is
8  that located?
9      A. Hidalgo Port of Entry in Hidalgo, Texas.
10     Q. In Hidalgo? What's on the other side of Hidalgo?
11     A. Reynosa.
12     Q. You said you started working there in April of this
13 year?
14     A. Oh, in April I was sent to Georgia.
15     Q. Okay.
16     A. And I came back and I think I started here July 15th.
17     Q. But you were paid continuously during that time?
18     A. Yes, ma'am.
19     Q. From April until July when you actually started
20 working?
21     A. Yes.
22     Q. You were just receiving training during that time
23 period?
24     A. Yes.
25     Q. So once in July is when you started getting overtime?

Page 18

1      A. Yes.
2      Q. When you were in training, you just got your basic
3  twelve dollars an hour?
4      A. It's a little bit less than twelve. I don't recall
5  exactly how much.
6      Q. Somewhere between eleven and twelve?
7      A. Yes, ma'am.
8      Q. You haven't been self-employed at all in any
9  capacity?
10     A. No, ma'am.
11     Q. Have you ever been arrested, indicted, convicted or
12 given a military discharge other than honorable?
13     A. No, ma'am.
14     Q. Have you been under the treatment of any medical
15 providers, including psychiatrists, clergy, counselors,
16 therapists in the last ten years?
17     A. No, ma'am.
18     Q. No?
19     A. No.
20     Q. Since you were terminated, have you had any type of
21 counseling at all?
22     A. No, ma'am.
23         MS. NEALLY: Want us to stop?
24         (Momentary pause.)
25     Q. (By Ms. Neally:) Are you presently taking any type

Page 19

1  of medication?
2      A. Right now, yes, because I'm -- I have got a -- I had
3  a fever yesterday.
4      Q. Okay. Medication, so you're taking like Tylenol or
5  something for the fever?
6      A. Yes, ma'am.
7      Q. Any other type of medication?
8      A. No, ma'am.
9      Q. Anything that would impair your ability to answer the
10 questions here today?
11     A. No, ma'am.
12     Q. Have you ever filed any other type of lawsuits?
13     A. No, ma'am.
14     Q. Other than the grievance you filed over your
15 termination, have you ever filed any other grievances?
16     A. No, ma'am.
17     Q. How about anybody else in your family, have they
18 filed any other lawsuits?
19     A. No.
20     Q. After you were terminated with the school district,
21 did you apply at a lot of jobs or --
22     A. Yes.
23     Q. How many places would you say you applied?
24     A. Lots of places. We had to. I mean I had to because
25 the unemployment benefits, they require to look for jobs and I

Page 20

1  searched everywhere.
2      Q. And your unemployment benefits gave out about the
3  same time you got this job at Security?
4      A. No, before that.
5      Q. Before that?
6      A. Yes.
7      Q. Since the date of your employment with the school
8  district have you been unable to work because of physical or
9  mental injury, illness or disability of any kind?
10     A. No, ma'am.
11     Q. You said you started off at the school district in
12 1983 as a paraprofessional?
13     A. Yes, ma'am.
14     Q. And also a bus driver; is that right?
15     A. Yes.
16     Q. How long were you a bus driver?
17     A. I don't recall how many years, but even when I was
18 terminated, I had my bus driver's license and I would drive in
19 emergency situations.
20     Q. Did you apply at --
21     A. I was --
22     Q. I'm sorry.
23     A. I was their emergency bus driver.
24     Q. And when you left in 2000, were you still driving
25 school busses also in addition to your duties?

Page 21

1    A. If needed.
2    Q. Just in an emergency?
3    A. Yes.
4    Q. After you were terminated from the school district,
5   did you apply at any other school districts?
6    A. No, ma'am.
7    Q. Why not?
8    A. I wanted a change of pace from a school district.
9    Q. When you first started working, you were a
10  paraprofessional, you were a teacher's aide, right?
11   A. Yes, ma'am.
12   Q. And at some point your job duties changed, right?
13   A. Yes.
14   Q. What was the change? What was your next job that you
15  held there?
16   A. Can I take a break?
17       MS. NEALLY: Of course.
18   A. It's fixed assets.
19   Q. Okay. Go ahead. Go ahead.
20   A. Fixed assets inventory clerk.
21       But I need to take a break.
22       MS. NEALLY: No problem.
23       (Discussion off the record.)
24   A. I'm ready.
25   Q. (By Ms. Neally:) Okay. You were saying before the

Page 22

1   break that you were fixed assets inventory clerk. You went
2   from being a paraprofessional to that position; is that right?
3    A. Yes, ma'am.
4    Q. And that's the position you held when you were
5   terminated; is that right?
6    A. Yes, ma'am.
7    Q. What year did you go to that position?
8    A. Maybe -- maybe. I believe it was '95.
9    Q. 1995?
10   A. Yes.
11   Q. Is that a new position that they created for you or
12  did you fill somebody else's slot?
13   A. They didn't create it, but they needed a --
14   Q. Have they filled your position since you left?
15   A. I don't know.
16   Q. What did you do as the fixed asset inventory clerk?
17   A. The duties of having everything inventoried and
18  stored --
19   Q. Okay.
20   A. -- on discs. I also helped out with textbooks, I
21  assisted the textbook coordinator.
22   Q. Who was your supervisor?
23   A. Mr. Acosta. Present here.
24   Q. And you held that position from 1995 until 2000; is
25  that right?

Page 23

1    A. I believe it was '95.
2    Q. When did your wife first run for the school board?
3    A. I don't recall.
4    Q. Explain the politics to me over there. Who's the
5   trustees now?
6    A. The trustees now, you want all the names?
7    Q. Right.
8    A. My wife. Noe Diaz. Alicia Martinez. Francisco
9   Gonzalez. Rambaldo Rivera. Oscar Saldivar. How many are
10  those? I don't recall the other one.
11   Q. There's one more someplace. Your elections are in
12  May, right?
13   A. Yes.
14   Q. Of those people, who was newly elected this past
15  year?
16   A. I believe it was Rambaldo Rivera.
17   Q. He's the only one that was new?
18   A. I don't know if it was Oscar.
19   Q. How about at the time that you were terminated, who
20  was on the board?
21   A. There was -- Oscar Saldivar was not there.
22   Q. Okay.
23   A. The other lady was Norma Ramon.
24   Q. Everybody was the same?
25   A. And Benito Contreras.

Page 24

1    Q. Is Mr. Contreras still on the board?
2    A. No, ma'am.
3    Q. So those two weren't and Mr. -- those two were and
4   Mr. Rivera was not?
5    A. I believe Mr. Rivera was there then.
6    Q. At the time you were terminated?
7    A. I'm not sure.
8    Q. You know how there's majorities in boards, right?
9    A. Yes, ma'am.
10   Q. Who's in the majority right now?
11   A. Right now?
12   Q. Yes.
13   A. It's my wife, Francisco Gonzalez, Alicia Martinez. I
14  don't know who -- there's some -- there's another person.
15   Q. That would be four?
16   A. Yes. I don't recall.
17   Q. Let's see if I can figure that out.
18   A. Oh. Leo. Leo Martinez.
19   Q. Leo Martinez is on there now?
20   A. Yes, ma'am.
21   Q. And is he in the majority?
22   A. Yes.
23   Q. And then the other camp is Noe Diaz, Mr. Rivera and
24  Mr. Saldivar?
25   A. Yes, ma'am.

RIGO DE LA ROSA                    Condenseit                    DECEMBER 3, 2002

Page 25

1  Q. How about at the time you were terminated, who was in
2  the majority then, your wife or Mr. Diaz's camp?
3  A. Mr. Diaz's camp.
4  Q. So with the May, 2000, election, Mr. Diaz's camp was
5  in the majority?
6  A. Was that the last election?
7  Q. Right. You were terminated in July of 2000.
8  A. The election just happened this May.
9  Q. No, no, no. I'm talking about at the time you were
10 terminated.
11 A. Oh. Mr. Diaz was in the majority.
12 Q. Was Mr. Diaz in the majority the year before?
13 A. I don't know, ma'am.
14 Q. Okay.
15 A. I believe so.
16 Q. So in 1999 and 2000 he had the majority?
17 A. (Witness nodded affirmatively.)
18 Q. And who --
19 A. Yes.
20 Q. -- was with him at the time that you were terminated
21 that had the majority, Mr. Diaz, Ms. Ramon?
22 A. Ms. Ramon, Berrito Contreras and Rambaldo.
23 Q. Rivera?
24 A. Rivera.
25 Q. Has it basically for the last, you know, five years,

Page 26

1  been four-three?
2  A. Yes, I believe so.
3  Q. Dr. Cantu was the superintendent there from April,
4  '99, until 2001, right?
5  A. (Witness nodded affirmatively.)
6  Q. Yes?
7  A. I believe so.
8  Q. Did you have any problems with him as the
9  superintendent?
10 A. None.
11 Q. Did you ever have any discussions with him about your
12 work performance or --
13 A. No, ma'am.
14 Q. -- did he ever have any criticisms of your work
15 performance?
16 A. Never.
17 Q. When did you learn that Dr. Cantu had some concerns
18 about your job?
19 A. I don't know the date exactly, but it was couple of
20 months before I got terminated.
21 Q. And what happened that you figured this out?
22 A. When I figured that he had a -- I found out that he
23 had been approached by some board members about terminating
24 me.
25 Q. How did you find that out?

Page 27

1  A. My wife told me.
2  Q. Okay.
3  A. She had a meeting with -- a personal meeting with
4  him, my wife and Francisco Gonzalez.
5  Q. And when was that?
6  A. I don't know the date.
7  Q. Was it before the election, the May, 2000, election
8  or after?
9  A. The May, 2000, election?
10 Q. Right. You were terminated in July of 2000.
11 A. It was before I was terminated.
12 Q. But a couple months before?
13 A. I don't know exactly.
14 Q. What did your wife tell you about this meeting that
15 she had with Francisco Gonzalez, Dr. Cantu and herself?
16 A. She told me that he told them that he was being
17 pressured by Noe Diaz and Norma Ramon to get rid of me and
18 Mr. Acosta and he -- they offered him an extension on his
19 contract.
20 Q. Well, what did he tell them, you know, your wife and
21 Mr. Gonzalez, what did he tell them about how he felt about
22 being pressured?
23 A. What did he tell them?
24 Q. Yes.
25 A. He told them that he was going to -- my wife told him

Page 28

1  to discuss that in a meeting in open session and he said he
2  would, and he didn't agree with, he would always say, over my
3  dead body, they're not going to get rid of Mr. de la Rosa and
4  Mr. Acosta.
5  Q. So that's what he told your wife and Mr. Gonzalez,
6  over his dead body were they going to get rid of you two?
7  A. I don't know if that's the exact words.
8  Q. Okay.
9  A. But --
10 Q. But he was against it; is that right?
11 A. Yes.
12 Q. Dr. Cantu, the couple months before your termination
13 when he had this meeting with them, he was against terminating
14 you based on the pressuring by these two board members; is
15 that right?
16 A. Right.
17 Q. That was your impression; is that right?
18 A. That was my impression.
19 Q. Did you ever have a conversation with Dr. Cantu about
20 the pressure?
21 A. No, ma'am.
22 Q. Did you share this information with Mr. Acosta?
23 A. What information?
24 Q. Information you learned about from your wife.
25 A. I believe so.

Case 1:03-cv-00041    Document 8    Filed in TXSD on 03/10/2003    Page 20 of 31

## Page 29

1   Q. Do you know if Dr. Cantu ever discussed this
2   pressuring with the board in a meeting?
3   A. I don't know.
4   Q. Other than this conversation that your wife told you
5   about, when did you find out that Dr. Cantu had some concerns
6   about your job performance?
7   A. About my job performance?
8   Q. About -- what's your understanding about why you were
9   terminated?
10  A. It was politically based.
11  Q. Other than it being politically based, other than the
12  pressure by the board members, what was your understanding,
13  what -- did Dr. Cantu ever have a conversation with you about
14  it?
15  A. Never.
16  Q. How about during your grievance, was any evidence
17  presented about anything with regard to you?
18  A. Nothing.
19  Q. You're an at-will employee, right?
20  A. Right.
21  Q. You don't have a contract?
22  A. Right.
23  Q. And the person that hires and fires at-will employees
24  at Santa Maria is the superintendent; is that correct?
25  A. Correct.

## Page 30

1   Q. So Dr. Cantu advised you of your termination; is that
2   right?
3   A. Not orally; he sent me a letter.
4   Q. Right. Okay. Sent you a letter. I have got a copy
5   of it someplace. We will mark it as Exhibit No. 1 as soon as
6   I find it.
7        Was that your first notification that you had
8   been terminated?
9   A. Yes, ma'am.
10  Q. Did you have any conversation with him at all about
11  it?
12  A. None at all.
13  Q. After you got the letter from him terminating you,
14  which is dated July 11, 2000, we will mark this Exhibit No. 1,
15  is this the letter that you got, the memo?
16       (Exhibit No. 1 marked.)
17  A. Uh-huh.
18  Q. (By Ms. Neally:) Is that yes?
19  A. That's it.
20  Q. And after you got that notice, did you go in to
21  Dr. Cantu and say what's the deal here?
22  A. I never -- never talked to him anymore.
23  Q. Why not?
24  A. I never went back to the school district.
25  Q. Well --

## Page 31

1   A. Except for any grievance.
2   Q. Were you working on July 11th?
3   A. No, I was on vacation.
4   Q. And were you at home when you got the letter? Where
5   were you?
6   A. I was at home.
7   Q. So someone came and hand delivered it to you?
8   A. No, I got it from the post office.
9   Q. In the mail?
10  A. Yes.
11  Q. And when you got it in the mail, what was the -- what
12  did you do with it?
13  A. I opened it up.
14  Q. But did you take it to anybody at the school
15  district, discuss it with anybody at the school district?
16  A. No.
17  Q. Did you go and hire an attorney?
18  A. I didn't have the money to.
19  Q. You did file a grievance, right?
20  A. Yes.
21  Q. So you filed a grievance with the school district,
22  right?
23  A. Yes, ma'am.
24  Q. Who heard level one grievance?
25  A. I don't know. I don't --

## Page 32

1   Q. You don't remember?
2   A. No.
3   Q. Did you have an attorney present with you during the
4   level one grievance?
5   A. No, ma'am.
6   Q. Okay.
7   A. Level one grievance is when you're with the board?
8   Q. No, that's usually level three, but sometimes
9   terminations it goes straight to level three. And I'm not
10  sure if you had a level one or a level two. I'll try to find
11  out.
12  A. I don't believe so.
13  Q. You just went straight to the board; is that right?
14  A. I believe the -- I went through the proper
15  procedures, but I don't recall.
16  Q. You did file a grievance?
17  A. Yes.
18  Q. And your grievance was based on that you thought that
19  this was politically --
20  A. Yes, ma'am.
21  Q. -- motivated; is that right?
22  A. Uh-huh.
23  Q. And that was the sole basis for your grievance,
24  right?
25  A. Yes, ma'am.

Page 33

1   Q. When you went to the board, did all the board members
2   hear your grievance?
3   A. My wife was not there. She -- she was vacationing,
4   she had gone to another state, to Washington.
5   Q. Well, she would have had to recuse herself anyway,
6   right?
7   A. I don't know.
8   Q. At the time you got the letter, was she also on
9   vacation?
10  A. No.
11  Q. But during the grievance process she was on vacation;
12  is that right?
13  A. Uh-huh.
14  Q. Is that yes?  You can't do uh-huhs or huh-uhs, okay?
15  A. Yes, ma'am.
16  Q. Who were the board members that heard your grievance?
17  A. The same ones that I --
18  Q. That you named off?  Everybody except for your wife?
19  A. Right.
20  Q. And did you present any witnesses at your grievance?
21  A. No.
22  Q. Did the administration present any witnesses?
23  A. No.
24  Q. How long did it last?
25  A. About thirty minutes.

Page 34

1   Q. During the time that you had your grievance, was
2   there any mention that you had been involved in some gambling
3   pools, anything like that?
4   A. No, ma'am.
5   Q. No mention at all about that?
6   A. No, ma'am.
7   Q. You presented your grievance on August 14th, 2000; is
8   that right?
9   A. (Witness nodded affirmatively.)
10  Q. Is that yes?
11  A. Yes, ma'am.
12  Q. And did you have -- you had an open --
13  A. I don't know if that's the exact date, but --
14  Q. Okay. I'm going to show you --
15  A. I'm saying --
16  Q. I'm going to show you this document we're going to
17  mark as Exhibit 2.
18      (Exhibit No. 2 marked.)
19  Q. (By Ms. Neally:)  Did you get a copy of that?
20  A. I believe so.
21  Q. And that's a letter to you advising you that your
22  grievance was denied; is that right?
23  A. Right.
24  Q. What was the next step you took after the grievance
25  hearing?  That was in 1999 -- I mean 2000. When did you

Page 35

1   eventually hire an attorney?
2   A. I don't recall what date it was.
3   Q. Was it in 2000 or was it 2001?
4   A. Maybe it was 2001.
5   Q. Let me show you another document that we received or
6   that I found in your personnel file. It's dated 12/8/01.
7   A. Uh-huh.
8   Q. I just want to ask you, is that when you had applied
9   with Immigration or was that another governmental agency?
10  A. That was probably Immigration, I guess.
11  Q. When did you apply with Immigration, back in 2001,
12  and it just takes a long time for you to get cleared?
13  A. It took about a year.
14  Q. About a year to get cleared?
15  A. Yes. Not to get cleared.
16  Q. Just to get hired?
17  A. Yes.
18  Q. Is that because of all of the red tape or --
19  A. I believe so.
20  Q. Did they tell you, look, we want to hire you but we
21  have got to go through all this process before we can hire
22  you?
23  A. Yes.
24  Q. So you knew that, provided that they were able to,
25  they were going to hire you for about a year; is that right?

Page 36

1   A. Yes.
2   Q. You got favorable recommendations and --
3   A. Yes, ma'am.
4   Q. And then you were eventually hired, is that right --
5   A. Yes.
6   Q. -- after they checked you out?
7       I'm going to show you some more documents, some
8   checks, and just ask you if you can tell me what they were
9   for.
10  A. Uh-huh.
11  Q. This will be Exhibit 3 -- no, actually make that
12  Exhibit 3, the one he was just referring to, the release, and
13  this will be Exhibit 4.
14      (Exhibit Nos. 3 and 4 marked.)
15  Q. (By Ms. Neally:)  This is page one of some checks
16  that were given to me. This is a check that was made out to
17  you, right, this top copy?
18  A. Which one?
19  Q. The top. I think I'm looking at one, two and three.
20  A. Yes, ma'am.
21  Q. What was that for?
22  A. This is my brother in California.
23  Q. And he wrote you a check for a hundred dollars?
24  A. Yes.
25  Q. And then you cashed it through the school district?

Page 37

1   A. Not through the school district.
2   Q. These are checks -- I'll just represent to you that
3 these are checks that went through the high school like -- I
4 think it's the high school activity account.
5   A. Uh-huh.
6   Q. So they were cashed through the school district?
7   A. Okay. Yes.
8   Q. So that's a check that you cashed through the school
9 district?
10   A. Yes.
11   Q. Had you ever been told by anybody that that was not
12 proper procedures, to cash checks through the high school
13 activity fund or anything --
14   A. No, ma'am.
15   Q. Did you work at the high school?
16   A. Yes.
17   Q. And that --
18   A. It wasn't at the high school. I was in the business
19 office.
20   Q. You were in the business office?
21   A. Yes.
22   Q. Why did you cash the checks through the high school
23 activity fund?
24   A. The money would come to the business office --
25   Q. Okay.

Page 38

1   A. -- and if I didn't have time to go to the bank --
2   Q. So you would just cash it through there?
3   A. Yes, ma'am.
4   Q. How about number two? Do you know anything about
5 number two?
6   A. What did it say? I can't read the --
7   Q. Let me see it. I only made one copy. Number two is
8 a check made out to you, it's a Western Union Money Order for
9 a hundred dollars.
10   A. From who?
11   Q. Doesn't say. I can't tell. Do you know anything
12 about that?
13   A. That's probably my brother, too.
14   Q. Why was your brother sending you money?
15   A. He would send money for a child that he has here.
16   Q. And then you would be the courier for that?
17   A. Yes.
18   Q. And then number three is another check from Alfonso
19 Medina to you for a hundred dollars. Do you know what that's
20 for?
21   A. It could be for a number that I sold him.
22   Q. A number that you sold him?
23   A. Yes.
24   Q. What kind of number?
25   A. A football pot.

Page 39

1   Q. Tell me about the football pots, what you mean it was
2 for a number that you sold him for a football pot.
3   A. What do you want me to tell you?
4   Q. Was that something that went on at the school
5 district that you were in charge of, or what was that?
6   A. In charge of, no. Once in awhile I would make a pot,
7 but that doesn't mean I would sell the numbers in school.
8   Q. And these football pots, how many employees of the
9 school district participated in them?
10   A. I don't know.
11   Q. How much -- how do they work? I don't do football
12 pots, so I don't know how that works.
13   A. You get a certain percentage from --
14   Q. Who gets a certain percentage?
15   A. Oh, whoever makes it.
16   Q. Whoever makes it?
17   A. Yes.
18   Q. So if you made one, what would your percentage be?
19   A. Twenty percent.
20   Q. Who else would make them besides you at the school
21 district?
22   A. Well, I knew of some people that did. It was Kromer,
23 Chris Kromer, he was a teacher.
24   Q. With a K or a C?
25   A. K.

Page 40

1   Q. And he's a high school teacher or --
2   A. He was. He doesn't work there anymore.
3   Q. Did he quit or was he fired?
4   A. I believe he was fired.
5   Q. Why was he fired, do you know?
6   A. I don't know.
7   Q. Who else besides Mr. Kromer?
8   A. Let's see. There was this lady Sandra Reyes.
9   Q. Sandra Reyes?
10   A. Uh-huh.
11   Q. Where was she employed?
12   A. Excuse me?
13   Q. What department was she employed at?
14   A. She was in the business office.
15   Q. Secretary?
16   A. Yes.
17   Q. Who else besides Mr. Kromer, Ms. Reyes and yourself?
18   A. I don't know. There could have been --
19   Q. Okay.
20   A. -- one or two other people.
21   Q. How often in a year would you do or organize a pot?
22   A. Twice a year.
23   Q. And how much did each square -- it's like a square,
24 right, you draw a graph?
25   A. Uh-huh.

Page 41

1    Q. And then somehow people pick numbers, or do they put
2    the numbers in or do you write them out? I really don't know.
3    Do you write the numbers or do they pick the numbers? Does it
4    go like one to what, how many squares are there?
5        A. It depends. There's one through a hundred or one
6    through twenty-five.
7        Q. The ones that you did, were they one through a
8    hundred or one through twenty-five?
9        A. One through a hundred.
10       Q. One to a hundred. Then how much did each square
11   cost?
12       A. A hundred dollars. But I wouldn't do it by myself.
13   It was -- I had another partner that --
14       Q. Okay.
15       A. So I would only sell about fifty.
16       Q. So you would sell fifty and who was your partner that
17   would sell the other fifty?
18       A. Jose Rodriguez.
19       Q. And where does he work?
20       A. He works -- he's an electrician. I don't know with
21   what company.
22       Q. So he would sell about fifty and you would sell
23   fifty?
24       A. Yes, ma'am.
25       Q. And you'd have a hundred dollars a square for a

Page 42

1    hundred pot, so that's worth ten thousand dollars?
2        A. No.
3        Q. Doing my math, I got a thousand dollars.
4        A. Huh?
5        Q. A thousand dollars? You know, a hundred times a
6    hundred is ten thousand dollars, right?
7        A. Yes.
8        Q. So isn't it worth -- the pot is worth ten thousand
9    bucks?
10       A. Yes. But you don't keep ten thousand, you only keep
11   twenty percent.
12       Q. So you would get -- the most you could possibly get
13   would get -- well, actually it would be a thousand, right,
14   because your partner would get the other thousand?
15       A. Right.
16       Q. And then the person that won would get eight thousand
17   dollars, if you sold all the squares?
18       A. Yes.
19       Q. And you said you would do this maybe two times a
20   year?
21       A. Yes.
22       Q. For how many years did you do it?
23       A. I don't recall.
24       Q. And during the time you were employed, nobody at the
25   school district ever told you that that was illegal or

Page 43

1    anything?
2        A. I know it's illegal.
3        Q. But during the time you were employed there, did
4    anybody at the school district ever tell you that you
5    shouldn't be doing it?
6        A. No, ma'am.
7        Q. Did you do it during working hours?
8        A. No, ma'am.
9        Q. Did you ever sell any squares to any administrators?
10       A. Yes.
11       Q. Who did you sell squares to?
12       A. Well, Mr. Medina was the one -- this check you showed
13   me.
14       Q. Right.
15       A. He's a principal at the high school.
16       Q. So he knew about it?
17       A. Yes, ma'am.
18       Q. Okay.
19       A. And two superintendents prior to Dr. Cantu --
20       Q. Which --
21       A. -- they would buy squares from me.
22       Q. Who did you sell, which two?
23       A. Hector Gonzalez and Homero Garcia.
24       Q. They would buy squares from you?
25       A. Yes.

Page 44

1    Q. How many years do you think you had been doing this?
2        A. Oh, maybe eight years.
3        Q. Any other people, any other administrators that you
4    did this with?
5        A. No, ma'am.
6        Q. How about Mr. Acosta, did he ever buy any squares
7    from you?
8        A. Yes.
9        Q. Let me show you a couple more of these, and if we
10   could just -- can you write one, two and three on there so we
11   know which ones? Okay.
12          This will be Exhibit 5.
13          (Exhibit No. 5 marked.)
14       Q. (By Ms. Neally:) Check number one, is that from your
15   brother again for the child he was supporting?
16       A. This one?
17       Q. Yeah.
18       A. No. That's Ofelia Yzaguirre.
19       Q. Who's that?
20       A. She's a high school secretary.
21       Q. And was that for the pot?
22       A. I don't recall. It could be.
23       Q. How much is that check for?
24       A. Thirty dollars.
25       Q. How about number two, is number two also for the pot?

Page 45

1  It's a check for a hundred dollars, right?
2      A. No, this is two hundred dollars. This is somebody
3  from Bellingham, Washington. It's some money that I had
4  loaned him.
5      Q. To who?
6      A. Arturo Rodriguez.
7      Q. Is that a relative?
8      A. He's my wife's cousin.
9      Q. So number one could be for the pot, but number two is
10 just a loan that you made to your wife's cousin?
11     A. Right.
12     Q. Can you write one and two on there?
13     A. (Witness complied.)
14         (Exhibit No. 6 marked.)
15     Q. (By Ms. Neally:) Then this is Exhibit 6. Did you
16 ever actually make any deposits for the high school activity
17 fund?
18     A. Yes.
19     Q. You would actually fill out the deposit slips and
20 turn them in?
21     A. No, the deposit slips were already made. I would
22 just --
23     Q. You would just bring them over to them, over to the
24 business office?
25     A. No, no. I worked in the business office.

Page 46

1      Q. Okay.
2      A. I mean I would take them to the bank.
3      Q. Oh, you would take them to the bank?
4      A. Yes.
5      Q. And you would do that for every deposit, too, not
6  just the high school activity fund?
7      A. Oh, other deposits.
8      Q. And I think what you told me when we see checks going
9  through here, you would just be -- you wouldn't have time to
10 go to the bank so you would cash them?
11     A. I would ask the secretary to cash them for me.
12     Q. And that -- which secretary was that?
13     A. Nora Jimenez.
14     Q. And that was --
15     A. She was the business manager's secretary.
16     Q. And that was something that was just routinely done
17 the entire time you were working there, or at least since you
18 were fixed assets clerk?
19     A. Yes.
20     Q. This is Exhibit 6, and if I could get you to look at
21 number one. It's also made out to you by Arturo Rodriguez?
22     A. Okay.
23     Q. And it's for fifty dollars. Was that also for a
24 loan?
25     A. I don't know.

Page 47

1      Q. Were you selling him squares, Mr. Rodriguez?
2      A. Yes.
3      Q. So it could have been for the poll also?
4      A. Yes, but I don't know.
5      Q. How about the next one, can you -- I can't even tell
6  who that's made out to. It's for a hundred dollars. Can you
7  tell, number two?
8      A. Nora Jimenez.
9      Q. Right. Did she ever buy any squares from you?
10     A. I believe once.
11     Q. Will you put one and two on Exhibit 6.
12     A. (Witness complied.)
13         MS. NEALLY: This will be Exhibit 7.
14         (Exhibit No. 7 marked.)
15     Q. (By Ms. Neally:) Let me get you to look at Exhibit
16 7.
17     A. Uh-huh.
18     Q. The number one check, it's made out from Mr. Medina
19 to you --
20     A. Right.
21     Q. -- for seventy-five dollars. Was that for a pot?
22     A. I wouldn't know, ma'am. It could have been.
23     Q. Can you think of any other reason he would be giving
24 you money?
25     A. No, not at the time.

Page 48

1      Q. Can you put a one by that first one?
2      A. (Witness complied.)
3         (Exhibit No. 8 marked.)
4      Q. (By Ms. Neally:) And then this is Exhibit 8. Can I
5  get these back?
6      A. Uh-huh.
7      Q. Exhibit 8, I'm going to ask you to look at the first
8  one. That's made out to you; is that right?
9      A. Uh-huh.
10     Q. And who is that by, or from?
11     A. Frank L. Garcia. He's a teacher at the high school.
12     Q. And that was Mr. -- from Mr. Garcia?
13     A. Fran Garcia.
14     Q. Was that for a pot?
15     A. Probably.
16     Q. What was the amount?
17     A. It's a hundred and twenty dollars.
18     Q. Can you put a one by that?
19     A. (Witness complied.)
20     Q. And then how about number two, do you know, that was
21 made out directly to Santa Maria ISD. Do you know who wrote
22 the check, number two?
23     A. Yes. That's Ester Plata. She was a counselor there.
24     Q. Do you know -- did that have anything to do with your
25 pots?

Page 49

1    A. Probably.
2    Q. So it's number one and number two, those are probably
3  for pots?
4    A. Yes.
5    Q. Let me show you down at the bottom --
6    A. Uh-huh.
7    Q. -- there's a deposit slip which -- at the very bottom
8  of that, so that would be one, two, three, four, five, so it's
9  the fifth item on that, on Exhibit 8.
10   A. Right.
11   Q. Is that your initials?
12   A. Yes.
13   Q. RR?
14   A. Yes, ma'am.
15   Q. Is that changed because you would write a check and
16  then get cash out?
17   A. No. That's changed probably because it was made out
18  wrong or something and in the bank they would ask me to --
19   Q. To initial it?
20   A. Yes.
21   Q. How about on Exhibit 7, the fourth item down, the
22  deposit slip at the bottom, it's dated 1/14/98. Is that your
23  initials also?
24   A. Where at?
25   Q. Right here.

Page 50

1    A. I don't think so.
2    Q. How about this one, on Exhibit 6, 12/3/98, is that
3  your initials where things were changed?
4    A. Yes, they look like my initials.
5    Q. And that was something that you changed at the
6  bank --
7    A. Yes.
8    Q. -- to make it all work out?
9       Have you ever been questioned by anybody with
10  the FBI or the state troopers or any other kind of law
11  enforcement agency regarding these checks that were written to
12  the high school activities fund?
13   A. No, ma'am.
14   Q. No one has ever investigated you about this?
15   A. No.
16   Q. When was the first time that you saw these checks,
17  besides when they were presented to you and you cashed them
18  through the high school activities accounts?
19   A. Right now.
20   Q. And this is the first time anybody has ever talked to
21  you about it?
22   A. Uh-huh.
23   Q. It's your testimony that at the time of your
24  termination, during your grievance procedure, no one ever told
25  you that you were being terminated for running these pots

Page 51

1  through the high school activity account?
2    A. No. Even when I -- when I went to the grievance,
3  they didn't tell me.
4    Q. Has anyone, either at the school district or with a
5  governmental agency, ever mentioned anything to you about a
6  RICO violation or any type of money laundering?
7    A. No.
8    Q. No one has ever raised that with you?
9    A. No, ma'am.
10   Q. Don't believe no one has ever accused you of money
11  laundering or violating the RICO Act?
12   A. No.
13   Q. Today is the first day you have ever heard anything
14  like that?
15   A. RICO, no, never heard it.
16   Q. Or money laundering?
17   A. No. I had never heard.
18   Q. And when you said earlier that you knew it was
19  illegal to run these pots, why did you think it was illegal?
20  Because it's gambling?
21   A. Right.
22   Q. It's your testimony you never did it during school
23  hours?
24   A. Right.
25   Q. Did you have anything to do with the cafeteria, with

Page 52

1  their accounts --
2    A. No, ma'am.
3    Q. -- except to maybe make a deposit at the bank?
4    A. Right.
5    Q. Somebody at the business office gave you the deposit,
6  you would go run it to the bank?
7    A. Right.
8    Q. The decision at the grievance level you never
9  appealed, right?
10   A. No.
11   Q. Is that correct?
12   A. That's correct.
13   Q. You did your grievance but you never appealed it to
14  anyone; is that correct?
15   A. I didn't know I could.
16   Q. Have you ever filed anything with the -- any other
17  agency such as the, I don't know, the Education Agency or the
18  Equal Employment Opportunity, Texas Commission on Human Rights
19  Act, anything like that?
20   A. No, ma'am.
21   Q. Have you heard anything else from your wife or
22  anybody else about your termination? Since that one
23  conversation you had with your wife that she talked to the
24  superintendent and the superintendent told her he was being
25  pressured, have you had any other conversations with anyone

**Page 53**

1 else?
2 A. No, ma'am.
3 Q. You said your wife was on vacation at the time of the
4 grievance?
5 A. Right.
6 Q. How about after that, did she come back and say, you
7 know, I have talked to somebody and --
8 A. No.
9 Q. Did she advise you of any other conversations she had
10 with Dr. Cantu after that one that occurred a couple months
11 before July, 2000, regarding your termination?
12 A. I don't know either, but she told me about this other
13 incident at South Padre Island, it was a -- I don't know what
14 event it was that everyone gets together, board members and --
15 Q. You're talking about a seminar?
16 A. Yes. And she was there along with Alicia Martinez
17 and Dr. Cantu was telling her and Alicia, another board
18 member --
19 Q. Who was the other board member?
20 A. Alicia Martinez.
21 Q. Okay.
22 A. And Dr. Cantu told them at that time, too, about him
23 being pressured, that even Dr. Cantu's wife told my wife that
24 her husband couldn't sleep at night and --
25 Q. And you said you never had any problems with

**Page 54**

1 Dr. Cantu?
2 A. I never did.
3 Q. Or any complaints about Dr. Cantu?
4 A. Never.
5 Q. Is that right?
6 A. (Witness nodded affirmatively.)
7 Q. Do you know why these other board members would want
8 to have you terminated?
9 A. Because I was with the majority party.
10 Q. Did you campaign for your wife and these other boards
11 members?
12 A. Yes, ma'am.
13 Q. Did you ever have any conversations with Mr. Diaz or
14 Norma --
15 I forget got her last name.
16 A. Ramon.
17 Q. -- Ramon regarding your termination?
18 A. No, ma'am.
19 Q. Do you know if your wife ever had any conversations
20 with any of the other board members about your determination?
21 A. I wouldn't know.
22 Q. After you were terminated -- I mean you got the
23 letter on July 11th advising you that you were terminated, did
24 your wife ever go to Dr. Cantu and say, hey, what's this
25 about?

**Page 55**

1 A. I don't know, ma'am.
2 Q. This meeting you had at South Padre, or that your
3 wife had at South Padre Island, you didn't go to that?
4 A. Yes.
5 Q. You did go?
6 A. Yes. But I didn't hear the conversation.
7 Q. Okay.
8 A. I walked away, along with the other board member's
9 husband.
10 Q. Okay.
11 A. And we let them have their conversation.
12 Q. And you don't recall whether that occurred before or
13 after your termination?
14 A. Before.
15 Q. Do you know anything about Mr. Acosta's termination?
16 A. No, ma'am.
17 Q. Do you know about why he was terminated?
18 A. Something about his contract.
19 Q. I'll represent to you that I anticipate that
20 Dr. Cantu's testimony is going to be that the decision to
21 terminate you was based on your running these checks through
22 the high school activities account and conducting a gambling
23 pot and that he was not -- that he was -- while he was
24 pressured by the board members, that he did not take that into
25 consideration at the time that he terminated you.

**Page 56**

1 You disagree with that, I take it?
2 A. Yes, ma'am.
3 Q. You believe that it was just based wholly on his
4 being pressured; is that right?
5 A. Yes, ma'am.
6 Q. And that when he says that it was really because of
7 these gambling pools, that that's not true; is that correct?
8 A. Correct.
9 Q. And, again, in the event that you were offered your
10 job back at this time, you would not take it; is that correct?
11 A. Correct.
12 Q. You have never been investigated by any governmental
13 agency regarding this gambling pool?
14 A. No, ma'am.
15 Q. Are you still doing them?
16 A. No.
17 Q. When did you quit doing them?
18 A. About a year ago.
19 Q. Does that have to do with your employment with the
20 Immigration Department?
21 A. Yes, ma'am.
22 MS. NEALLY: That's all the questions I have.
23 Thank you very much, sir.
24 A. Okay.
25

**Page 57**

ERRATA SHEET / SIGNATURE PAGE

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| | | | |

1
2
3 ___  ___  _____
4 ___  ___  _____
5 ___  ___  _____
6 ___  ___  _____
7 ___  ___  _____
8 ___  ___  _____
9 ___  ___  _____
10 ___  ___  _____
11 ___  ___  _____

12    I, RIGO DE LA ROSA, have read the foregoing deposition and hereby affix my signature that same is true and correct,
13 except as noted above.

14    _____
15         RIGO DE LA ROSA

16 THE STATE OF TEXAS
    COUNTY OF HIDALGO
17

18    Before me, _____, on this day personally appeared RIGO DE LA ROSA, known to me to be the
19 person whose name is subscribed to the foregoing instrument and acknowledged to me that the said witness executed the same
20 for the purposes and consideration therein expressed.

21    Given under my hand and seal of office this _____ day of
   _____, 2002.
22

23    _____
24       Notary Public in and for The State of Texas
25

---

**Page 58**

CAUSE NO. 2002-07-2652-E

| SALVADOR ACOSTA and RIGO DE LA ROSA | X | IN THE DISTRICT COURT |
| Plaintiffs | X | |
| vs. | X | |
| | X | CAMERON COUNTY, TEXAS |
| SANTA MARIA INDEPENDENT SCHOOL DISTRICT and | X | |
| Employees, Agents and all those Acting in Concert or at their Discretion | X | |
| | X | |
| Defendants | X | 357TH JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
RIGO DE LA ROSA
DECEMBER 3, 2002

   I, THURMAN J. MOODY, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

   That the witness, RIGO DE LA ROSA, was duly sworn by the officer and that the transcript of the ORAL deposition is a true record of the testimony given by the witness;

   That the deposition transcript was submitted on December 23, 2002, to counsel for the witness for examination, signature, and return to Dorsey & Associates, 8318 Jones Maltsberger, Suite 112, San Antonio, Texas 78216, by January 13, 2003;

   That the amount of time used by each party at the deposition is as follows:
     Michael Pruneda - 0 hours 0 minutes
     Elizabeth G. Neally - 1 hour 8 minutes

   That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

   MICHAEL PRUNEDA
   THE PRUNEDA LAW FIRM, P.L.L.C.
   944 West Nolana, Suite B
   Post Office Box T
   Pharr, Texas 78577-1220
   ELIZABETH G. NEALLY

---

**Page 59**

ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78550

   I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

   Subscribed and sworn to by me on December 23, 2002.

   _____
   THURMAN J. MOODY, Texas CSR No. 2861
   Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

---

**Page 60**

CAUSE NO. 2002-07-2652-E

| SALVADOR ACOSTA and RIGO DE LA ROSA | X | IN THE DISTRICT COURT |
| Plaintiffs | X | |
| vs. | X | |
| | X | CAMERON COUNTY, TEXAS |
| SANTA MARIA INDEPENDENT SCHOOL DISTRICT and | X | |
| Employees, Agents and all those Acting in Concert or at their Discretion | X | |
| | X | |
| Defendants | X | 357TH JUDICIAL DISTRICT |

SUPPLEMENTAL CERTIFICATE UNDER TRCP 203
TO THE ORAL DEPOSITION OF
RIGO DE LA ROSA
DECEMBER 3, 2002

   The original deposition of RIGO DE LA ROSA taken on December 3, 2002, was ( ) was not ( ) returned to the deposition officer on January 13, 2003.

   If returned, the attached changes and signature page contains any changes and the reasons therefor;

   If returned, the original deposition was delivered to Elizabeth G. Neally, Custodial Attorney.

   That $_____ is the deposition officer's charges to Defendant for preparing the original deposition transcript and any copy of exhibits;

   That the deposition was delivered in accordance with Rule 203, TCRP, and that a copy of this certificate was served on all parties shown herein and filed with the clerk.

   Subscribed and Sworn to by me on _____, 2003.

   _____
   THURMAN J. MOODY, Texas CSR No. 2861
   Expiration Date: 12-31-03
Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

CAUSE NO. 2002-07-2652-E

| | |
|---|---|
| SALVADOR ACOSTA and | )( |
| RIGO DE LA ROSA | )( IN THE DISTRICT COURT |
| Plaintiffs | )( |
| vs. | )( |
| | )( CAMERON COUNTY, TEXAS |
| SANTA MARIA INDEPENDENT | )( |
| SCHOOL DISTRICT and | )( |
| Employees, Agents and all | )( |
| those Acting in Concert | )( |
| or at their Discretion | )( |
| | )( |
| Defendants | )( 357TH  JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
RIGO DE LA ROSA
DECEMBER 3, 2002

I, THURMAN J. MOODY, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, RIGO DE LA ROSA, was duly sworn by the officer and that the transcript of the ORAL deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on December 23, 2002, to counsel for the witness for examination, signature, and return to Dorsey & Associates, 8318 Jones Maltsberger, Suite 112, San Antonio, Texas 78216, by January 13, 2003;

That the amount of time used by each party at the deposition is as follows:
    Michael Pruneda - 0 hours 0 minutes
    Elizabeth G. Neally - 1 hour 8 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

    MICHAEL PRUNEDA
    THE PRUNEDA LAW FIRM, P.L.L.C.
    944 West Nolana, Suite B
    Post Office Box T
    Pharr, Texas 78577-1220
    ELIZABETH G. NEALLY

ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78550

      I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

      Subscribed and sworn to by me on December 23, 2002.

                                   
THURMAN J. MOODY, Texas CSR No. 2861
Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

CAUSE NO. 2002-07-2652-E

| SALVADOR ACOSTA and | )( IN THE DISTRICT COURT |
| RIGO DE LA ROSA | )( |
| Plaintiffs | )( |
| vs. | )( |
| | )( |
| SANTA MARIA INDEPENDENT | )( |
| SCHOOL DISTRICT and | )( CAMERON COUNTY, TEXAS |
| Employees, Agents and all | )( |
| those Acting in Concert | )( |
| or at their Discretion | )( |
| | )( |
| Defendants | )( 357TH  JUDICIAL DISTRICT |

SUPPLEMENTAL CERTIFICATE UNDER TRCP 203
TO THE ORAL DEPOSITION OF
RIGO DE LA ROSA
DECEMBER 3, 2002

The original deposition of RIGO DE LA ROSA taken on December 3, 2002, was (    ) was not ( ✓ ) returned to the deposition officer on January 13, 2003.

If returned, the attached changes and signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Elizabeth G. Neally, Custodial Attorney.

That $ 283.50 _____ is the deposition officer's charges to Defendant for preparing the original deposition transcript and any copy of exhibits;

That the deposition was delivered in accordance with Rule 203, TCRP, and that a copy of this certificate was served on all parties shown herein and filed with the clerk.

Subscribed and Sworn to by me on _____, 2003.

_____
THURMAN J. MOODY, Texas CSR No. 2861
Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

CAUSE NO. 2002-07-2652-E

SALVADOR ACOSTA and      )( IN THE DISTRICT COURT
RIGO DE LA ROSA          )(
        Plaintiffs        )(
    vs.                  )(
                         )(
SANTA MARIA INDEPENDENT  )(
SCHOOL DISTRICT and      )( CAMERON COUNTY, TEXAS
Employees, Agents and all)(
those Acting in Concert  )(
or at their Discretion   )(
                         )(
        Defendants        )( 357TH  JUDICIAL DISTRICT

SUPPLEMENTAL CERTIFICATE UNDER TRCP 203
TO THE ORAL DEPOSITION OF
RIGO DE LA ROSA
DECEMBER 3, 2002

The original deposition of RIGO DE LA ROSA taken on December 3, 2002, was (    ) was not ( ✓ ) returned to the deposition officer on January 13, 2003.

If returned, the attached changes and signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Elizabeth G. Neally, Custodial Attorney.

That $ 283.50  is the deposition officer's charges to Defendant for preparing the original deposition transcript and any copy of exhibits;

That the deposition was delivered in accordance with Rule 203, TCRP, and that a copy of this certificate was served on all parties shown herein and filed with the clerk.

Subscribed and Sworn to by me on _____, 2003.

_____
THURMAN J. MOODY, Texas CSR No. 2861
Expiration Date: 12-31-03

Dorsey & Associates
8318 Jones Maltsberger, Suite 112
San Antonio, Texas 78216
(210) 342-3393

---

DORSEY & ASSOCIATES

San Antonio  -  Corpus Christi  - McAllen  - Austin
(210) 342-3393  - (877) 919-3393 (Toll Free)  Fax (210) 342-6211